# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **WISCONSIN RIGHT TO LIFE POLITICAL ACTION COMMITTEE et al.,** | |
| *Plaintiffs,* | |
| *v.* | **Civil Action No. 3:09-cv-00764** |
| **MICHAEL BRENNAN et al.,** | |
| *Defendants.* | |

## BRIEF IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

Michael D. Dean
First Freedoms Foundation, Inc.
20975 Swenson Drive, Suite 125
Waukesha, WI 53186
Ph: 262/798-8046
Fax: 262/798-8045
*Local Counsel for Plaintiffs*

James Bopp Jr., Ind. #2838-84
Anita Y. Woudenberg, Ind. #25162-64
Sarah E. Troupis, Wis. #1061515
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Ph: 812/232-2434
Fax: 812/234-3685
*Lead Counsel for Plaintiffs*

**Table of Contents**

I.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.   Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      A.   Standards for Granting Summary Judgment. . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      B.   The Current State of Public Financing of Judicial Campaigns. . . . . . . . . . . . . . . 2

           1.   *Day, Daggett*, and *Davis*: The Foundational Cases on Public Financing
                of Judicial Campaigns. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

           2.   The Current State of Rescue Funds in Judicial Campaigns. . . . . . . . . . . 4

      C.   Plaintiffs Are Entitled to Summary Judgment Because There Is No Genuine
           Issue as to Any Material Fact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           1.   The Rescue Funds and Independent Expenditure Provisions of the
                IJB Burden First Amendment Rights. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

           2.   The Rescue Funds and Independent Expenditure Provisions of the
                IJB Must Satisfy Strict Scrutiny. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

           3.   Neither the Rescue Funds Provision Nor the Independent
                Expenditure Provision of the IJB Is Narrowly Tailored to Serve a
                Compelling Government Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

                a.   The Rescue Funds Provision of the IJB Is Not Narrowly
                     Tailored to Serve a Compelling Government Interest. . . . . . . . . 12

                b.   The Independent Expenditure Provision of the IJB Is Not
                     Narrowly Tailored to Serve a Compelling Government
                     Interest. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

           4.   The Independent Expenditure Provision of the IJB Is Vague and
                Overbroad. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                a.   The Independent Expenditure Provision of the IJB Is
                     Vague. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

                b.   The Independent Expenditure Provision of the IJB Is
                     Overbroad. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

D.    Plaintiffs Mitchell and Prosperity PAC Are Likely to Succeed on the Merits of Their Contribution Limit Challenge. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    1.  The Contribution Limits Fail Intermediate Scrutiny. . . . . . . . . . . . . . . . . . 18

    2.    The Contribution Limits Are Unconstitutional Under *Randall*. . . . . . . . 19

        a.    The Contribution Limits Disproportionately Burden Challengers. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        b.    The Contribution Limits of The IJB Are Not Adjusted For Inflation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

        c.    The Contribution Limits Lack A Special Justification. . . . . . . . 21

III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## Table of Authorities

*Cases*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Anderson v. Milwaukee County*, 433 F.3d 975 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Buckley v. Valeo*, 424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*California Prolife Council PAC v. Scully*, 989 F. Supp. 1282 (E.D. Cal. 1998) . . . . . . . . . . . . 19

*Citizens for Responsible Government State Political Action Committee*,
  236 F.3d 1174 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Citizens for Responsible Gov't v. Davidson*, 236 F.3d 1174 (10th Cir. 2000) . . . . . . . . . . . . . . 16

*Citizens United v. FEC*, 130 S. Ct. 876 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 22

*Commodity Trends Serv. v. Commodity Futures Trading Comm'n*,
  149 F.3d 679 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Daggett v. Commission on Governmental Ethics and Election Practices*,
  205 F.3d 445 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Day v. Holohan*, 34 F.3d 1356 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7-14

*Davis v. FEC*, 128 S. Ct. 2759 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3-5, 7-14, 22

*FEC v. National Conservative Political Action Committee*, 470 U.S. 480 (1985) . . . . . . . . . . . 12

*FEC v. National Right to Work Comm.*, 459 U.S. 197 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Ford v. Wilson*, 90 F.3d 245 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Green Party of Connecticut v. Garfield*, 648 F. Supp. 2d 298 (D. Conn. 2009) . . . . . . . . 4-5, 14

*McComish* v. *Bennett*, No. 09A-1163, 2010 WL 2265319 (June 8, 2010) . . . . . . . . . . . . . . . . . 6

*McComish v. Bennett*, No. 10-14165, 2010 WL 2595288 (9th Cir. May 21, 2010) . . . . . . . . . . 6

*McComish v. Brewer*, No. CV-08-1550, 2010 WL 2292213 (D. Ariz. Jan. 20, 2010) . . . . . . . 5-6

*McConnell v. FEC*, 540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Nixon v. Shrink Mo. Gov't. PAC*, 528 U.S. 377 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Randall v. Sorrell*, 548 U.S. 230 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18-22

*Stromberg v. People of the State of California*, 283 U.S. 359 (1931) . . . . . . . . . . . . . . . . . 6, n.2

### Constitutions, Statutes, and Rules

U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Wis. Stat. § 11.26(1)(am) and (2)(an) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Wis. Stat. § 11.513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 17

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

### Other Authorities

Press Release, Institute for Justice, *U.S. Supreme Court Prevents Arizona From Penalizing
    Free Speech During 2010 Election*, June 8, 2010. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

# I.  Introduction

Plaintiffs Wisconsin Right to Life PAC ("WRTL"), George Mitchell ("Mitchell"), and Wisconsin Center for Economic Prosperity PAC ("Prosperity PAC") (collectively "Plaintiffs") seek summary judgment on all counts of their Amended Verified Complaint. Defendants against whom summary judgment is now sought are the members of the Government Accountability Board ("GAB"), Dawn Marie Sass ("Sass"), and   John T. Chisholm ("Chisholm") (collectively "Defendants") who are responsible for implementing and enforcing the "Impartial Justice Bill" ("IJB" or "the Bill").

