IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WISCONSIN RIGHT TO LIFE POLITICAL
ACTION COMMITTEE, et al.,

       Plaintiffs,

  v.                                            Case No. 09-C-764

MICHAEL BRENNAN, et al.,

       Defendants.

DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR JUDGMENT ON THE PLEADINGS

INTRODUCTION

This is a civil action seeking declaratory and injunctive relief invalidating and enjoining enforcement of certain portions of 2009 Wisconsin Act 89, also known as the Impartial Justice Act ("the Act"), which establishes a new system of public financing of election campaigns for the office of Wisconsin Supreme Court Justice. The Amended Complaint includes six counts attacking the constitutionality of Wis. Stat. § 11.513(1) and (2) and § 11.26(1)(am) and (2)(an) on the ground that they allegedly violate the First and Fourteenth Amendments to the United States Constitution. The defendants are the six members of Wisconsin's Government Accountability Board ("G.A.B."), the Wisconsin State Treasurer, and the District Attorneys of Milwaukee County and Waukesha County. Defendants have moved for a judgment on the pleadings on all claims, pursuant to Fed. R. Civ. P. 12(c), on the ground that the Amended Complaint fails to state a claim upon which relief can be granted.

BACKGROUND

Independence and impartiality are cornerstones of an effective judiciary in a democracy. The concern for promoting and protecting these values dates back at least to our nation's founding, when Alexander Hamilton wrote that "the complete independence of the courts of justice is peculiarly essential in a limited Constitution." *The Federalist No. 78* at 466 (Clinton Rossiter ed., 1961). The United States Constitution seeks to ensure the independence and impartiality of the federal judiciary in part by giving to the President and the Senate the powers to nominate and confirm federal judges and by granting those judges life tenure during good behavior. *See* U.S. Const. art. II, § 2 and art. III, § 1.

In the early and mid 19th century, however, the framers of many state constitutions were concerned about the potential threats to judicial independence posed by the pursuit of appointive office. Accordingly, between 1846 and 1860, numerous states, including Wisconsin, provided in their constitutions for popular election of judges. *See* Kermit L. Hall, *The Judiciary on Trial: State Constitutional Reform and the Rise of an Elected Judiciary, 1846-1860*, 45 THE HISTORIAN 337 (1983); Wis. Const. art. VII, §§ 4 and 7. Proponents of popular election saw that practice as enhancing, rather than diminishing, the independence of the judicial branch of government. *Id.* at 343-45 and 349-50. In their view, the appointment of judges by governors or legislatures had led to the distribution of judgeships based on political service, rather than legal skill or judicial temperament. *Id.* at 347. That practice, they believed, was itself dangerous to judicial independence because it denied the judiciary its own claim to direct support from the sovereign people. *Id.* at 350. The elective system was thus meant to insulate the judiciary from the control of the other branches of government by providing for direct popular support of judges. Caleb Nelson, *A Re-Evaluation of Scholarly Explanations for the Rise of the Elective Judiciary*

*in Antebellum America*, 37 AMERICAN JOURNAL OF LEGAL HISTORY 190, 205-06 (1993).  This

view of the purpose of judicial elections was articulated in the constitutional debates in Wisconsin.

*See Wagner v. Milwaukee County Election Com'n*, 2003 WI 103, ¶ 26, 263 Wis. 2d 709, 666

N.W.2d 816 (quoting Milo Quaife, *The Convention of 1846* (1919) at 287-88).

Judicial elections are thus different than elections for legislators and executive officials.

Members of those "political" branches of government are expected to be representative of and

responsive to the interests of their electoral constituencies, whereas judges—even when popularly

elected—are not representative officials, but rather are expected to be impartial and independent

in applying the rule of law.  Accordingly, states with judicial elections have addressed the fear that

the sway of popular politics might itself endanger the independence of the judiciary by establishing

constitutional devices designed to insulate elected judges from excessive political influence by, for

example, providing for district rather than state-wide elections for lower courts, giving judges

fixed terms of office during good behavior and longer terms for higher courts, and making elected

judges ineligible for other offices during the term for which they were elected.  Hall, *The*

*Judiciary on Trial*, 45 THE HISTORIAN at 352; *see also, e.g.,* Wis. Const. art. VII, §§ 1, 6-7,

and 10; *Wagner*, 263 Wis. 2d 709, ¶¶ 27-28.

In addition to such insulating mechanisms, Wisconsin has enacted a voluntary public

financing program for its Supreme Court elections that protects the independence and integrity of

the state's highest judges by regulating their campaign financing within constitutionally

permissible limits and by facilitating their political speech, thereby furthering First Amendment

values.  The Act establishes a "Democracy Trust Fund" ("the Fund") for public financing of such

campaigns.  *See* Wis. Stat. § 25.421.  The Fund receives money first from voluntary taxpaying

contributors, using the "check-off" box on Wisconsin income tax returns, and second, from

general state revenues if there is a shortfall in the amount of funds necessary to cover the public financing obligations contemplated in the Act. Wis. Stat. § 20.855(4)(ba) and (bb).  Primary responsibilities for administering the Fund and related requirements have been delegated to the state treasurer and the G.A.B.  *See* Wis. Stat. §§ 11.515-11.516.

This public funding program provides a comprehensive scheme that allows Wisconsin's Supreme Court candidates to voluntarily accept strict limitations on private fund-raising and campaign spending in exchange for public financing of their campaigns.  Candidates are free to choose whether to participate in the public funding program or to conduct privately financed campaigns.  Those who choose public funding must agree to comply with the requirements of the Act.  Wis. Stat. § 11.51(1).  Candidates who desire to participate in the Fund must file an application with the G.A.B. and, during an initial qualifying period, collect qualifying contributions of $5 to $100 each from at least 1,000 contributors in an aggregate amount of $5,000 to $15,000. *See* Wis. Stat. §§ 11.501(16); 11.502(2).   In addition, during an initial exploratory period and the qualifying period, participating candidates also may receive contributions of up to $100 and may contribute up to $5,000 of personal funds to their campaigns as "seed money."  *See* Wis. Stat. §§ 11.501(17) and 11.507.

Upon certification by the G.A.B., a candidate becomes eligible to receive public grants from the Fund.  *See* Wis. Stat. § 11.502.  Once the exploratory and qualifying periods have ended, a participating candidate may not receive any further private contributions.  *See* Wis. Stat. § 11.506(1) ("An eligible candidate may not accept private contributions other than seed money contributions and qualifying contributions . . .").   In addition, campaign spending by a participating candidate is limited to the total amount of the public financing received by that

candidate plus the total qualifying and seed money contributions received by the candidate.  Wis. Stat. §§ 11.517(1) and 11.518(1).

Public funding levels under the Act are carefully tailored to make public financing a viable alternative to private fundraising, without setting the grants so high that public funds would be wasted or public financing would become the only practical option.  Upon certification that a candidate has qualified, a portion of the total available public funding amount is provided to the candidate in the form of an initial grant of $100,000 for the primary election and $300,000 for the general election.  *See* Wis. Stat. §§ 11.51(2) and 11.511(2)-(3).  If there is no primary for the office of Justice in a given year, then no candidate is eligible to receive public funding for the primary period.  *See* Wis. Stat. § 11.511(4).

In addition to these initial grants, the Act requires the state treasurer to provide the participating candidate additional matching public funds, up to a total of three times the initial grant, when:  (1) a privately-funded opponent's expenditures exceed 5% above the initial public grant (*i.e.*, $105,000/$315,000); or (2) aggregate independent expenditures against the participating candidate exceed 120% of the initial public grant (*i.e.*, $120,000/$360,000).  Wis. Stat. §§ 11.512 and 11.513.  A participating candidate does not, however, receive any matching funds if opposition spending does not exceed one of the trigger amounts.  The matching funds protect a participating candidate from being in a position in which a non-participating opponent or independent spender could derive a tactical competitive advantage by increasing spending above the participating candidate's spending limit, so as to engage in campaign speech that the participating opponent would be powerless to answer.  By thus giving participating candidates greater assurance that they will have enough funds to run viable campaigns in the most competitive races, the matching funds provide an incentive for participation in the public funding

program, thereby reducing the potential for electoral corruption and increasing the amount of speech in Supreme Court races.

In order to facilitate administration of the matching fund provisions, help combat actual and apparent corruption, and provide information to the public, the Act also contains reporting requirements for participating candidates, non-participating candidates, and independent spenders. Any non-participating candidate who receives contributions or makes (or becomes obligated to make) expenditures exceeding the matching fund threshold must file a report with the G.A.B. itemizing all contributions and disbursements. Any non-participating candidate who has been required to file such a report must also file additional reports after each additional $1,000 of contributions received or expenditures made (or obligated). If reportable events occur more than six weeks prior to the primary, then the reports shall be made at the next regular reporting interval under Wis. Stat. § 11.506. If the reportable events occur later than that, then the reports must be made within 24 hours after the contribution or expenditure. Wis. Stat. § 11.512(1).

Similarly, any person who makes (or becomes obligated to make) an independent expenditure in excess of $1,000 with respect to a candidate for the office of Justice must file a report thereof with the G.A.B. The report must be filed on the 15th or last day of the month immediately following the expenditure, whichever is earlier. If the reportable event occurs within six weeks of a primary or general election, then the person must file the report within 24 hours. Any person who has been required to file such a report must file an additional report after each additional $1,000 of expenditures are made (or obligated). Wis. Stat. § 11.513(1).

Because the above reporting requirements relate to implementing the matching funds, they do not apply to participating candidates whose expenditures do not trigger such funds. Conversely, however, because participating candidates may not receive any private contributions

after the qualifying period, the Act does impose on them special record keeping and reporting requirements related to qualifying and seed money contributions which do not apply to privately funded candidates. *See* Wis. Stat. § 11.506(2)-(5).  In addition, outside the scope of the Act, the general registration and reporting requirements of Wis. Stat. §§ 11.05 and 11.06 are applicable to all candidates, including participating candidates and their committees.  Moreover, the independent expenditure reporting requirements of Wis. Stat. § 11.513(1) apply to any person or committee making an independent expenditure on behalf of a participating candidate, as well as on behalf of a non-participating candidate.

If a candidate does not accept public funding, he or she is limited to receiving no more than $1,000 in campaign contributions from each individual or political committee other than a political party committee or legislative campaign committee. Wis. Stat. § 11.26(1)(am), § 11.26(2)(an). This contribution limit does not apply to participating candidates because they are already subject to the much more restrictive limitations related to seed money and qualifying contributions.