On May 1, 2010, the IJB went into effect in Wisconsin.  The IJB coerces participation in a public financing scheme for Wisconsin Supreme Court elections, through, among other things, providing "rescue funds" to candidates who are participating in the public financing scheme as soon as any opponent or opponents of the participating candidate reach or exceed a threshold spending amount—even if that threshold was reached not by the nonparticipating opponent, but by groups making independent expenditures on behalf of the nonparticipating candidate or against the participating candidate.

Further, the IJB implements contribution limits on Wisconsin Supreme court races that are unconstitutionally low and do not serve an anticorruption interest. These limits do not reflect the requirements the U.S. Supreme Court established for contribution limits over thirty years ago in *Buckley v. Valeo*, 424 U.S. 1 (1976), and has since affirmed and further explained in *Randall v. Sorrell*, 548 U.S. 230 (2006).

Plaintiffs now seek summary judgment on all counts of their Amended Verified Complaint.

## II.  Argument

### A.  Standards for Granting Summary Judgment.

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  This does not mean that there cannot be some dispute as to the facts: "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Further, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id*. at 248. A verified complaint is sufficient for an affidavit in support of summary judgment. *Ford v. Wilson*, 90 F.3d 245, 247 (7th Cir. 1996).

Here, there is no genuine issue as to any material fact that might affect the outcome of this dispute under the applicable law, and as fully developed below, Plaintiffs are entitled to summary judgment on all of their claims.

### B.  The Current State of Public Financing of Judicial Campaigns.

#### 1.  *Day, Daggett*, and *Davis*: The Foundational Cases on Public Financing of Judicial Campaigns.

Until recently, courts were divided over whether First Amendment rights are burdened by rescue funds provisions like those implemented in Wisconsin by the IJB.  However, the Supreme Court's recent decision in *Davis v. FEC*, 128 S.Ct. 2759 (2008), clarifies that a campaign financing scheme like that of the IJB is unconstitutional.  To see how the Supreme Court ultimately reached this determination, it is important to see what led to the Court's decision.

In *Day v. Holohan*, 34 F.3d 1356 (8th Cir. 1994), the Eighth Circuit struck down Minnesota's rescue funds provision on the grounds that making independent expenditures and contributions in support of a candidate that resulted in an equal contribution to that candidate's opponent improperly penalized First Amendment rights. The *Day* court reasoned that independent groups would be chilled from expending money opposing a candidate if they knew that doing so would result in a government funded contribution to that candidate's campaign.  *Id.* at 1356 ("[t]he knowledge that a candidate who one does not want to be elected will . . . receive a public subsidy equal to . . . the amount of the independent expenditure, as a direct result of that independent expenditure, chills the free exercise of that protected speech").  According to the reasoning of the *Day* court, the rescue funds provision turned independent expenditures over the trigger amount into de facto contributions to an opponent's campaign. The provision was therefore an impermissible restriction on First Amendment rights.

In contrast, in *Daggett v. Commission on Governmental Ethics and Election Practices*, 205 F.3d 445 (1st Cir. 2000), the First Circuit upheld the rescue funds provision of the Maine Clean Election Act against a First Amendment challenge.  The *Daggett* court rejected Day's analysis, arguing that the provision for rescue funds did not burden First Amendment rights. *Id.* at 464.  The *Daggett* decision was premised on the supposition that the rescue funds provision simply made it possible for certified candidates to reply to campaign speech.  *Id.* at 465 ("We cannot adopt the logic of *Day*, which equates responsive speech with an impairment to the initial speaker").

However, in 2008, the Supreme Court settled much of the split between the circuits on the issue of rescue funds with its decision in *Davis*.  The *Davis* case involved the so-called "Millionaire's Amendment" to the Bipartisan Campaign Reform Act ("BRCA").  Under the

Millionaire's Amendment of the BCRA, "when a candidate spends more than $350,000 in

personal funds and creates what the statute apparently regards as a financial imbalance, that

candidate's opponent may qualify to receive both larger individual contributions than would

otherwise be allowed and unlimited coordinated party expenditures." *Davis,* 128 S. Ct. at 2770.

The Court found that the Millionaire's Amendment "scheme impermissibly burdens [the] First

Amendment right to spend [one's] own money for campaign speech." *Id.* at 2771. The Court

reasoned that

> [w]hile BCRA does not impose a cap on a candidate's expenditure of personal funds,
> it imposes an unprecedented penalty on any candidate who robustly exercises that
> First Amendment right. [The Millionaire's Amendment] requires a candidate to
> choose between the First Amendment right to engage in unfettered political speech
> and subjection to discriminatory fundraising limitations.