## APPLICABLE LEGAL STANDARD

At any time after the pleadings close and before trial commences, a party may move for judgment on the pleadings under Fed. R. Civ. P. 12(c).  In determining such a motion, the Court may consider any of the pleadings, including, the complaint, the answer, and any written instruments attached to them.  *See* Fed. R. Civ. P. 10(c) (copy of instrument attached as exhibit is part of pleading for all purposes).  The legal standard for determining a motion under Rule 12(c) is the same as for a motion under Rule 12(b)(6).  That is, the Court must accept as true the allegations of the non-moving party, view the facts in the light most favorable to the non-moving

party, and draw all inferences in favor of the non-moving party.  *See GATX Leasing Corp. v. National Union Fire Ins. Co.*, 64 F.3d 1112, 1114 (7th Cir. 1995).  A motion for judgment on the pleadings thus "must be sustained by the undisputed facts appearing in all the pleadings" and "[a]ny allegations of the moving party which are denied must be taken as false."  *Brinich v. Reading Co.*, 9 F.R.D. 420, 422 (E.D. Pa. 1949) (*citing Art Metal Construction Co. v. Lehigh Structural Steel Co.*, 116 F.2d 57 (3d Cir. 1940).  The Court also is not obliged to assign any weight to unsupported conclusions of law in the complaint.  *Northern Indiana Gun & Outdoor v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998).  Judgment on the pleadings should be granted if the moving party is entitled to judgment as a matter of law.  *Burns Intern. Sec. Services v. Intern. Union UPGWA*, 47 F.3d 14, 16 (2d Cir. 1994); *see also GATX*, 64 F.3d at 1114.

## ARGUMENT

The fundamental issue in this case is whether a state, for the purpose of protecting the real and perceived integrity and impartiality of its highest court, may establish a voluntary public funding program for elections to that court and provide reasonable incentives for participation in that program.  The crux of plaintiffs' case is that the incentives built into Wisconsin's new public funding system for Supreme Court candidates impermissibly chill political speech by deterring the supporters of non-participating candidates from spending money either in support of the non-participating candidate or in opposition to the participating candidate.  An examination of the Act, however, makes it clear, as a matter of law, that the challenged incentives actually promote, rather than deter, free speech and thus do not impose any burden at all on First Amendment values.

I.   COUNT 4 OF THE AMENDED COMPLAINT FAILS BECAUSE MATCHING FUND PROVISIONS THAT ARE PART OF A PUBLIC FUNDING PROGRAM PROMOTE, RATHER THAN RESTRICT, SPEECH AND THUS CREATE NO FIRST AMENDMENT BURDEN.

Central to the logic of plaintiffs' case is Count 4 of the Amended Complaint, which challenges the constitutionality of the Act's independent expenditure matching fund provision, Wis. Stat. § 11.513(2).  That provision requires the state treasurer to provide a candidate who participates in the public funding system with a grant of matching public funds, up to a total of three times the initial public funding grant, when aggregate independent expenditures against the participating candidate exceed 120% of the initial public grant.   Wis. Stat. §§ 11.513(2). According to plaintiffs, this provision creates an unconstitutional chilling effect on the political speech of those who oppose the participating candidate by causing them to limit their own independent expenditures in order to avoid triggering the payment of matching funds to the candidate whom they oppose.  *See* Amended Complaint, ¶ 45.

Plaintiffs derive their theory of constitutional harm from *Davis v. FEC*, ___ U.S. ___, 128 S. Ct. 2759 (2008), in which the United State Supreme Court invalidated a provision of federal law that raised the contribution and coordinated party expenditure limits of a candidate when that candidate's opponent spent more than a threshold amount of his personal funds on his campaign.  Plaintiffs appear to infer from this that the First Amendment prohibits any legislative mechanism that triggers the granting of a benefit to a candidate on the amount of political spending by a person or entity opposed to the candidate.  That inference, however, is incorrect. For the provision at issue in *Davis* affected the competitive balance between two privately funded candidates by imposing asymmetrical *restrictions* on the amount of money that one of those candidates could raise for his campaign.  The matching fund provision at issue here, in contrast,

involves a public campaign funding system of a type that was not before the Court in *Davis*.  In this public funding context, a triggered matching fund provision like that in Wis. Stat. § 11.513(2) does not *restrict* the amount of money that anyone can raise or spend on political speech, but rather *promotes* speech through a public subsidy, thereby furthering, rather than infringing, First Amendment values.  Plaintiffs' claim in Count 4 thus fails because their *Davis*-based theory of constitutional injury does not apply under the distinct circumstances of the present case.

> A.   The *Davis* theory of constitutional injury does not apply in the context of voluntary public funding.

The provision at issue in *Davis* differed significantly from the provisions challenged here. *Davis* did not concern public financing or matching funds, but rather involved a unique provision of federal law that introduced unequal treatment into the otherwise even-handed regulation of *privately* funded candidates.  The provision in question was the "Millionaire's Amendment" of the federal Bipartisan Campaign Reform Act ("BCRA"), which raised the contribution and coordinated party expenditure limits of a candidate when that candidate's opponent indicated an intent to spend more than $350,000 of his personal funds on his campaign.  *Davis*, 128 S. Ct. at 2765-66.  Both candidates in *Davis* were initially subject to mandatory limits on private fundraising which became asymmetrical when one candidate announced an intention to spend personal funds above the specified threshold.  *Id.*  The self-financed candidate's fundraising efforts thereafter remained subject to the ordinary limits on contributions and coordinated party spending, but his opponent was freed from those limits and could receive contributions up to three times the ordinary limit and take advantage of unlimited coordinated party spending.  *Id.* at 2766 (*citing* BCRA § 319(a), 2 U.S.C. § 441a-1(a)).

The Court found this provision to be "unprecedented," because it applied "asymmetrical" and "discriminatory" fundraising limits to otherwise similarly situated candidates, both of whom were competing to raise private funds, and thereby created an advantage under the law for one candidate over his similarly situated opponent. *See id.* at 2770-73. This discriminatory treatment arose in the context of federal congressional elections where "[u]nder the usual circumstances, the same restrictions apply to all the competitors for a seat . . ." *Id.* at 2765. That baseline is key and distinguishes the congressional campaign financing system at issue in *Davis* from the kind of public funding system at issue here.

In congressional campaigns, all candidates are subject to the same contribution limits, *see* 2 U.S.C. § 441a(a)(1), and the same disclosure requirements, *see* 2 U.S.C. § 434. Congressional candidates are not eligible to receive the public funding that is available to candidates for President, *see* 2 U.S.C. § 441a(b), 26 U.S.C. § 9001 *et seq.*, nor is there any alternative to the system of private fundraising. In short, all congressional candidates like those at issue in *Davis* are similarly situated from a regulatory perspective. The Millionaire's Amendment, however, replaced the normal rule in congressional elections with a "new, asymmetrical regulatory scheme." *Davis*, 128 S. Ct. at 2766. Because that provision subjected otherwise similarly-situated candidates to discriminatory fundraising limits based on one candidate's choice to spend personal funds, the Court concluded that the law resulted in an "unprecedented penalty" that burdened speech rights and was unsupported by any compelling interest. *Id.* at 2771. It was thus the "different contribution and coordinated party expenditure limits on candidates vying for the same seat" that, in the Court's eyes, were "antithetical to the First Amendment." *Id.* at 2774.

In contrast, the public funding system at issue here does not include such a system of discriminatory fundraising limits. Instead, the Act offers all candidates a choice between two

entirely different packages of regulatory benefits and burdens.  A candidate can either elect to participate in public funding and accept spending limits and stringent fundraising restrictions or elect to finance her campaign through private contributions and be subject to no spending limits and less burdensome fundraising restrictions.  A candidate who chooses public funding receives certain benefits, including a "release from the rigors of fundraising, the assurance that contributors will not have an opportunity to seek special access, and the avoidance of any appearance of corruption." *Daggett v. Commission on Govern. Ethics and Elec.*, 205 F.3d 445, 471 (1st Cir. 2000).  However, as the Supreme Court noted in the seminal decision of *Buckley v. Valeo*, publicly funded candidates also "suffer a countervailing denial [because] acceptance of public financing entails voluntary acceptance of an expenditure ceiling." *Buckley v. Valeo*, 424 U.S. 1, 95 (1976).

Both the voluntary choice imposed by public funding systems and the resulting asymmetries were approved in *Buckley* and reaffirmed in *Davis*.  *See Buckley*, 424 U.S. at 97 (rejecting the argument that a public financing program is unconstitutional if "it does not treat all declared candidates the same"); *Davis*, 128 S. Ct. at 2772 ("Congress 'may engage in public financing of election campaigns and may condition acceptance of public funds on an agreement by the candidate to abide by specified expenditure limitations.'") (quoting *Buckley,* 424 U.S. at 57 n.65).  The purpose of the First Amendment is to "secure the widest possible dissemination of information from diverse and antagonistic sources," *Buckley*, 424 U.S. at 49 (citation and internal quotation marks omitted).   The Supreme Court has recognized that the voluntary choice underlying the public funding of campaigns furthers that purpose because it aims "not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people. .

- 12 -

. . .  [It] furthers, not abridges, pertinent First Amendment values." *Id.* at 92-93.  Because public funding furthers First Amendment values by promoting "uninhibited, robust, and wide-open public debate," *id.* at 93 n.127, *Buckley* did not apply heightened scrutiny to the presidential public funding system, even though the law conditioned participation on acceptance of spending limits. *See id.* at 57 n.65 and 85 n.107.

Public funding systems that include triggered matching fund provisions like Wis. Stat. § 11.513 operate according to the same speech-promoting principles recognized in *Buckley*—they do not burden speech, but rather enhance it by assuring participating candidates a sufficient public subsidy to allow them to run competitive campaigns without restricting the ability of non-participating candidates and their supporters to freely raise and spend money to advance their own views.  The difference between matching funds and the system upheld in Buckley lies simply in how the public subsidy amount is derived.  The system in Buckley provided a single grant in an amount based on expenditures made in prior elections.  Systems that include matching funds instead set a lower initial public subsidy and then provide additional grants only in the most competitive races by looking at expenditures made during the race.  Whether public funding stems from an initial grant or a triggered match, however, it enhances First Amendment values by increasing, rather than restricting, the amount of speech in the electoral marketplace of ideas.