*Id.* Nor was the Millionaire's Amendment constitutional because a candidate had made the

choice not to participate in the public fund scheme: "The resulting drag on First Amendment

rights is not constitutional simply because it attaches as a consequence of a statutorily imposed

choice." *Id.* at 2772.

## 2.     The Current State of Rescue Funds in Judicial Campaigns.

Since the decision in *Davis* and today, at least two cases have arisen that apply the

reasoning of *Davis* to rescue funds schemes. In one case, a court found that a rescue funds

scheme was unconstitutional in light of the *Davis* decision; litigation in the other case is

currently in the petition stage at the U.S. Supreme Court.

In *Green Party of Connecticut v. Garfield*, 648 F. Supp. 2d 298 (D. Conn. 2009), the

court dealt with Connecticut's campaign finance scheme, which included a rescue funds

provision. Connecticut's scheme provided rescue funds for individuals participating in public

funding when non-participating candidates reached an expenditure threshold. Relying on *Davis,*

-4-

the court explained its decision that these rescue funds provisions were unconstitutional:

> Although it is true that the campaign finance provision at issue in *Davis* was a discriminatory, asymmetrical contribution limit for candidates in the same race, and not a matching funds provision in a public financing scheme, the holding was founded on the same principle advanced by the plaintiffs in this case: that it is a substantial burden on the exercise of First Amendment rights to force a candidate to choose between engaging in his or her right to make personal campaign expenditures, which then confers a benefit on an opponent, or adhering to a self-imposed limit on campaign expenditures. Although the benefit to CEP-participating candidates is not the same—rather than having contribution limits increased as in *Davis*, the CEP releases additional public funding grants—the effect is the same. The non-participating opponent making excess expenditures or the non-candidate making independent expenditures must choose whether to forgo his or her additional spending on speech or see his or her opponent receive an additional infusion of public funding.

*Green Party of Conn. v. Garfield*, 648 F. Supp. 2d at 372.  The court emphasized the troubling First Amendment implications of Connecticut's rescue funds provisions for a non-participating candidate:

> Like the Millionaires' Amendment, there are no expenditure limits on the non-participating candidate or non-candidate's ability to expend funds.  But also, like the Millionaires' Amendment, 'it imposes an unprecedented penalty on any candidate who robustly exercises that First Amendment right [to self-finance his or her campaign]' because it requires the non-participating candidate and/or the non-candidate to choose between engaging in 'unfettered political speech' or self-limiting one's expenditures.

*Id.*

Shortly after the *Green Party* decision, the Arizona District Court considered a similar case and found that *Davis* applied to a rescue funds scheme and that such rescue funds scheme was therefore unconstitutional.  In *McComish v. Brewer*, No. CV-08-1550, 2010 WL 2292213 (D. Ariz. Jan. 20, 2010), the Court analyzed the rescue funds case before it under *Davis*: "Plaintiffs face a choice very similar to that faced in *Davis*: either 'abide by a limit on personal expenditures' or face potentially serious negative consequences. . . . Here, the negative

-5-

consequence is having one's opponent receive additional funds." *Id.* at *8.  The Arizona court

then quoted the *Green Party* case, and concluded that "If lifting a candidate's opponent's

fundraising limitations constitutes a 'substantial burden,' awarding funds to a candidate's

opponent must constitute a 'substantial burden' as well. " *Id*. at *8.  The Arizona court then

found that the rescue funds scheme in Arizona failed strict scrutiny, and entered summary

judgment for the plaintiffs in that case, and enjoined enforcement of Arizona's rescue funds

provisions. *Id.* at *13.  On May 21, 2010, the U.S. Court of Appeals for the Ninth Circuit

reversed the District Court's decision.  *McComish v. Bennett*, No. 10-14165, 2010 WL 2595288

(9th Cir. May 21, 2010).  However, shortly thereafter, on June 8, 2010, the Supreme Court

vacated the stay issued by the Ninth Circuit, pending timely filing and disposition of a petition

for a writ of certiorari.  *McComish* v. *Bennett*, No. 09A-1163, 2010 WL 2265319 (June 8, 2010).

Attorneys for plaintiffs in the *McComish* case have indicated they will soon be filing a petition

for a writ of certiorari.  Press Release, Institute for Justice, *U.S. Supreme Court Prevents Arizona

From Penalizing Free Speech During 2010 Election*, June 8, 2010.[1]

**C.  Plaintiffs Are Entitled to Summary Judgment Because There Is No Genuine Issue as to
     Any Material Fact.**

The First Amendment to the United States Constitution states, "Congress shall make no

law . . . abridging the freedom of speech." U.S. Const. amend. I.[2] The freedoms of speech and

---

[1] If nothing else, this Court should stay implementation of the IJB until after the Supreme Court's decision on this petition for a writ of certiorari.  The IJB, which was originally not going to go into effect until December 1, 2010, has now been in effect for two months, and, as far as Plaintiffs are aware, none of the rescue funds provisions at issue in this case have been used by any candidates for Wisconsin Supreme Court.

[2] The First Amendment is applicable to the states through the Fourteenth Amendment. *Stromberg v. People of the State of California*, 283 U.S. 359, 368 (1931).

association protected by the First Amendment have their "fullest and most urgent application precisely to the conduct of campaigns for political office." *Buckley*, 424 U.S. at 15 (citation omitted).