*Davis* thus does not support a finding that Wis. Stat. § 11.513 imposes a burden on the speech rights of persons or entities such as the plaintiffs who support a non-participating candidate and/or oppose a participating candidate.  As already shown, the provision challenged in *Davis* directly restricted the speech of self-financing candidates, relative to their opponents, by subjecting them to lower fundraising limits.  *See Davis*, 128 S. Ct. at 2771-72.  *Davis* identified as antithetical to the First Amendment "the notion that the government has a legitimate interest in

*restricting the quantity of speech* to equalize the relative influence of speakers on elections." *Id.* at 2773 (emphasis added).   *Davis* did not, however, hold that it is impermissible for government to *increase the quantity of speech* through a public subsidy simply because that may result in raising the voice of a subsidized candidate relative to other voices.   Indeed, if such subsidies to increase speech were impermissible, the constitutionality of all public funding of elections would be thrown into question—an outcome that both *Buckley* and *Davis* rejected.   *See Buckley*, 424 U.S. at 85-109 (upholding public funding program that disbursed money only to participating candidates); *Davis*, 128 S. Ct. at 2772 (reaffirming *Buckley*).   The public funding scenario simply was not before the Court in *Davis* and that decision went out of its way to emphasize that public funding schemes are not "remotely parallel" to the regulations on private fundraising at issue in *Davis*, but rather are "quite different."   *Id.*

Nor does *Davis* support plaintiffs' suggestion that any legislative mechanism that triggers the granting of a benefit to a candidate on the amount of political spending by persons or entities opposed to the candidate has an unconstitutional chilling effect on the political speech of those persons or entities.   *Davis* did not invalidate the Millionaire's Amendment simply because that provision was triggered by the spending of a self-financed candidate, but rather because the particular competitive disadvantage that was triggered by such spending itself involved restrictions on the candidate's political speech.   The plaintiff in *Davis* had suggested—similarly to plaintiffs' suggestion—that the Millionaire's Amendment was unconstitutional merely because "making expenditures . . . has the effect of enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of Davis' own speech."   *Id.* at 2770.   The Supreme Court, however, did not adopt that line of reasoning, but instead held that if Davis's personal expenditures had triggered a rise in "the contribution limits

for all candidates, Davis' argument would plainly fail." *Id*.  It is thus clear that it was the discriminatory *fundraising limits* for similarly-situated, privately-financed opponents—not the trigger mechanism *per se*—that was the basis of the Court's finding of an unconstitutional burden. *Id*. at 2771-72.  Conversely, the reasoning of *Davis* makes it clear that, contrary to plaintiffs' suggestion, trigger mechanisms are constitutional as long as the burden or benefit being triggered is itself constitutional. *Id*.

The trigger mechanism in the Act at issue here thus survives analysis under *Davis* because the benefit that is triggered here—*i.e.,* matching funds for the participating candidate—*furthers* First Amendment values by facilitating more political speech, without imposing any legal restrictions on the ability of non-participating candidates or their supporters to raise and spend money to further their own views.  In contrast, the benefit that was triggered in *Davis*—*i.e.,* discriminatory contribution limits—*burdened* First Amendment values by directly restricting the ability of some candidates to raise funds to finance their political speech.  For all of these reasons, the matching fund provision in Wis. Stat. § 11.513 does not create the kind of constitutional harm alleged in plaintiffs' Amended Complaint.

> B.    Courts in other jurisdictions have upheld matching fund provisions that are part of a public funding program against First Amendment challenges similar to the one alleged by plaintiffs.

>> 1.    The First and Fourth Circuits have concluded that matching funds do not create a First Amendment burden.

Wisconsin is neither the first nor the only state to employ matching funds as a means of realizing the overall goals of a full public funding program.  A number of other states have included comparable provisions involving matching funds or other triggered benefits in their own

public funding systems and such provisions have repeatedly been upheld against challenges similar to that of the plaintiffs here.  *See*, *e.g.*, *Daggett*, 205 F.3d at 463-65 (upholding Me. Rev. Stat. Ann. tit. 21-A, § 1125(9)); *N.C. Right to Life Committee Fund v. Leake*, 524 F.3d 427, 437-39 (4th Cir. 2008) (upholding N.C. Gen. Stat. § 163-278.67); *Gable v. Patton*, 142 F.3d 940, 947-49 (6th Cir. 1998) (upholding Ky. Rev. Stat. § 121A.030(5)(a)); *Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1549-53 (8th Cir. 1996) (upholding Minn. Stat. Ann. § 10A.25(10)(a)(1)-(2)).

The First Circuit, in rejecting a challenge to the matching fund provisions of Maine's Clean Election Act, found that the plaintiffs' contentions "boil[ed] down to a claim of a First Amendment right to outraise and outspend an opponent."  *Daggett,* 205 F.3d at 464.  The court explained:

> Appellants misconstrue the meaning of the First Amendment's protection of their speech. They have no right to speak free from response – the purpose of the First Amendment is to secure the widest possible dissemination of information from diverse and antagonistic sources.  The public funding system in no way limits the quantity of speech one can engage in or the amount of money one can spend engaging in political speech, nor does it threaten censure or penalty for such expenditures.

*Id.* (internal quotation marks and citations omitted).   The district court decision affirmed by the First Circuit had explained the principles very clearly:

> The general premise of the First Amendment as interpreted by the Supreme Court . . . is that it preserves and fosters a marketplace of *ideas*. . . . In that view of the world, more speech is better. If a privately funded candidate puts out his/her candidacy and ideas to the public, the public can only gain when the opposing candidate speaks in return. This "marketplace of ideas" metaphor does not recognize a disincentive to speak in the first place merely because some other person may speak as well.

*Daggett v. Webster*, 74 F. Supp. 2d 53, 58 (D. Me. 1999) (citation omitted), *aff'd*, 205 F.3d 445.

Similarly, both the Sixth and Eighth Circuits have upheld trigger provisions that released a publicly funded candidate from an expenditure limit based on the spending of a privately funded

opponent.  *See Gable*, 142 F.3d at 947-49; *Rosenstiel*, 101 F.3d at 1551 (recognizing that triggers "avert a powerful disincentive for participation in [the state's] public financing scheme: namely, a concern of being grossly outspent by a privately financed opponent with no expenditure limit.").

Even more recent and on-point authority is found in *Leake*, in which the Fourth Circuit upheld the matching fund provisions in North Carolina's Judicial Campaign Reform Act which are very similar to Wisconsin's provisions and likewise relate to judicial elections.  *See Leake*, 524 F.3d at 437-39.  The Fourth Circuit specifically rejected the argument—also suggested by plaintiffs here—that the speech of the supporters of non-participating candidates was chilled because they would choose to spend less money on political speech in order to prevent participating candidates whom they opposed from receiving matching funds.  *Id.* at 437.  Relying on the logic of *Buckley*, the Court held that matching funds do not violate the First Amendment because non-participating candidates and their supporters "remain free to raise and spend as much money, and engage in as much political speech, as they desire."  *Id.*   Indeed, the Court emphasized that "North Carolina's provision of matching funds is likely to result in more, not less, speech."  *Id.* at 438.

Most recently, a panel of the Ninth Circuit unanimously held that the matching funds provision in Arizona's Citizens' Clean Elections Act does not violate the First Amendment.  *See McComish v. Bennett*, 605 F.3d 720 (9th Cir. 2010).  The plaintiffs in that case, like the plaintiffs here, contended that matching funds are unconstitutional under *Davis*, but the court disagreed, finding that "*Davis* is easily and properly distinguished from the case at bench."  *Id.* at 731.  The principal opinion concluded that any burden on speech imposed by the matching fund provision was "indirect or minimal" and acknowledged that the First and Fourth Circuits have concluded

that matching funds "imposed no First Amendment Burden at all." *Id.* at 732 and n.9. Judge Kleinfeld, concurring, likewise found that *Davis* was "easily distinguished." *Id.* at 737. Following the approach of the First and Fourth Circuits, he reasoned that "[b]ecause the challenged scheme imposes no contribution or spending limits, it does not restrict speech at all, so I cannot see why heightened scrutiny would apply." *Id.* at 738. In particular, he noted that all state election laws—including, but not limited to, matching fund provisions—give political candidates and their supporters incentives to make strategic choices when exercising their political speech rights, but this obvious point does not mean that all such laws impose constitutionally cognizable burdens on free speech. *Id.*

The matching fund provision at issue in the present case is comparable, in material respects, to the matching fund provisions upheld in *Daggett* and *Leake* and, like those provisions, promotes political speech, rather than restricting it as was the case in *Davis*. Accordingly, this Court should follow the approach of the First and Fourth Circuits and conclude that the Act's matching fund provisions do not create any First Amendment burden.

2.    The only contrary Circuit Court decision is distinguishable
and of doubtful validity.

The only federal circuit decision to strike down a matching fund provision is *Day v. Holahan*, 34 F.3d 1356 (8th Cir. 1994). That case involved a First Amendment challenge to a 1993 amendment to Minnesota's campaign finance laws that included a trigger provision under which any independent expenditure in opposition to a publicly funded candidate raised that candidate's voluntary spending limit by the amount of the independent expenditure and gave that candidate matching funds equal to one-half the independent expenditure. *Id.* at 1359. The Court invalidated the provision, reasoning that "[t]he knowledge that a candidate who one does not

- 18 -

want to be elected will have her spending limits increased and will receive a public subsidy equal to half the amount of the independent expenditure, as a direct result of that independent expenditure, chills the free exercise of [the independent spender's] protected speech." *Id.* at 1360.

In upholding the matching fund provisions in Maine and North Carolina, however, both the First and Fourth Circuits explicitly rejected the reasoning of *Day*.  *See Daggett*, 205 F.3d at 464-65; *Leake*, 524 F.3d 437-38.  According to the First Circuit, *Day* erred in "equat[ing] responsive speech with an impairment to the initial speaker." *Daggett*, 205 F.3d at 465.  The Fourth Circuit, similarly, found that "*Day's* key flaw is that it equates the potential for self-censorship created by a matching funds scheme with direct government censorship." *Leake*, 524 F.3d at 438 (internal quotation marks omitted).  Both *Daggett* and *Leake* also noted that the Eighth Circuit itself had declined to follow *Day's* reasoning in the subsequent case of *Rosenstiel v. Rodriguez*, 101 F.3d 1544 (8th Cir. 1996), which upheld a trigger provision based on the spending of non-participating candidates. *See Daggett*, 205 F.3d at 464 n.25 (noting that the "continuing vitality of *Day* is open to question"); *Leake*, 524 F.3d at 438 ("the *Day* decision appears to be an anomaly even within the Eighth Circuit, as demonstrated by that court's later decision in *Rosenstiel*").