Under the First Amendment to the U.S. Constitution, and as enunciated in *Buckley*, *Davis*, and their progeny, a state public financing scheme for campaigns violates the right to free political speech where it goes beyond mere promotion of the voluntary use of public funding and improperly injects the state into the political process by attempting to equalize the relative financial resources of candidates—thereby coercing involuntary participation in public campaign financing by punishing and burdening those entities like WRTL, who intend to make independent expenditures over $1,000 supporting a nonparticipating candidate or opposing a participating candidate. *Day v. Holahan,* 34 F.3d 1356 (8th Cir. 1994); *see also Davis*, 128 S.Ct. at 2774 ("[T]he unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment").

To determine the constitutionality of both the rescue fund and independent expenditure provisions, this Court must determine three things: first, whether the provisions burden First Amendment rights; second, if the provisions do burden First Amendment rights, the proper level of scrutiny to apply; and third, whether the provisions meet the applicable level of scrutiny. Here, the IJB burdens First Amendment rights, and strict scrutiny should apply to both the rescue funds and independent expenditure provisions of the Bill.  Under strict scrutiny, the statute must be narrowly tailored to serve a compelling government interest.  Neither the rescue funds nor the independent expenditure schemes in the IJB meet this standard.

-7-

1.   **The Rescue Funds and Independent Expenditure Provisions of the IJB Burden First Amendment Rights.**

   The Court has long held that financial limitations on campaigns, such as the rescue funds provision and the independent expenditure provision of the IJB, are burdens on First Amendment rights.  *See Buckley*, 424 U.S. at 46 ("independent advocacy . . . does not presently appear to pose dangers of real or apparent corruption comparable to those identified with large campaign contributions");  *Davis,* 128 S. Ct. at 2770 ([T]he [Supreme] Court has recognized that such limits [on discrete and aggregate individual contributions and on coordinated party expenditure] implicate First Amendment interests…" and citing various Supreme Court cases). The rescue funds provision of the IJB impermissibly burdens Plaintiff's First Amendment rights by chilling and penalizing their speech, resulting in self-censorship at the cost of their First Amendment rights, and eclipsing their freedom of association.  And the reporting requirement of the IJB burdens First Amendment rights by coercing participation in the public funding program and penalizing nonparticipation and equalizing the financial resources of the candidates.

   Under the Constitution, and as articulated in *Buckley*, a state public financing scheme violates the right to free speech where it goes beyond mere promotion of voluntary use of public funding and improperly injects the state into the political process by attempting to equalize the relative financial resources of the candidates.  424 U.S. 1 (1976).  The rescue fund provides a direct, dollar-for-dollar public subsidy to participating candidates whenever an independent expenditure is made that either opposes that participating candidate or supports a nonparticipating candidate.  Therefore, an individual or group intending to contribute to a participating candidates' defeat becomes directly responsible for adding to his or her campaign. *Day*, 34 F.3d at 1360.  Consequently, the political speech of the individual or group who made

the independent expenditure "against" her is penalized by forcing the individual or group to choose between the right to engage in unfettered political speech and subjection to discriminatory fundraising. *Id.; Davis*, 128 S. Ct. at 2764.

In discussing limitations on usage of personal funds, the *Davis* Court noted that *any* limitations that have the effect of enabling an opponent to raise more money and use that money to counteract and diminish the effectiveness of a candidate's own speech imposes a substantial burden on the exercise of First Amendment rights. *Id.* at 2772. *See also Buckley*, 424 U.S. at 48-49 ("[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment."); *Day*, 34 F.3d at 1360 ("The knowledge that a candidate who one does not want to be elected will have her spending limits increased…as a direct result of that independent expenditure, chills free exercise of that protected speech.").

WRTL has stated that it will not make its expenditures to support a nonparticipating candidate or oppose a participating candidate as a result of its contribution triggering funds to an opponent. (Finding of Fact ¶ 29.)  Although not direct censorship, this leads to a practice of "self-censorship" by those who would normally give freely their time and money to campaigns and, consequently, results in indirect restrictions by the government on independent expenditures.  Furthermore, by giving a matching fund to an opponent, whom Plaintiffs' are advocating against, the rescue funds provision is essentially muting the voice of the Plaintiff by neutralizing the financial benefit they intended to give.  If they know their expenditure will merely trigger a matching donation to the opponent, there is no incentive to give, and therefore no incentive to publicly associate, with either candidate.

-9-

Additionally, by making a contribution or expenditure supporting a candidate, an individual is necessarily associating with that candidate.  Therefore, the rescue fund also implicates "protected associational freedoms" by encroaching on the ability of "like-minded persons to pool their resources in furtherance of common political goals." *Buckley,* 424 U.S. at 22 (per curiam).   By chilling WRTL's expenditures, the rescue funds provision abridges its right to associate.  This chilling effect on political speech is a severe burden on WRTL's First Amendment freedom of speech.  *See Day*, 34 F.3d at 1360.

The IJB's reporting requirements also substantially burden WRTL's' First Amendment rights.  The reporting requirement is a tool to help the state implement the rescue funds provision, which has a penalizing effect on nonparticipating candidates. If an individual participates, she will not be subject to the burdensome reporting requirements. This benefits not only the candidate, but his or her supporters as well, as they will not have to face ramifications of having their personal information disseminated.  But if a candidate chooses not to participate, the reporting requirement has a negative effect on both that candidate and her supporter's freedom of association.  As stated in *Davis*, "[c]ompelled disclosure, in itself, can seriously infringe on privacy of association and belief guaranteed by the First Amendment." *Davis*, 128 S. Ct. at 2765 (*quoting Buckley*, 424 U.S. at 64).  Disclosures in any form are a burden on speech.