Defendants anticipate that plaintiffs may nonetheless suggest that new life has been breathed into *Day* by a single "*see*" citation to that case in the *Davis* opinion, but such a suggestion would read too much into that citation.  The *Davis* Court merely cited *Day* as illustrating a situation in which a "potentially significant burden" was associated with a decision to spend money on campaign-related speech.  *See Davis*, 128 S. Ct. at 2772.  The citation was unaccompanied by any discussion or analysis and *Davis* neither disapproved of *Daggett* or *Leake*

nor analyzed the merits of *Day*.   Because the complex issues involved in addressing public financing systems under the First Amendment were not before the Court in *Davis* and the single citation to *Day* did not discuss those issues, the better conclusion is that *Davis* left undisturbed the view of the First and Fourth Circuits that matching funds impose no cognizable First Amendment burden.   It simply is not plausible to suggest that *Davis*, through a single, passing "*see*" citation, could have intended to establish new doctrine that would resolve a disagreement among federal circuits in an area of law that was not before the Court in *Davis*.   *See also McComish*, 605 F.3d at 732 n.9 ("In so citing *Day*, *Davis* did not affirm or adopt the Eighth Circuit's approach, nor did it overturn *sub silentio* the decisions of the First and Fourth Circuits.").

The *Davis* decision also does not say that the matching funds at issue in *Day* imposed burdens of similar severity to those created by the Millionaire's Amendment that was invalidated in *Davis*.   On the contrary, the *Davis* Court, although expressly aware of the earlier matching-fund provision in *Day*, labeled the "discriminatory" contribution limits imposed by the Millionaire's Amendment an "*unprecedented* penalty."   *Davis*, 128 S. Ct. at 2771 (emphasis added).   If the *Davis* Court had considered the "potentially significant burden" imposed by the earlier provision in *Day* to be comparable to the penalty imposed by the Millionaire's Amendment, then it would not have considered the latter penalty to be "unprecedented."

Finally, *Day* is distinguishable from the present case and other cases upholding matching funds and similar triggered provisions because it involved an unusual partial public funding system that gave a participating candidate matching funds and an increased spending limit for *every* dollar of independent spending against that candidate.   *See Day*, 34 F.3d at 1359.   The *Day* provision thus would have been automatically triggered in virtually every campaign.   In addition, the

Minnesota law in *Day* did not impose any ceiling on the amount of matching funds a candidate could receive. *See id.* In contrast, under the provision at issue here, matching funds are not available unless and until aggregate independent expenditures against a participating candidate exceed 120% of the initial public grant (*i.e.*, $120,000/$360,000) and the matching funds are capped at three times the amount of the initial grant (*i.e.*, $300,000/$900,000). Wis. Stat. § 11.513. Similarly, in both *Daggett* and *Leake*, matching funds were capped at twice the amount of the initial grant and were not available at all unless and until opposition spending exceeded a threshold much higher than the "every dollar" threshold in *Day*. *See Daggett*, 205 F.3d at 451; *Leake*, 524 F.3d at 433. Clearly, then, the potential "penalty" at issue in *Day* was much greater than any purported burden in the present case, in *Daggett*, or in *Leake*.

3.   The Seventh Circuit, while not addressing matching funds, has adopted the same rationale applied by the First and Fourth Circuits.

The Seventh Circuit has not specifically addressed the constitutionality of matching funds, but it has nonetheless adopted the same rationale applied in the above cases. *Libertarian Party of Indiana v. Packard*, 741 F.2d 981 (7th Cir. 1984), involved a First Amendment challenge to a statutory scheme under which a portion of revenue raised by Indiana through the sale of personalized license plates was distributed to qualifying political parties. *Id.* at 983. Plaintiffs, who were associated with a non-qualifying party, argued that this funding mechanism violated their First Amendment right not to contribute to the advancement of a political or ideological message with which they disagreed by conditioning the availability of a public benefit—*i.e.*, the license plates—on their surrender of that right. *Id.* at 988.

- 21 -

While acknowledging that government could not use such a mechanism to financially support a particular partisan viewpoint, the Court found that Indiana's system for funding political parties was permissible because "the funds are not considered to be contributing to the spreading of a political message, but rather are advancing an important public interest, the facilitation of 'public discussion and participation in the electoral process, goals vital to a self-governing people.'" *Id.* at 989 (*quoting Buckley*, 424 U.S. at 92-93).   Moreover, because the public financing of political parties does not offend the First Amendment, the Court concluded that "the fact that some Indiana motorists might forgo owning a personalized license plate in order to avoid contributing money to political parties with which they may not agree also is of no constitutional significance." *Id.* at 990.   In the present case, similarly, matching funds do not support a particular partisan viewpoint—all candidates are free to opt into public funding—but rather facilitate and enlarge public discussion in Wisconsin Supreme Court races.   Accordingly, under the Seventh Circuit's reasoning, the fact that some non-participating candidates or independent spenders might forgo some campaign expenditures in order not to trigger matching funds is of no constitutional significance.

For all of the above reasons, this Court should accept the prevailing view in most federal courts that have considered matching funds or related issues and conclude, as a matter of law, that the matching fund provision in Wis. Stat. § 11.513(2) does not burden the First Amendment right of supporters of non-participating candidates to make independent expenditures on political speech.   Defendants are, therefore, entitled to judgment in their favor as a matter of law on Count 4 of the Amended Complaint.

II.    COUNT 1 OF THE AMENDED COMPLAINT FAILS BECAUSE THE INDEPENDENT EXPENDITURE REPORTING REQUIREMENTS IN WIS. STAT. § 11.513(1) ARE SUBSTANTIALLY RELATED TO SEVERAL IMPORTANT GOVERNMENT INTERESTS.

Count 1 of the Amended Complaint challenges the constitutionality of the independent expenditure reporting requirements in Wis. Stat. § 11.513(1).  Under that provision, any person who makes (or becomes obligated to make) an independent expenditure in excess of $1,000 with respect to a candidate for the office of Justice is required to file a report thereof with the G.A.B. The report must be filed on the 15th or last day of the month immediately following the expenditure, whichever is earlier.  If the reportable event occurs within six weeks of a primary or general election, then the person must file the report within 24 hours.  Any person who has been required to file such a report must file an additional report after each additional $1,000 of expenditures are made (or obligated).  Wis. Stat. § 11.513(1).  According to the plaintiffs, these reporting requirements fail constitutional scrutiny under the First Amendment because they allegedly do not serve any government interest that has been judicially recognized as justifying a restriction of speech rights.  *See* Amended Complaint, ¶¶ 28-29.  Plaintiffs also contend that the 24-hour reporting requirement in Wis. Stat. § 11.513(1) is "patently unreasonable."  Amended Complaint, ¶ 30.  These contentions fail as a matter of law.

The Supreme Court has stated that campaign finance disclosure requirements generally do not impose a serious infringement on First Amendment rights and are the "least restrictive means of curbing the evils of campaign ignorance and corruption[.]" *Buckley*, 424 U.S. at 68. Accordingly, reporting requirements are subject to "exacting scrutiny," which requires that there must be a substantial relationship between an important government interest and the information to be disclosed. *See Buckley*, 424 U.S. at 64.  This exacting scrutiny is less demanding than strict

scrutiny—that is, the disclosure requirement need not be *narrowly tailored* to advance a *compelling* government interest.  On the contrary, such strict scrutiny was explicitly rejected by the Court in *Buckley*.  *See id* at 83-84.  The Court held that line-drawing as to the particulars for reporting requirements was "necessarily a judgmental decision" best left to legislative discretion and explained that because reporting requirements serve several goals, Congress could not be required to set a threshold for reporting that is tailored only to one or two of those goals.  *Id.* at 83.  Rather, reporting requirements should be struck down only if the particulars of the provisions are "wholly without rationality."  *Id*.

Applying this standard of review, the *Buckley* Court upheld the broad reporting requirements of the Federal Election Campaign Act ("FECA") against claims that the laws infringed on First Amendment associational and free speech rights.  *See id.* at 60-74.  The Court found that three compelling governmental interests justified reporting requirements: (1) informing voters about a candidate's possible allegiances and interests; (2) deterring actual and apparent corruption; and (3) enforcing other substantive campaign finance provisions.  *See id.* at 66-68 and 83-84 (upholding a reporting requirement for independent expenditures in excess of $100 in a calendar year); *see also McConnell v. FEC*, 540 U.S. 93, 196 (2003) (footnote omitted) ("We agree . . . that the important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements—providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions—apply in full force to BCRA."); *Daggett*, 205 F.3d at 472 (upholding the reporting of independent expenditures exceeding $50 for a single election period).

The independent expenditure reporting requirements in Wis. Stat. § 11.513(1) easily satisfy the "exacting scrutiny" prescribed by the Supreme Court because those requirements are

"substantially related" to all three of the important government interests recognized in the above cases.  First, it is evident from the face of the statute that the required reporting will inform the electorate of where campaign money is coming from and where it is spent, which necessarily will have the effect of assisting voters in evaluating the allegiances and interests of Wisconsin Supreme Court candidates before the election. *See also Buckley*, 424 U.S. at 66-67.  Second, it is clear under *Buckley* that such required reporting deters actual and apparent corruption by exposing large contributions and expenditures, and by helping the electorate to evaluate post-election actions by public officials. *See id.* at 67.  Finally, the reporting requirements, on their face, plainly make it possible for the G.A.B. to administer the issuance of matching funds under Wis. Stat. § 11.513(2) by requiring disclosure of expenditures so that G.A.B. can determine when the statutory thresholds for triggering those matching funds are reached.

Plaintiffs concede that the purpose of the reporting requirements in Wis. Stat. § 11.513(1) is to assist G.A.B. in implementing the matching funds.  Amended Complaint, ¶ 29.  They nonetheless contend that the reporting requirements do not promote the anti-corruption interest because the matching funds themselves, in plaintiffs' view, do not advance that interest, but rather seek to equalize the relative financial resources of candidates—a goal which has not been recognized by the courts as sufficiently important to justify restrictions on free speech. *See* Amended Complaint, ¶¶ 29, 44.