The additional reporting required under the rescue funds provision renders that burden particularly substantial. The Tenth Circuit has held that a 24-hour notice requirement after "obligating funds" for an expenditure was "patently unreasonable" and "severely burden[ed] First Amendment rights." *Citizens for Responsible Government State Political Action Committee*, 236 F.3d 1174, 1197 (10th Cir. 2000). Likewise here, a 24- hour requirement for all obligations and expenditures during the final six weeks of an election cycle is patently

-10-

unreasonable and burdensome.  Individuals and groups are required to expend their time and resources filing out reports that risk disclosing any political strategy they may have and that subject them to sanctions if they fail to properly do so. The effect is a severe chill of speech and association during the most important weeks of the electoral process—those immediately preceding an election. The independent expenditures provision, like that of the rescue funds, imposes substantial burdens on speech.

   **2.   The Rescue Funds and Independent Expenditure Provisions of the IJB Must Satisfy Strict Scrutiny.**

   Having made a determination on whether the rescue funds and independent expenditure provisions of the IJB burden First Amendment rights, the Court must next determine what level of scrutiny must be applied to those provisions, so that a proper analysis of their constitutionality may be made.

   Both rescue funds and independent expenditure provisions, such as those of the Impartial Justice Bill, impose a substantial burden upon the core freedoms protected by the First Amendment. *Davis*, 128 S. Ct. at 2774-75.  Such provisions "cannot stand unless they are 'closely drawn' to serve a 'sufficiently important interest,' . . . ." *Id*. at 2770.  Put in more traditional terms, this test is the exacting scrutiny/strict scrutiny initially outlined in *Buckley*, which requires that the independent expenditure provisions must be narrowly tailored and "justified by a compelling state interest."  *Id*. at 2772; *see also Buckley*, 424 U.S. 1, 64 (1976).

**3. Neither the Rescue Funds Provision Nor the Independent Expenditure Provision of the IJB Is Narrowly Tailored to Serve a Compelling Government Interest.**

**a. The Rescue Funds Provision of the IJB Is Not Narrowly Tailored to Serve a Compelling Government Interest.**

Since *Buckley*, there has been only one legitimate compelling state interest for restricting campaign finance: the interest in preventing corruption or the appearance of corruption. *See FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 496-97 (1985) ("The corruption-related interest cited by the *Buckley* Court remains "the only legitimate and compelling government interest [] thus far identified for restricting campaign finances"); *see also Davis*, 128 S. Ct. at 2771 (reaffirming *Buckley*'s argument that an expenditure cap cannot be justified on grounds of equalizing the relative financial resources of candidates competing for government office). Thus, the only compelling government interest that the State can use to justify infringing First Amendment rights through the IJB is if the provisions of the Bill deal with corruption or the appearance of corruption.

The State must therefore advance an argument as to why the rescue funds provisions of the IJB advance the government's interest in preventing corruption or the appearance of corruption. However, the State can advance no such argument; indeed, to do so would be foolish, as neither Plaintiffs nor the State is aware of any allegations of corruption or the appearance of corruption in races for the State Supreme Court since the original implementation of Wisconsin's campaign financing scheme.[3] (Finding of Fact ¶¶ 18-19.)

_____

[3] One purpose for the IJB is to equalize campaigns. (Finding of Fact ¶¶ 16-17.) However, the Supreme Court has been unequivocal in its statements that such attempts to equalize the amounts of money spent by candidates are not compelling government interests in the realm of campaign finance. *Davis*, 128 S.Ct. at 2773 ("Our prior decisions provide no support for the proposition that [asymmetrical limits are] a legitimate government objective"); id. ("The argument that a candidate's speech may be restricted in order to 'level electoral opportunities' has ominous implications . . . ."); *Buckley*, 424 U.S. at 48-49 ("[T]he concept that government may restrict the speech of some

Even if such a corruption interest existed in Wisconsin, the rescue funds provisions of the IJB would not address this corruption. While a public funding scheme in general might serve a corruption interest, *see Buckley,* 424 U.S. at 57, the rescue funds provision of the Bill merely provides funds for candidates participating in such public funding. Moreover, any corruption interest addressed would be resolved only as to those participating in the rescue fund scheme: candidates not participating in the public funding scheme are not subject to the rescue funds provision and consequently any corruption concerns regarding them are woefully overlooked. This renders the rescue funds provision underinclusive.

WRTL faces imminent injury to their First Amendment rights to free political speech and free association as a direct result of this statutory scheme. The state's payment of rescue funds—which, unlike an independent expenditure, is directly controlled by the participating candidate—neutralizes the voice of the group when it makes an independent expenditure. The knowledge that making an independent expenditure that opposes a government-funded candidate will directly result in that candidate receiving a dollar-for-dollar matching public subsidy (with no effect on that candidate's spending limit) creates a chilling effect on WRTL's free exercise of protected speech, and imposes a climate of self-censorship on speech that is inimical to our American heritage of unfettered political discourse. In so doing, the statute also encroaches upon the ability of like-minded persons to pool their resources in furtherance of common political goals in violation of WRTL's right to freedom of association. *See Day*, 34 F.3d at 1360.