Plaintiffs are incorrect.  The matching funds, on their face, protect a participating candidate from being in a position in which a non-participating opponent or independent spender could derive a tactical competitive advantage by increasing spending above the participating candidate's spending limit, so as to engage in campaign speech that the participating opponent would be powerless to answer.  By thus giving participating candidates greater assurance that

they will have enough funds to run viable campaigns in the most competitive races, the matching funds provide an incentive for participation in the public funding program, thereby reducing the potential for electoral corruption in Supreme Court races.  Because the challenged reporting requirements are necessary to provide G.A.B. with the information it needs to administer the distribution of matching funds, it follows that those reporting requirement likewise serve the state's important anti-corruption interest.

Courts have adopted this view of the purpose of matching funds and their associated reporting requirements in upholding the constitutionality of both.  In *Daggett*, for example, the First Circuit held that the increased reporting requirements in Maine's clean elections act were constitutional because they "allow[] voters access to information about who supports a candidate financially and . . . allow[] the Commission to effectively administer the matching funds provision of the Act" and deter "corruption and its appearance."  *Daggett*, 205 F.3d at 466.  The *Leake* case, too, involved a challenge to a North Carolina reporting requirement very similar to plaintiffs' claim here.  *See Leake*, 524 F.3d at 439-40.  The Fourth Circuit rejected that challenge as follows:

> In sum, the plaintiffs' arguments against the reporting requirements lack merit. As in *Buckley* and *McConnell* the requirements advance three important state interests: "providing the electorate with information, deterring actual corruption and avoiding any appearance thereof, and gathering the data necessary to enforce more substantive electioneering restrictions."  *McConnell*, 540 U.S. at 196, 124 S.Ct. 619.  By ensuring the release of campaign funding information to the public and enabling the effective administration of matching funds, the reporting requirements clearly demonstrate a "substantial relation" to these interests.  Because having a substantial relation to an important state interest is all that is required by *Buckley* and *McConnell* . . .  [North Carolina's reporting requirement] passes constitutional muster.

*Id.* at 440 (footnote omitted).  This Court should follow *Daggett* and *Leake* not only in upholding the validity of matching funds, but also in upholding the validity of the associated reporting requirements as advancing all of the important state interests described above.

Finally, plaintiffs challenge the requirement in Wis. Stat. § 11.513(1) that independent expenditures in excess of $1,000 that occur within six weeks of a primary or general election must be reported to G.A.B. within 24 hours.   According to plaintiffs, such 24-hour reporting requirements have been held to be patently unreasonable.  *See* Amended Complaint, ¶ 30 (*citing Citizens for Responsible Gov't v. Davidson*, 236 F.3d 1174, 1997 (10th Cir. 2000)).  The 24-hour reporting requirement at issue in *Davidson*, however, is distinguishable from the requirement in the present case, for the law in *Davidson* required *every* independent expenditure of more than $1,000 to be reported within 24 hours—without regard to when that expenditure might be made or obligated.  *Davidson*, 236 F.3d at 1196.  In contrast, Wis. Stat. § 11.513(1) only imposes a 24-hour reporting time line on independent expenditures of more than $1,000 that are made or obligated within six weeks of a primary or general election.  In addition, the reporting requirement in *Davidson*, unlike the one in Wis. Stat. § 11.513(1), was not part of the implementation of a public campaign funding program.

Moreover, since the issuance of the *Davidson* decision, the Supreme Court has upheld a federal 24-hour reporting requirement for certain independent expenditures on electioneering communications, defined as communications that are made within a specified period of time close to an election.  *McConnell*, 540 U.S. at 194-97.  It is thus no longer clear that *Davidson* is good law on this point.  In any event, even if *Davidson*'s reasoning continues to apply to the facts of that case, it does not apply here.  Rather, because the 24-hour reporting requirement in Wis. Stat.

§ 11.513(1) only applies to independent expenditures during the final weeks of a campaign, it is analogous to the provision upheld in *McConnell* and should likewise be upheld.

For all of these reasons, the independent expenditure reporting requirements in Wis. Stat. § 11.513(1) do not violate the First Amendment and defendants are entitled to judgment in their favor on Count 1 of the Amended Complaint.

III.   COUNTS 2 AND 3 OF THE AMENDED COMPLAINT FAIL BECAUSE THE INDEPENDENT EXPENDITURE REPORTING REQUIREMENTS IN WIS. STAT. § 11.513(1) ARE NEITHER UNCONSTITUTIONALLY VAGUE NOR OVERBROAD.

Counts 2 and 3 of the Amended Complaint challenge the constitutionality of the requirement in Wis. Stat. § 11.513(1) that a person report to G.A.B. not only the actual disbursement of an independent expenditure of more than $1,000, but also any *obligation* to make such a disbursement. According to plaintiffs, an obligation to make an expenditure is nothing more than a mere possibility of a future expenditure. The requirement to report such mere possibilities, plaintiffs contend, is both: unconstitutionally vague because it does not clearly articulate what amounts to such an obligation (Count 2); and unconstitutionally overbroad because it requires the reporting of possible expenditures that might never actually take place (Count 3). *See* Amended Complaint, ¶¶ 31-40.

Plaintiffs' challenges to the requirement to report an obligation to make an independent expenditure are foreclosed by *McConnell*. In that case, the Supreme Court upheld a provision in federal law which required that an expenditure for electioneering communication be disclosed when a contract to produce or broadcast the communication is entered, even if the communication has not yet been disseminated. *See McConnell*, 540 U.S. at 199-202. In reaching its conclusion, the Court noted that to require reporting only when funds are actually disbursed

would "open a significant loophole" allowing independent spenders to avoid pre-election disclosures by entering into contracts that do not require actual payment to be made until after the election. *Id.* at 200. This loophole is closed by making the reporting requirements apply to a contract to disburse such funds, as well as to an actual disbursement. On this basis, the Court approved the challenged provision. *See id.* While the *McConnell* Court did not specifically discuss the constitutional doctrines of vagueness or overbreadth in connection with the provision in question, it did reject as speculative the suggestion that confusion would result from a requirement that information be disclosed about contracts that had not yet been and might never be performed. *Id.* at 200-01. *McConnell* thus demonstrates that Counts 2 and 3 of the Amended Complaint fail to state a claim on which relief can be granted.

More specific consideration of the doctrines of vagueness and overbreadth leads to the same conclusion.

A.    Vagueness

When violation of a law is punishable by criminal penalty, the law must clearly state what conduct it requires or prohibits. *Kolender v. Lawson,* 461 U.S. 352, 357 (1983). The void-for-vagueness doctrine generally demands that a penal statute must define the criminal offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Id*. This concern is especially important where a statute's lack of clarity could have the effect of deterring persons from engaging in speech or other activities with special constitutional protection. *Id.* at 358. The vagueness doctrine is potentially implicated here because violations

of the reporting requirements of Wis. Stat. § 11.513(1) may be punishable by fine or imprisonment pursuant to Wis. Stat. § 11.61(1)(c).

Although clarity is required, however, a court cannot expect the parameters of the law to be delineated with mathematical precision or certainty. *See Ward v. Rock Against Racism,* 491 U.S. 781, 794 (1989); *Grayned v. City of Rockford,* 408 U.S. 104, 110 (1972). The proper inquiry, rather, is whether the language of the statute as enacted "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." *United States v. Petrillo,* 332 U.S. 1, 8 (1947). *See also Department of State Compliance and Rules Division v. Michigan Educ. Association-NEA*, 650 N.W.2d 120, 126-27 (Mich. App. 2002) ("When determining whether a statute is void for vagueness, the reviewing court need not set aside common sense, nor is the Legislature required to define every concept in minute detail. Rather, the statutory language need only be reasonably precise.").

In the Minnesota case previously discussed, the federal district court applied these principles and rejected a vagueness claim very similar to the claim asserted by the plaintiffs here. *See Day v. Hayes*, 863 F. Supp. 940, 948-50 (D. Minn. 1994) rev'd in part on other grounds by *Day v. Holahan*, 34 F.3rd 1356 (8th cir. 1994). The Minnesota law in that case required reporting when a person or political committee "makes or becomes *obligated* by oral or written agreement to make an independent expenditure in excess of $100[.]" *Id.* at 948 (quoting Minn. Stat. § 10A.20 subd. 6b (Supp. 1993)) (emphasis added). The plaintiffs in that case, like the plaintiffs here, argued that the reference to becoming obligated to make an expenditure was so indefinite that they could not determine what was required of them under the statute. *Id.* The court rejected that contention and instead found that "[t]he existence of a legal obligation is readily determined by common experience and the application of well-established principles of

contract law and related equitable principles." *Id.* at 949 (footnote omitted). The court noted that even an unsophisticated person of ordinary experience "understands when she is legally 'obligated'" *id.* at 949, n.8, and reasoned that it was not credible to suggest that political committees with "a higher degree of sophistication and experience in matters of political expenditures and obligations than the ordinary person . . . . would be unable to determine whether or when they become obligated to make an expenditure[.]" *Id.* at 949. Accordingly, the court concluded that:

> The existence of an obligation is not vague or indeterminate. People of ordinary experience and intelligence understand when they have entered an obligation; a law imposing reporting requirements on those who enter independent expenditure obligations does not require them to guess at its meaning or expose them to the risk of penalty without fair warning. *See Kolender,* 461 U.S. 352, 103 S.Ct. 1855 (1983); *Grayned,* 408 U.S. 104, 110, 92 S.Ct. 2294, 2300 (1972); *Rowan v. United States Post Office Dept.,* 397 U.S. 728, 740, 90 S.Ct. 1484, 1492-93, 25 L.Ed.2d 736 (1970).

*Id.* at 950. On this basis, the court held that "[t]he substantive provisions of the statute alone are sufficiently clear and definite to satisfy the requirements of due process and the First Amendment." *Id.*

In the present case, as in *Day v. Hayes,* the existence of an "obligation" to make an expenditure is readily understandable from common experience, from well-established legal principles, and from the specialized experience of political committees in matters related to political expenditures and obligations. Therefore, as with the Minnesota law, the requirement to report an obligation to make an independent expenditure in Wis. Stat. § 11.513(1) is not unconstitutionally vague.