This chill on the First Amendment exists long before the trigger threshold is reached,

---

elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment").

Similarly, the Supreme Court has indicated that the State's interest in effectuating the trigger provision is not a sufficiently compelling interest to justify restriction of First Amendment rights. *Davis v. FEC,* 128 S. Ct. at 2775.

because of the aggregation of funds brought about through the independent expenditure provisions of the IJB.  The Court in *Green Party of Connecticut v. Garfield* recognized this exact problem: "Because the independent expenditure provision contemplates aggregating the campaign expenditures of all non-participating candidates with any independent expenditure by a non-candidate individual or advocacy group, there is no minimum amount of money that a non-participating minor party candidate must expend in order to trigger matching funds for participating candidates."  648 F. Supp. 2d at 368.

A further problem with this scheme is quickly illustrated by examining the potential effect of having three individuals participating in a judicial race.  Candidate A and Candidate B are not participating in the public financing scheme; Candidate C is participating.  Even if neither Candidate A nor Candidate B intend to spend enough to pass the rescue fund threshold, and even if those wishing to make independent expenditures related to Candidate A and Candidate B are attentive to keeping each individual candidate from crossing the threshold, their combined expenditures may well cause the threshold to be crossed, and have Candidate C receive rescue funds.  One can even see how this situation would allow the publicly financed candidate to spend *more* than the non-participating candidates, particularly if the threshold is crossed late in the campaign and the non-participating candidates do not realize that their aggregated spending has surpassed the threshold amount.  The same is true in the instance of a non-candidate organization, such as WRTL, whose concern about triggering funds to a candidate's opponent causes them to not make their own expenditures, even though such expenditures are presumptively not corrupting. *See Davis,* 128 S. Ct. at 2771 (*quoting Buckley,* 424 U.S. at 52-53).  Such an effect does little to minimize corruption or its appearance while significantly burdening those who desire to make their own expenditures during the campaign.

-14-

**b. The Independent Expenditure Provision of the IJB Is Not Narrowly Tailored to Serve a Compelling Government Interest.[4]**

As set forth above, since *Buckley*, there has been only one legitimate compelling state interest for restricting campaign finances: the interest in preventing corruption or the appearance of corruption. *See supra* Part III.3.a. As with rescue funds, the only compelling government interest that the State can have for the independent expenditure provisions included in the IJB is that such provisions be narrowly tailored to address corruption or its appearance. *Id.*

Wis. Stat. § 11.513 requires a person who makes an independent expenditure of $1000 or more "with respect to" a candidate to file notice of the expenditure to the State. (Finding of Fact ¶ 21.) That report must be filed on the fifteenth or last day of the month following the expenditure.[5] (*Id.*) If the expenditure is made within six weeks of the election, it must be reported within 24 hours of being made. (*Id.*) These reports are required for each separate expenditure of $1000 or more, and apply not just to actual expenditures, but any "obligated" expenditure, which is an expenditure that has not yet been made and may never actually be made. (*Id.*)

---

[4] If this Court determines that the rescue funds provision of the IJB is unconstitutional, it need not reach the question of whether the independent expenditure reporting requirements are also unconstitutional. The independent expenditure reporting requirements are only necessary to effectuate the rescue funds scheme; thus, if the rescue funds scheme is unconstitutional, the independent expenditure provision is likewise unconstitutional.

[5] In effect, those who make independent expenditures must be extremely careful to note the day that the expenditure was made. Although an expender may have approximately two weeks to report an expenditure if the expenditure is made on the first or sixteenth of the month, if the expender makes that same expense on the fourteenth or thirtieth, the expenditure must be reported within 24 hours.

Such a quick turnaround for reporting is constitutionally problematic, as a quick turnaround does nothing to prevent corruption or the appearance thereof; it merely speeds up the time for reporting. Indeed, one could see how this could increase problems involving the appearance of corruption. If groups must report quickly and, in their haste to report, make mistakes, those mistakes could be viewed as corruption when, in reality, no corruption has occurred.

-15-

The independent expenditure provisions of the IJB do nothing to stop corruption or the appearance of corruption.  Nor does it deter who donates to elections, a fact fundamental to an anticorruption interest—it is groups or types of groups making significant donations to a campaign that trigger corruption concerns. Instead, the provisions merely provide that those who make independent expenditures must make multiple reports within certain time periods.[6] Without the prerequisite compelling interest, the independent expenditure provisions fails strict scrutiny.

Even with a compelling interest, the independent expenditure provisions' 24-hour reporting requirement is "patently unreasonable" and is not narrowly tailored. *See Citizens for Responsible Gov't v. Davidson*, 236 F.3d 1174, 1197 (10th Cir. 2000). Increasing the number or timing of reports during the final six weeks of a campaign for only one type of campaign in no way combats corruption beyond what Wisconsin's reporting requirements already do. More thorough reporting requirements, such as those requiring *better* reporting of independent expenditures—not merely *more* reports or reports that occur *more often*—would serve corruption more clearly. These reporting requirements are not tailored to combat corruption.