Moreover, the word "obligation" is not undefined in Wisconsin's campaign finance statutes. As used in Wis. Stat. ch. 11, the term "incurred obligation" is defined to mean:

> every express obligation to make any contribution or disbursement including every loan, guarantee of a loan or other obligation or payment for any goods, or for any services which have been performed or are to be performed in the future, incurred by a candidate, committee, individual or group for political purposes.

Wis. Stat. § 11.01(11).  In addition, Wisconsin's statutory definition of the word "disbursement" includes, in pertinent part, "[a] contract, promise, or agreement, if legally enforceable, to make a purchase, payment, distribution, loan, advance, deposit or gift of money or anything of value . . . for a political purpose."  Wis. Stat. § 11.01(7)(a)3.

When the word "obligation," as used in Wis. Stat. § 11.513(1), is construed in the context of these related definitions, it is clear that an "obligation" to make an expenditure is not a mere *possibility* of a future expenditure, as plaintiffs wrongly suggest, but rather includes elements of express formality and enforceability that provide discernible criteria for determining when an "obligation" exists.  *See also Department of State Compliance*, 650 N.W.2d at 126 (statute defining a contribution in part in terms of "forbearance" not unconstitutionally vague where legislative intent was clear from the word's ordinary meaning and the context in which it was used); *Human Life of Washington, Inc. v. Brumsickle*, No. C08-0590-JCC, 2009 WL 62144, at *22-23 (W.D. Wash. Jan. 8, 2009) (statute referring to an "expectation" of receiving contributions or making expenditures was not unconstitutionally vague where any initial ambiguity was eliminated by narrowing interpretations that provided concrete, discernible criteria.).  For these reasons, too, the requirement to report an obligation to make an independent expenditure in Wis. Stat. § 11.513(1) is not unconstitutionally vague.

### B.      Overbreadth

In the First Amendment context, a statute is overbroad if, in addition to imposing a constitutionally permissible burden or restriction on some speech or expressive conduct, it also

sweeps within its coverage other speech or conduct that may not constitutionally be burdened or restricted. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973). Where the overbreadth doctrine is applied, a statute may be found to be facially invalid because the mere existence of an overly broad statute is liable to have a chilling effect on speech or conduct that may not be restricted. *Id.*

The risk of such a chilling effect is not present to the same degree, however, where the statute is one as to which a court can readily establish the line between conduct that may and may not be burdened. Accordingly, the Supreme Court in *Broadrick* curtailed the use of facial overbreadth analysis in First Amendment cases, noting that such analysis is "strong medicine" that should be employed "sparingly and only as a last resort" and should not be invoked "when a limiting construction has been or could be placed on the challenged statute." *Id.* at 613. Particularly where the burdened activity involves not just pure speech, but speech joined with other expressive conduct, a statute will not be facially invalidated unless its overbreadth is "not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Id.* at 615. Such a rule, the Court indicated, "would invalidate statutes for overbreadth only when the flaw is a substantial concern in the context of the statute as a whole." *Id.* at 616 n.14.

In the present case, the requirement to report an obligation to make an expenditure in Wis. Stat. § 11.513(1) survives overbreadth analysis under *Broadrick*. First, that reporting requirement clearly affects not pure speech, but speech joined with conduct—*i.e.*, political communications joined with the conduct of making expenditures for those communications and of entering into binding agreements to disburse such expenditures. Second, as previously shown, the word "obligation" as used in Wis. Stat. § 11.513(1) is subject to limiting construction in the context of the related definitions of "incurred obligation" and "disbursement" in Wis. Stat.

§ 11.01(7)(a)3. and (11).   In light of these features, it is clear that the challenged reporting requirement's applicability to an obligation to make an expenditure is not substantially overbroad when judged in relation to its plainly legitimate sweep as applied to actual expenditures.   On the contrary, as the Supreme Court recognized in *McConnell*, to require reporting of a contract to make an expenditure prevents evasion of pre-election disclosure requirements and thus is within the plainly legitimate sweep of such requirements.   *See McConnell*, 540 U.S. at 200.

Accordingly, the Fourth Circuit, in *Leake*, rejected an almost identical overbreadth claim directed against an independent expenditure reporting requirement in North Carolina's judicial campaign matching fund statute.   *Leake*, 524 F.3d at 440 n.3.   Like Wis. Stat. § 11.513(1), the North Carolina statute required reporting of "obligations made" for future expenditures.   *Id.*   The Court concluded that the requirement was not overbroad because "the reporting of a campaign's future obligations does not encroach on protected speech any more than the reporting of past expenditures[.]"   *Id.*   The *Day v. Hayes* decision likewise held that a Minnesota law requiring the reporting of obligations to make expenditures was not unconstitutionally overbroad.   *Day v. Hayes*, 863 F. Supp. at 950-51.[1]

For all of the above reasons, the independent expenditure reporting requirements in Wis. Stat. § 11.513(1) are neither unconstitutionally vague nor overbroad and defendants are, therefore, entitled to judgment in their favor on Counts 2 and 3 of the Amended Complaint.

---

[1]In addition, the Supreme Court in *Buckley* upheld against an overbreadth challenge a $1,000 contribution limit that applied not only to contributions that had actually been made, but also to a *promise* to give a contribution.   *See Buckley*, 424 U.S. at 23, 29-30.   While the *Buckley* Court did not discuss the specific issue of whether the statute's applicability to a promise rendered it overbroad, the decision nonetheless exemplifies the Court's long-standing approval of campaign finance laws that apply to executory agreements.

IV.   COUNTS 5 AND 6 OF THE AMENDED COMPLAINT FAIL
BECAUSE THE CONTRIBUTION LIMITS IN WIS. STAT.
§ 11.26(1)(am) AND (2)(an) SURVIVE INTERMEDIATE SCRUTINY
AND ARE NOT UNCONSTITUTIONALLY LOW.

Counts V and VI of the Amended Complaint challenge the constitutionality of the campaign contribution limits in Wis. Stat. §§ 11.26(1)(am) and (2)(an), under which no individual or committee, other than a political party or legislative campaign committee, may contribute more than $1,000 to a candidate for the Wisconsin Supreme Court during a single primary and general election cycle.   In Count V, plaintiffs contend that these contribution limits fail intermediate scrutiny—*i.e.*, are not closely drawn to advance a sufficiently important government interest—for two reasons.  First, plaintiffs allege that the contribution limits are underinclusive—and, therefore, not closely drawn—because they are lower for Supreme Court candidates than for other statewide elective offices.  Amended Complaint, ¶ 51.  Second, plaintiffs allege that the limits do not advance a sufficiently important government interest because their "only apparent purpose . . . is to coerce participation in Wisconsin's rescue fund scheme and penalize those who do not."  Amended Complaint, ¶ 52.  In Count VI, plaintiffs contend that the contribution limits are facially so low as to violate the First Amendment under the Supreme Court's decision in *Randall v. Sorrell*, 548 U.S. 230 (2006).  Amended Complaint, ¶¶ 55 and 56.  Plaintiffs' contentions in both Counts fail as a matter of law.

A.   Count V fails because the contribution limits are closely drawn to advance important government interests other than coercion.

The U.S. Supreme Court has held that limits on contributions to candidates impose less burden on freedoms of speech and association than do spending limits.  *Buckley* 424 U.S. at 19-22.  According to the Court, spending limits "represent substantial . . . restraints on the

quantity and diversity of political speech" because "virtually every means of communicating ideas in today's mass society requires the expenditure of money." *Id.* at 19.  In contrast, "a limitation upon the amount that any one person or group may contribute to a candidate . . . entails only a marginal restriction upon the contributor's ability to engage in free communication." *Id.* at 20-21.  Such a limit, according to the Court, "involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." *Id.* at 21.  Similarly, contribution limits impose less burden on freedom of association than do spending limits because contribution limits "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates" and "permit associations and candidates to aggregate large sums of money to promote effective advocacy," whereas spending limits prevent candidate organizations and political committees from  "effectively amplifying the voice of their adherents." *Id.* at 22.  In fact, as the court pointed out, the overall effect of contribution limits "is merely to require candidates and political committees to raise funds from a greater number of persons and to compel people who would otherwise contribute amounts greater than the statutory limits to expend such funds on direct political expression, rather than to reduce the total amount of money potentially available to promote political expression." *Id.* at 22.

Because contribution limits impose less burden on First Amendment rights than do spending limits, they are held to a lower standard of constitutional review. *Buckley*, 424 U.S. at 25.  Indeed, the Supreme Court has "consistently held that restrictions on contributions require less compelling justifications than restrictions on independent spending." *Federal Election Com'n v. Mass. Citizens for Life*, 479 U.S. 238, 259-260 (1986).  Thus, under this lower level of

scrutiny, a contribution limit survives constitutional challenge if the State can demonstrate that the limit is "closely drawn" to advance a "sufficiently important interest." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 387-388 (2000) *quoting Buckley*, 424 U.S. at 25.

> 1.      The contribution limits are not underinclusive.

Under constitutional judicial review, there are at least two distinct ways in which a statute may be found to be insufficiently closely drawn to advance a sufficiently important government interest.  First, a statute may be overinclusive if it restricts conduct that does not implicate the government's interest in the statute.  *See Simon & Schuster v. New York Crime Victims Bd.*, 502 U.S. 105, 121 (1991).  Second, a statute may be underinclusive if it fails to restrict conduct that does implicate the government's interest.  *See, e.g., Carey v. Brown*, 447 U.S. 455, 465 (1980).  Here, plaintiffs contend that the $1,000 limit on contributions to Wisconsin Supreme Court candidates is underinclusive because it is lower than the limit on contributions to candidates for other statewide offices.  Contributions to those other candidates, according to plaintiffs, implicate the same government interests in preventing corruption and the appearance of corruption as do contributions to Supreme Court candidates, but are not restricted by the same $1,000 limit.  *See* Amended Complaint, ¶¶ 50-51.  Plaintiffs infer from this that the contribution limit for Supreme Court candidates does not restrict all contributions that implicate the government's anti-corruption interest and that it is, therefore, underinclusive.