### 4.   The Independent Expenditure Provision of the IJB Is Vague and Overbroad.

####   a.   The Independent Expenditure Provision of the IJB Is Vague.

A law is void for vagueness "if it fails to give fair warning of what is prohibited, if it fails to provide explicit standards for the persons responsible for enforcement and thus creates a risk of discriminatory enforcement, and if its lack of clarity chills lawful behavior." *Anderson v. Milwaukee County*, 433 F.3d 975, 978 (7th Cir. 2006). Laws regulating First Amendment freedoms are closely examined to ensure they are precisely drafted.  *Buckley,* 424 U.S. at 40-41.

---

[6] Indeed, a provision that might be narrowly tailored to meet the compelling government interest in preventing corruption or the appearance thereof would address the "who" aspect of donations, by requiring better identification of those who are making independent expenditures.

The reporting requirement of Wis. Stat. § 11.513(1) requires nonprofit entities like WRTL to not only report actual expenditures but to report the possibility of such expenditures, or "obligations," without clearly articulating what constitutes such an obligation. (Finding of Fact ¶ 21.)  What rises to the level of an obligation for purposes of determining when to report and what is sanctionable effectuates either excessive, unnecessary reporting that risks disclosing political strategy, or a chill from making the expenditure at all.  Because of such vagueness, the reporting requirement unconstitutionally burdens the rights of free speech and free association guaranteed by the First Amendment.

### b.  The Independent Expenditure Provision of the IJB Is Overbroad.

An overbroad law is facially invalid if the impermissible applications of the law are substantial when compared to the law's legitimate application. *Commodity Trends Serv. v. Commodity Futures Trading Comm'n,* 149 F.3d 679, 688 n. 4 (7th Cir. 1998) (*quoting Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). As such, the overbreadth doctrine prevents a law from having a deterrent effect on protected speech. *Id.*

The reporting requirement of Wis. Stat. § 11.513(1) requires nonprofit entities like WRTL to not only report actual expenditures but to report the possibility of such an expenditure, even if the expenditure never actually takes place. (Finding of Fact ¶ 21.)  From its language, an "obligation" may be an expenditure that is obligated, but never actually expended.  However, because it must be reported upon its obligation, the "obligated" expense may trigger rescue funds, even if it is never an actual expenditure.

This requirement is also problematic in that it requires multiple reports of the same expenditure.  For example, a person is required to report an expenditure when it is "obligated." (*Id.*)  They must also file a report when that expenditure is actually made. (*Id.*)  Moreover, from

-17-

the language of the statute, it appears that during the last six weeks of an election cycle, *every* $1,000 must be separately reported; i.e., a group may spend $5,000 on a mailing, but instead of reporting this once, it would have to be reported five separate times.  (*Id.*)

By requiring these disclosures, the reporting requirement is overbroad, unconstitutionally burdening the rights of free speech and free association in violation of the First Amendment.

**D.  Plaintiffs Mitchell and Prosperity PAC Are Likely to Succeed on the Merits of Their Contribution Limit Challenge.**

**1.   The Contribution Limits Fail Intermediate Scrutiny.**

Wis. Stat. § 11.26(1)(am) and (2)(an) establish a $1,000 limit on all contributions to individuals running for a position on the Wisconsin Supreme Court. (Finding of Fact ¶¶ 22 & 23.)  The U.S. Supreme Court has previously stated that such contribution limits are subject to intermediate scrutiny; in other words, statutes that implement contribution limits must be "closely drawn" to a "sufficiently important interest," or else they abridge First Amendment freedoms.  *Randall*, 548 U.S. at 247; *McConnell v. FEC*, 540 U.S. 93, 231 (2003); *Buckley* 424 U.S. at 25.

Of the interests that have been proposed to the Court as justifying contribution limits, the only interest the Court has found sufficiently important is the interest in preventing corruption and the appearance of corruption associated with large contributions. *McConnell,* 540 U.S. at 138 ("large financial contributions" can lead to corruption and its appearance); *Nixon v. Shrink Mo. Gov't. PAC*, 528 U.S. 377, 393 (2000) (*"Shrink PAC"*); *FEC v. National Right to Work Comm.*, 459 U.S. 197, 198-199, and n. 1 (1982); *Buckley*, 424 U.S. at 26–27.  To establish this corruption interest, the contributions must be large enough to give rise to a legitimate suspicion of corruption, and there must be a bona fide "suspicion that [the] large contributions are

corrupt." *Shrink PAC*, 528 U.S. at 390-91. The only anti-corruption interest the United States Supreme Court has recognized is the interest in preventing quid-pro-quo corruption. *Citizens United v. FEC*, 130 S. Ct. 876, 901 (2010).

Any interest in preventing quid-pro-quo corruption is severely undermined by the variable limits imposed by the State. Contribution for all other statewide offices are $10,000. (Finding of Fact ¶¶ 22 & 23.) Contribution levels for other, non-statewide races are set higher than the contribution limits, with other judicial races set at $3,000 for court of appeals positions in districts with a county population exceeding 500,000; $2,500 for all other court of appeals positions; $3,000 for circuit courts in circuits with populations greater than 300,000; and $1,000 for all other circuit court positions. (*Id.*)  The same individuals and organizations are subject to variable limits, depending on to whom they wish to contribute. That a contribution to a Wisconsin Supreme Court justice is more corrupting than those to a court of appeals or circuit judge candidate—who hear significantly more cases—defies logic. And without any corruption interest to justify it, the contribution limits fail.  *See California Prolife Council PAC v. Scully*, 989 F. Supp. 1282, 1296 (E.D. Cal. 1998), *aff'd*, 164 F.3d 1189 (9th Cir. 1999) ("the adoption of the variable limits reflects a conclusion on the part of the voters that the [higher] limit suffices to address the issue of corruption even if it is not the lowest amount which would do so. That conclusion requires a finding that the lower limit is not closely drawn.").  Indeed, that the contribution limits are so much lower than other statewide, and to a lesser degree, judicial races suggests that promoting the rescue fund scheme, rather than preventing quid-pro-quo corruption, is the true  motivation for the lower limits. The contribution limits fail intermediate scrutiny.