Plaintiffs' inference is incorrect because there are two legally material ways in which candidates for the Wisconsin Supreme Court differ from candidates for other statewide offices.  First, only Supreme Court candidates are eligible for public funding from the Democracy Trust Fund under Wis. Stat. §§ 11.501 to 11.522.  *See* Wis. Stat. § 11.501(4) ("'Eligible candidate'

means a candidate for the office of justice . . .").   That fund provides *full* public financing for participating Supreme Court candidates.   That is, grant levels are set at a relatively high level—$100,000 for a primary and $300,000 for a general election plus up to three times those amounts in any matching funds awarded under Wis. Stat. §§ 11.512 and 11.513—and those grants are required to pay for almost 100% of a participating candidate's permitted campaign expenses.   *See* Wis. Stat. § 11.518 (prohibiting a participating candidate from spending more than the total public funding plus the relatively small amount of qualifying and seed money contributions).   In contrast, other statewide candidates can only receive public funding from the Wisconsin Election Campaign Fund under Wis. Stat. § 11.50.   That fund provides only *partial* public financing that covers no more than 45% of a candidate's total permitted spending, leaving the candidate to finance the other 55% from traditional fundraising.   *See* Wis. Stat. §§ 11.31(1)-(2) and 11.50(9).   In addition, grants from the Wisconsin Election Campaign Fund are restricted by the limited amount of money in that fund, which cannot exceed one third of the total amount raised from voluntary taxpaying contributors via a "check-off" box on Wisconsin income tax returns.   *See* Wis. Stat. § 20.855(4)(b).   In contrast, grants from the Democracy Trust Fund are not similarly limited.   *See* Wis. Stat. § 20.855(4)(ba) and (bb) (appropriating to the Democracy Trust Fund two-thirds of the tax check-off amount plus a sum sufficient to cover the balance of public financing for qualified candidates).

Because candidates for other statewide offices thus do not have access to the full public funding that is available to Supreme Court candidates, it makes sense that those other candidates should be subject to higher contribution limits in order to enable them to raise enough money to finance their campaigns.   Similarly, the lower contribution limits for Supreme Court candidates are intended to provide an incentive to induce candidates to participate in the Democracy Trust

Fund, which itself serves the state's anti-corruption interests by giving candidates a fuller alternative to private fundraising. Courts have readily acknowledged that it is constitutionally permissible to provide such incentives for accepting public financing and its accompanying spending limits. *See Leake*, 524 F.3d at 436-37; *Daggett*, 205 F.3d at 471; *Gable*, 142 F.3d at 948; *Rosenstiel*, 101 F.3d at 1550-51; *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39 (1st Cir. 1993); *Republican Nat. Committee v. Fed. Elec. Com'n*, 487 F. Supp. 280, 285 (S.D.N.Y. 1980) (three-judge court), *aff'd mem.*, 445 U.S. 955 (1980); *Wilkinson v. Jones*, 876 F. Supp. 916, 928 (W.D. Ky. 1995) ("Kentucky has a compelling interest in encouraging candidates to accept public financing and its accompanying limitations . . ."). Because Supreme Court candidates in Wisconsin thus are not similarly situated to other statewide candidates with regard to contribution limits, the $1,000 limit challenged here is not underinclusive.

Second, campaign contributions to candidates for other statewide offices do not implicate the state's interest in combating the reality and appearance of corruption to the same extent as do contributions to Supreme Court candidates because only the latter are candidates for a judicial office. Other statewide elective offices in Wisconsin are all in the executive branch. The state's interest in combating even the appearance of possible corruption is at its strongest with regard to seats on the state's highest court. As previously noted, judges and justices—even when popularly elected—are required to be impartial and independent in carrying out their duty of applying the rule of law, whereas executive officials are members of a political branch who are expected to be representative of and responsive to the interests of their electoral constituencies. For this reason, the possibility of the appearance of corruption or favoritism harms the public's faith in and respect for the judiciary more than for the other two branches of government. The state thus has a paramount interest in reinforcing the public's confidence that its Supreme Court Justices are not

beholden to outside interests, but rather are unfailingly dedicated to the impartial and independent application of the law to the cases before them.  This paramount interest in judicial impartiality and independence easily justifies lower campaign contribution limits for Supreme Court Justices than for other statewide elective officials.  The $1,000 contribution limit, therefore, is not underinclusive.

> 2.      The contribution limits advance legitimate and important
>         interests and are not coercive.

Because the challenged contribution limits thus are not coercive, plaintiffs are wrong in suggesting that their only purpose is to compel participation in public funding.  Contrary to that mistaken view, the contribution limits advance several important and valid state interests

The Wisconsin Legislature has expressly identified three important and valid goals of the state's campaign finance laws that are especially pertinent here:  (1) protecting the democratic process from the "potential corrupting influence" that may result "when a candidate becomes overly dependent upon large private contributors;" (2) "encourag[ing] the broadest possible participation in financing campaigns by all citizens of the state;" and (3) "stimulating vigorous campaigns on a fair and equal basis and to provide for a better informed electorate."  Wis. Stat. § 11.001(1).  These three purposes are all sufficiently important to justify the challenged contribution limits.

First, the State has a sufficiently important interest in preventing corruption or the appearance of corruption in judicial campaigns.  The Supreme Court has consistently held that preventing real or perceived corruption in the political process is an important state interest that justifies campaign contribution limits.  *See Buckley*, 424 U.S. at 26-29; *Federal Election Com'n v. Nat. Right to Work Comm.*, 459 U.S. 197, 208 (1982); *Shrink Mo. Gov't PAC*, 528 U.S.

at 388-89.  "Corruption is a subversion of the political process.  Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns." *Fed. Election Com'n v. Nat. Conserv. Pol. Action*, 470 U.S. 480, 497 (1985).  Because corrupt relationships and undue influence are difficult for the State to prove and even more difficult to criminalize, "[t]he best means of prevention is to identify and to remove the temptation" through contribution limits.  *McConnell*, 540 U.S. at 153.

Of equal concern is the possibility that judicial campaigns may appear corrupt to the general public.  *Buckley* was quite clear that avoiding the appearance of corruption is "critical," even if that appearance is grounded not in evidence of actual corruption, but only in "the opportunity for abuse inherent in the process of raising large monetary contributions." *Buckley*, 424 U.S. at 27, 30 (quotation and citation omitted).  The state may legitimately address the demoralizing effect of both the real and the "imagined coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Id.* at 25.  Conversely, a lack of contribution limits could add to "the cynical assumption that large donors call the tune" and "could jeopardize the willingness of voters to take part in democratic governance." *Shrink Mo. Gov't PAC*, 528 U.S. at 390.

Nor need a state, in every case, supply evidence of specific instances of actual corruption or the appearance thereof in order to justify contribution limits; rather the evidence of campaign corruption and the suspicion of corruption contained in the *Buckley* record is sufficient to support the conclusion. *Id.* at 391.  Moreover, courts are typically deferential to the legislature and will not "second guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *FEC v. Nat. Right to Work Comm*, 459 U.S. at 210.

Second, the State's campaign contribution limits encourage broad participation in the electoral process.   Although the Supreme Court has been primarily concerned with the anti-corruption interest, it has called a state's interest in fostering participation in the electoral process "a goal vital to a self-governing people."  *Buckley*, 424 U.S. at 92-93.   Without contribution limits, potential candidates with fewer affluent contributors would have less incentive to run for office because they would not be able to anticipate receiving as many substantial contributions as their better-connected rivals.   Fewer candidates running for office means less vigorous electoral debate.   The challenged contribution limits—particularly when considered in tandem with their corollary public funding system—directly address this concern and produce more political speech by encouraging more candidates to run for office.

Third, campaign contribution limits also create more vigorous campaigns by promoting a better informed electorate.   Without contribution limits, individual candidates would have an incentive to focus their attention on fewer potential contributors from whom they hope to receive large contributions.   With contribution limits, in contrast, candidates have an incentive to try to persuade a greater number of voters to contribute to their campaigns.   This increase in the breadth of political discourse will result in a better informed electorate as more citizens interact with candidates.  *See Shrink Mo. Gov't PAC*, 528 U.S. at 401 (Breyer, J., concurring) (noting that contribution limits "seek to build public confidence in [the electoral] process and broaden the base of a candidate's meaningful financial support, encouraging the public participation and open discussion that the First Amendment itself presupposes.");  *see also McConnell*, 540 U.S. at 137 (noting that "measures aimed at protecting the integrity of the process . . . tangibly benefit public participation in political debate.").

- 42 -

For all of the above reasons, the $1,000 campaign contribution limits under Wis. Stat. § 11.26(1)(am) and (2)(an) survive intermediate scrutiny and defendants are, therefore, entitled to judgment in their favor on Count V of the Amended Complaint.

        B.      Count VI fails because the contribution limits are not unconstitutionally low under the Supreme Court's decision in *Randall v. Sorrell*.

In Count VI of the Amended Complaint, plaintiffs allege that the $1,000 contribution limits in Wis. Stat. § 11.26(1)(am) and (2)(an) are unconstitutionally low under the Supreme Court's decision in *Randall v. Sorrell*, 548 U.S. 230 (2006), which struck down Vermont's contribution limit for statewide candidates of $400 per election cycle or $200 each for the primary and general election. Amended Complaint ¶¶ 55 and 56. Plaintiffs suggest that the contribution limits at issue here share the characteristics that doomed the Vermont law in *Randall*. Under closer examination of *Randall* and earlier cases, however, it is clear that *Randall* is easily distinguishable from the present case and that the contribution limits challenged here are not unconstitutionally low.

In *Buckley*, the Supreme Court upheld a limit on contributions to federal candidates of $1,000 per contributor per election. *See Buckley*, 424 U.S. at 23-35. Recognizing that contribution limits implicate First Amendment rights only enough to warrant intermediate scrutiny, the Court determined without hesitation both that the government interest in preventing the reality and appearance of corruption sufficed as a constitutional justification for the contribution ceiling and that the $1,000 limit was closely drawn to promote that interest because it:

"focuse[d] precisely on the problem of large campaign contributions—the narrow aspect of political association where the actuality and potential for corruption have

been identified—while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources."

*Id.* at 28.

*Buckley* likewise rejected the claim that the federal contribution limit was too low because $1,000 was far less than the amount required to exercise actual corrupting influence over candidates and officeholders. Denying the need for judicial fine tuning of legislatively established contribution limits, the Court said: "[I]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe, whether, say, a $2,000 ceiling might not serve as well as $1,000. Such distinctions in degree become significant only when they can be said to amount to differences in kind." *Id.* at 30 (quotation and citation omitted).