-19-

### 2.  The Contribution Limits Are Unconstitutional Under *Randall*.

Although it upheld them in *Buckley*, the Supreme Court has acknowledged that contribution limits can be too low and can consequently "harm the electoral process."  *Randall*, 548 U.S. at 248.  To determine whether such a risk exists, the Court has looked at five key factors: **1)** whether the contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns, *id.* at 253-256; **2)** whether a political party and its affiliates must abide by the same contribution limits that apply to individual contributors, resulting in harm of the right to associate, *id.* at 256-259; **3)** whether it excludes the expenses that volunteers incur in the course of campaign activities, *id.* at 259-260; **4)** whether the limits are adjusted for inflation, *id.* at 261; and **5)** whether there is any special justification for the contribution limits, *id.* at 261.  If some of these risk factors exist or "there is a strong indication in a particular case . . . that such risks exist," courts must review the record carefully, focusing on whether the statute is proportionate, that is, whether the restrictions placed on First Amendment rights are in proportion to the harm such restrictions are averting.  *Id.* at 249.  The unjustifiably lower contribution ceiling, *see supra* Part III.D.1, combined with the *Randall* factors, make the contribution limits unconstitutional.

### a.  The Contribution Limits Disproportionately Burden Challengers.

Public funding schemes inherently benefit incumbents.  With significant resources already amassed—both financial and human—an incumbent can easily satisfy the preliminary requirements to qualify for public funding. Incumbents are also less likely to be burdened by the contribution limits, either because as a public funding participant, they need no contributions, or because they are already well-positioned.  In contrast, challengers must build their campaigns from the ground up.  Low contribution limits imposed on challengers who choose not to

-20-

participate or who are unable to qualify for participation only magnify the incumbent advantage public funding affords and impose a disproportionately greater burden on nonparticipating challengers.

### b.   The Contribution Limits of The IJB Are Not Adjusted For Inflation.

In *Randall*, the Supreme Court indicated that low contribution limits that fail to provide for adjustments reflecting inflation signaled constitutional trouble:

> A failure to index limits means that limits which are already suspiciously low will almost inevitably become too low over time. It means that future legislation will be necessary to stop that almost inevitable decline, and it thereby imposes the burden of preventing the decline upon incumbent legislators who may not diligently police the need for changes in limit levels to assure the adequate financing of electoral challenges.

548 U.S. at 261 (internal citations omitted). By failing to adjust for inflation, the contribution limits will restrict increasingly more speech and associational rights than its crafters deemed necessary to prevent corruption.  This failure imposes the type of direct harm to the election process the *Randall* court was concerned with and exacerbates the contribution limits' unconstitutional nature.

### c.   The Contribution Limits Lack A Special Justification.

The State might be able to overcome an unconstitutionally low contribution limit by demonstrating a "special" justification beyond that which is normally required to sustain contribution limits.  *Randall*, 548 U.S. at 261.  The contribution limits already fail to serve any quid-pro-quo corruption interest.  Plaintiffs know of no other "special" justification that might rectify the contribution limits' deficiencies.

Indeed, it appears that the only purpose for the lowered contribution limit for races for Supreme Court Justice is to coerce participation in Wisconsin's rescue fund scheme and penalize

those who do not.[7]  Such a purpose is not a constitutionally recognized justification. *See Citizens,* 130 U.S. at 909 (holding that the only constitutionally cognizable interest in restricting political speech is the anti-corruption interest); *Davis,* 128 S. Ct. at 2773 (declining to recognize any interest in equalizing the financial resources of candidates).  No special justification for the contribution limits exists.

### III. Conclusion

For the foregoing reasons this Court should grant summary judgment in favor of Plaintiffs on all counts in their Amended Verified Complaint. Plaintiffs believe that oral argument would be helpful to the Court in determining whether summary judgment is appropriate and therefore request oral argument.

Dated: July 9, 2010

Respectfully submitted,

 s/ Michael D. Dean

James Bopp Jr., Ind. #2838-84
Anita Y. Woudenberg, Ind. #25162-64
Sarah E. Troupis, Wis. #1061515
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Ph: 812/232-2434
Fax: 812/234-3685
*Lead Counsel for Plaintiffs*

Michael D. Dean
First Freedoms Foundation, Inc.
20975 Swenson Drive, Suite 125
Waukesha, WI 53186
Ph: 262/798-8046
Fax: 262/798-8045
*Local Counsel for Plaintiffs*

---

[7] The rescue funds scheme applies only to races for Supreme Court Justice, though there is no evidence that such races are or appear to be more corrupt than any other races—judicial or otherwise—in Wisconsin.