*Buckley* did not explain what was meant by a "difference in kind" between various levels of contribution caps, but *Shrink Mo. Gov't PAC* did. Rejecting the claim that Missouri's $1,075 limit was different in kind from the $1,000 limit upheld in *Buckley*, the Court stated:

> In *Buckley*, we specifically rejected the contention that $1,000, or any other amount, was a constitutional minimum below which legislatures could not regulate. . . . [W]e referred instead to the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to "amas[s] the resources necessary for effective advocacy." We asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless.

*Shrink Mo. Gov't PAC*, 528 U.S. at 397 (internal citations omitted).

In *Randall*, the Court extended the "difference in kind" approach of *Buckley* and *Shrink Mo. Gov't PAC* by applying it to a unique set of factual circumstances involving the lowest contribution limits in the entire nation and found, for the first time, that a particular contribution limit was unconstitutionally low. In a plurality decision, the Court first repeated *Buckley*'s

- 44 -

statement that "we have no scalpel to probe each possible contribution level" and reaffirmed that it ordinarily defers to the superior empirical judgments of legislators about matters related to the costs and nature of running for office. *Randall*, 548 U.S. at 248 (citation and internal quotation marks omitted).  The Court also found, however, that the usual rule of deference to the legislature must be relaxed where there are "danger signs" suggesting that the contribution limits under review may "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id.* at 249.

In the case of Vermont's $400 contribution limit for statewide candidates, the *Randall* Court found that three such "danger signs" were present: (1) the Vermont limits applied per election cycle, which meant that the limit was only $200 for each primary or general election; (2) Vermont's limits were, overall, the lowest in the nation; and (3) "Vermont's limit[s] [were] well below the lowest limit this Court has previously upheld, the limit of $1,075 per election (adjusted for inflation every two years . . .)[.]" *Id.* at 251 (citation omitted).  It was only because of those danger signs that the Court found it appropriate to relax the usual rule of deference and independently examine whether the size of Vermont's contribution limits fell "outside tolerable First Amendment limits." *Id.* at 253.

The danger signs that justified a lower degree of deference in *Randall*, however, are either not present in this case, or not present to the same degree. First, while it is true that Wisconsin's contributions limits, like Vermont's, apply to an entire primary-general election cycle, the impact of that fact is diminished here by the non-partisan nature of Wisconsin's judicial elections.  That is, because Wisconsin's judicial candidates do not run on party tickets, there is no need for routine party primaries.  Only if three or more Supreme Court candidates are on the ballot is there need

for a non-partisan primary to reduce the number of candidates to two for the general election.  In contrast, the Vermont limits applied to legislative and executive branch races in which party primaries are commonplace.  Moreover, even on those occasions when a Supreme Court primary may be necessary in Wisconsin, there is a smaller chance that there will be three or more candidates who are all sufficiently competitive to give rise to a need for substantial fundraising in order to effectively compete for one of the top two places.  For these reasons, most if not all of the $1,000 limit in Wisconsin Supreme Court races is likely to often be available to candidates in the general election.  That was not similarly the case in Vermont.

Second, Wisconsin's limits, unlike Vermont's, are not the lowest in the nation.  On the contrary, Wisconsin's $1,000 limit is two-and-a-half times larger than the $400 Vermont limit invalidated in *Randall*.  Nor is Wisconsin's limit out of step with the rest of the nation.  On the contrary, at least seven other states have limits of $1,010 or less per year or per primary-general election cycle.  *See*, *e.g.*, Alaska Stat. § 15.13.070(b)(1) ($500 per candidate per year); Ariz. Rev. Stat. § 16-905 ($1,010 per candidate per election, where the general election is defined as including the primary, *see* Ariz. Rev. Stat. § 16-901); Colo. Const. art. XXVIII, § 3(1)(a) ($500 per candidate per primary or general election); Fla. Stat. Ann. § 106.08(1)(a) ($500 per candidate per election); Me. Rev. Stat. Ann. tit. 21-A, § 1015 ($350 per candidate per election for any office other than governor); Mass. Gen. Laws ch. 55, § 7A(a)(1) ($500 per candidate per year); Mont. Code Ann. § 13-37-216(1)(a) ($500 per candidate per year for governor, $250 for other statewide offices).  Considered in this nationwide context, Wisconsin's $1,000 contribution limits for Supreme Court candidates are not suspiciously atypical, as were the limits in *Randall*.

Third, Wisconsin's $1,000 contribution limit is much closer to the $1,075 limit upheld in *Shrink Mo. Gov't PAC* than was Vermont's $400 limit.

- 46 -

For all of the above reasons, the contribution limits at issue here do not exhibit the same danger signs that were present in *Randall*.  Accordingly, there is no need here for this Court to proceed to the kind of extraordinary independent judicial scrutiny that was warranted in *Randall*.  Rather, the Court should follow the standard rule of deference established in *Buckley* and *Shrink Mo. Gov't PAC* and uphold Wisconsin's $1,000 contribution limit without attempting to substitute the Court's judgment in place of that of the Wisconsin Legislature.  *See also Mont. Right to Life Ass'n, et al. v. Eddleman*, 343 F.3d 1085, 1092-96 (9th Cir. 2003) (upholding $100, $200, and $400 limits on contributions to legislative, statewide, and gubernatorial candidates); *Daggett*, 205 F.3d at 461-62 (upholding $250 limit on contributions to legislative candidates); *Shrink Mo. Gov't PAC v. Adams*, 204 F.3d 838, 840 (8th Cir. 2000) (upholding $275, $525, and $1,075 limits on contributions to House, Senate, and statewide candidates); *Florida Right to Life, Inc. v. Mortham*, 2000 WL 33733256, *4-*6 (M.D. Fla. Mar. 20, 2000) (upholding $500 limit).

Furthermore, even if this Court were to find sufficient danger signs to relax the rule of deference, this case is still distinguishable from *Randall*.  In that case, after finding the danger signs discussed above, the Court went on to consider five factors that, in its view, cumulatively justified invalidation of Vermont's contribution limits.  *See Randall*, 548 U.S. at 253-62.  The five factors were:

(1) the Vermont limits significantly restricted the amount of funding available for challengers to run competitive campaigns against incumbents, particularly the funds supplied by political parties, *see id.* at 253-54;

(2) Vermont required that "*political parties abide by exactly the same low contribution limits that appl[ied] to other contributors*," *id.* at 256 (emphasis in original);

(3) Vermont restricted the non-financial support that volunteers could contribute to candidates and provided no exceptions for volunteer expenses, *see id.* at 259;

(4) the Vermont contribution limits were not statutorily adjusted for inflation, *see id.* at 261; and

(5) there was no special justification to warrant Vermont's low and restrictive contribution limits, *id.*

Under the *Randall* plurality decision, it was only the combined effect of all these factors, "*[t]aken together* . . . ," that rendered Vermont's contribution limits unconstitutional. *Id.* at 253 (original emphasis).

As with the danger signs discussed above, so with these five factors, the Wisconsin contribution limits differ significantly from the limits in *Randall*. Regarding the first two factors, the Wisconsin limits do not significantly restrict the amount of money that political parties can supply to non-incumbent candidates, nor do they burden association rights by imposing the same dollar limits on party contributions as on individual contributions. On the contrary, the contribution limit in Wis. Stat. § 11.26(1)(am) applies only to individuals, while the limit in Wis. Stat. § 11.26(2)(an) expressly does not apply to political party or legislative campaign committees.

Regarding the third factor, the Wisconsin limits do not restrict volunteer activities in the way that Vermont's limits did. In Vermont, a "contribution" was broadly defined to include volunteer travel expenses and volunteer expenditures greater than $100. *See Randall*, 548 U.S. at 239. In contrast, the statutory definition of contribution in Wisconsin does not include uncompensated personal services, Wis. Stat. § 11.01(6)(b)1., voluntarily provided food, invitations, and use of property for residential non-fundraising events, Wis. Stat. § 11.01(6)(b)2., or volunteer travel expenses, Wis. Stat. § 11.01(6)(b)3. Therefore, in Wisconsin, much more than in Vermont, volunteer citizen participation in the campaign process does not count against the contribution limits and is statutorily encouraged.

With regard to the fifth factor, there clearly are special justifications warranting Wisconsin's $1,000 limit on contributions to Supreme Court candidates of a type that did not exist in Vermont.  First, as previously noted, the Wisconsin contribution limit is closely tied to the availability of full public financing for Wisconsin Supreme Court candidates.  There was no such connection to public funding justifying the Vermont limits.  Second, as also discussed previously, the Wisconsin limit is especially justified by the state's heightened interest in promoting judicial impartiality and independence and combating the reality or appearance of corruption in elections to the state's highest court.  That state interest was not present in Vermont, where the contribution limits did not apply to judicial candidates.

In contrast to the above factors, the only one of the five factors that is common to the Wisconsin and Vermont contribution limits is the fourth factor—*i.e.*, the absence of an automatic statutory adjustment for inflation.  In *Randall*, however, the lack of inflation indexing "was only one of five factors that, *taken together,* led the Court to conclude that the challenged act's contribution limits were not closely drawn, but disproportionately burdened numerous First Amendment rights."  *Ognibene v. Parkes*, 599 F.Supp.2d 434, 454 (S.D.N.Y. 2009) (citing *Randall,* 548 U.S. at 261-62).  *Randall* thus does not provide support for the conclusion that constitutionally permissible contribution limits must always be indexed for inflation.  *Id.*; *see also Anh Cao v. Federal Election Com'n*, 688 F.Supp.2d 498, 548 (E.D. La. 2010) ("[F]ailure to index, taken on its own, is certainly not fatal to a campaign finance statute.").

For all of the above reasons, the $1,000 campaign contribution limits under Wis. Stat. § 11.26(1)(am) and (2)(an) are not unconstitutionally low and defendants are, therefore, entitled to judgment in their favor on Count VI of the Amended Complaint.

CONCLUSION

For all of the reasons state herein, defendants respectfully ask the Court to enter judgment in their favor on all six counts in the Amended Complaint and to grant them such further relief as the Court deems appropriate.

Dated this 9th day of July 2010.

J.B. VAN HOLLEN
Attorney General


s/ Thomas C. Bellavia
THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

CHRISTOPHER J. BLYTHE
Assistant Attorney General
State Bar #1026147

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel:    (608) 266-8690 (TCB)
        (608) 266-0180 (CJB)
Fax:    (608) 267-2223
Email:  bellaviatc@doj.state.wi.us
        blythecj@doj.state.wi.us


bellaviatc\cases\first amendment cases\election cases\wrtl\br\2010 07-09 mjp brief.doc