# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| **WISCONSIN RIGHT TO LIFE POLITICAL ACTION COMMITTEE et al.,** | |
| *Plaintiffs*, | |
| *v.* | **Civil Action No. 3:09-cv-00764** |
| **MICHAEL BRENNAN et al.,** | |
| *Defendants*. | |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

Michael D. Dean
First Freedoms Foundation, Inc.
20975 Swenson Drive, Suite 125
Waukesha, WI 53186
Ph: 262/798-8046
Fax: 262/798-8045
*Local Counsel for Plaintiffs*

James Bopp Jr., Ind. #2838-84
Anita Y. Woudenberg, Ind. #25162-64
Sarah E. Troupis, Wis. #1061515
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Ph: 812/232-2434
Fax: 812/234-3685
*Lead Counsel for Plaintiffs*

**Table of Contents**

I.  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  The Standards for Judgment on the Pleadings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   B.  The Rescue Funds and Independent Expenditure Provisions of the IJB
      Are Unconstitutional as a Matter of Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      1.  The Rescue Fund Provision is Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         a.  The Rescue Fund Provision Substantially Burdens WRTL's First
            Amendment Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

         b.  The Rescue Fund Provision Fails Strict Scrutiny . . . . . . . . . . . . . . . . . . . . . . . 9

      2.  The Independent Expenditure Provision of the IJB Is Unconstitutional . . . . . . . . . 10

   C.  The Independent Expenditure Provision Is Vague and Overbroad . . . . . . . . . . . . . . . . . 13

      1.  The Independent Expenditure Provision Is Vague . . . . . . . . . . . . . . . . . . . . . . . . . 13

      2.  The Independent Expenditure Provision Is Overbroad . . . . . . . . . . . . . . . . . . . . . . 15

   D.  The Contribution Limits of the IJB Are Unconstitutional . . . . . . . . . . . . . . . . . . . . . . . . 17

      1.  The Contribution Limits Fail Intermediate Scrutiny . . . . . . . . . . . . . . . . . . . . . . . . 17

      2.  The Contribution Limits of the IJB Are Unconstitutionally Low and
         Lack Special Justification . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# Table of Authorities

*Cases*

*Anderson v. Milwaukee County,*
　　433 F.3d 975 (7th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Broadrick v. Oklahoma,*
　　413 U.S. 601 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

*Buckley v. Valeo,*
　　424 U.S. 1 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Citizens for Responsible Gov't v. Davidson,*
　　236 F.3d 1174 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Citizens United v. FEC,*
　　130 S. Ct. 876 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 19

*Commodity Trends Serv. v. Commodity Futures Trading Comm'n,*
　　149 F.3d 679 (7th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Daggett v. Commission on Governmental Ethics and Election Practices,*
　　205 F.3d 445 (1st Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

*Day v. Hayes,*
　　863 F.Supp. 940 (D. Minn. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Day v. Holohan,*
　　34 F.3d 1356 (8th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Davis v. FEC,*
　　128 S. Ct. 2759 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*FEC v. National Conservative Political Action Committee,*
　　470 U.S. 480 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 11

*FEC v. National Right to Work Comm.,*
　　459 U.S. 197 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*FEC v. Wisc. Right to Life,*
　　551 U.S. 449 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Foreseth v. Vill. of Sussex,*
　　199 F.3d 363 (7th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ii

*Gable v. Patton*,
    142 F.3d 940 (6th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Green Party of Connecticut v. Garfield*,
    648 F. Supp. 2d 298 (D. Conn. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 8, 10

*Guise v. BMW Mortgage, LLC*,
    377 F.3d 795 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McComish* v. *Bennett*,
    No. 09A-1163, 2010 WL 2265319 (June 8, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*McComish v. Bennett*,
    No. 10-14165, 2010 WL 2595288 (9th Cir. May 21, 2010) . . . . . . . . . . . . . . . . . . . . . . 8

*McComish v. Brewer*,
    No. CV-08-1550, 2010 WL 2292213 (D. Ariz. Jan. 20, 2010) . . . . . . . . . . . . . . . . . . . . 8

*McConnell v. FEC*,
    540 U.S. 93 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 17, 18

*N.C. Right to Life Committee Fund for Independent Political Expenditures v. Leake*,
    524 F.3d 427 (4th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

*Nixon v. Shrink Mo. Gov't. PAC*,
    528 U.S. 377 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Randall v. Sorrell*,
    548 U.S. 230 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Rosenstiel v. Rodriquez*,
    101 F.3d 1544 (8th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Stromberg v. People of the State of California*,
    283 U.S. 359 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Thomas v. Guardsmark, Inc.*,
    381 F.3d 701 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Thomason v. Nachtrieb*,
    888 F.2d 1202 (7th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*United States v. Wood*,
    925 F.2d 1580 (7th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Constitutions, Statutes, and Rules*

U.S. Const. amend. I. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

N.C. Gen. Stat. Ann. § 163-278.66 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Wis. Stat. § 11.05 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Wis. Stat. § 11.06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Wis. Stat. § 11.26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

Wis. Stat. § 11.513 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 11, 14

Fed. R. Civ. P. 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Other Authorities*

Press Release, Institute for Justice, *U.S. Supreme Court Prevents Arizona From
      Penalizing Free Speech During 2010 Election*, June 8, 2010. . . . . . . . . . . . . . . . . . . . . . 8

On July 9, 2010, Defendants filed their Motion for Judgment on the Pleadings. Plaintiffs now timely respond.

# I.  Introduction

The United States Supreme Court has only recognized one state interest that rises to a level that justifies the sort of campaign finance regulation at issue in this case: the interest in quid-pro-quo corruption. *Buckley v. Valeo*, 424 U.S. 1, 25-26 (1976); *Citizens United v. FEC*, __ U.S. __, 130 S. Ct. 876, 909-11 (2010). In their Brief in Support of Judgment on the Pleadings ("Defs. Opening Br."), Defendants repeatedly acknowledge that the disclosure requirements and contribution limits of Wisconsin's Impartial Justice Bill ("IJB") are designed to serve the rescue fund provision of the IJB. However, Defendants' own arguments illustrate that this relationship between the different portions of the IJB is not meant to fight corruption, but to "level the playing field" for candidates for Wisconsin Supreme Court races. The U.S. Supreme Court has repeatedly determined that justifying campaign finance regulations as a method to equalize the funding for candidates is unconstitutional. Plaintiffs' Amended Verified Complaint detailed these specific failings of the IJB, as well as its failings for vagueness and overbreadth. Thus, Plaintiffs' claims not only withstand a Judgment on the Pleadings, but, as set forth in Plaintiffs' Motion for Summary Judgment and Brief in Support thereof, are sufficient to warrant summary judgment in their favor.

# II.  Argument

## A.    The Standards for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) authorizes a judgment on the pleadings "after the pleadings are closed but within such a time as not to delay trial." Fed. R. Civ. P. 12(c).  Under Rule 12(c) a party essentially raises a proper Rule 12(b)(6) motion by challenging the sufficiency

1

of the complaint. *Thomason v. Nachtrieb,* 888 F.2d 1202, 1204 (7th Cir. 1989). Therefore, a motion for judgment on the pleadings is subject to the same standard as a Rule 12(b)(6) motion to dismiss. *United States v. Wood*, 925 F.2d 1580, 1581 (7th Cir. 1991); *Guise v. BMW Mortgage, LLC*, 377 F.3d 795, 798 (7th Cir. 2004). In considering a Rule 12(c) motion, a court looks to the content of the pleadings and must accept all well-pleaded allegations in the complaint as true. *Foreseth v. Vill. of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). Therefore, the district court may only grant the motion if, after viewing all of the facts in a light most favorable to the non-moving party and drawing all reasonable inferences in favor of the non-moving party, it is beyond a doubt that the non-movant can plead no facts that would support a claim for relief. *United States v. Wood*, 925 F.2d at 1581; *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 704 (7th Cir. 2004).

Defendants do not dispute any facts Plaintiffs have asserted, but instead argue that the challenged provisions do not burden speech and thus Plaintiffs have no First Amendment claims. (Defs. Opening Br. at 8.) As fully developed below, not only do the challenged claims burden speech, but Plaintiffs' claims satisfy First Amendment principles such that they are entitled to judgment in their favor. (*See also* Plaintiffs' Brief in Support of Motion for Summary Judgment, Dkt. 57.)

**B.    The Rescue Funds and Independent Expenditure Provisions of the IJB are Unconstitutional as a Matter of Law.**

The First Amendment to the United States Constitution states, "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. Amend. I.[1] The freedoms of speech and association protected by the First Amendment have their "fullest and most urgent application

---

[1] The First Amendment is applicable to the states through the Fourteenth Amendment. *Stromberg v. People of the St. of Cal.*, 283 U.S. 359, 368 (1931).

precisely to the conduct of campaigns for political office." *Buckley v. Valeo*, 424 U.S. at 15

(1976) (citation omitted).

Pursuant to Wisconsin's Impartial Justice Bill, codified at Wis. Stat. § 11.513(2) (the

"Rescue Fund Provision"):

> [w]hen the aggregate independent disbursements made or obligated to be made by a person against an eligible candidate for an office or for the opponents of that candidate exceed 120 percent [or $360,000 in a general election] of the public financing benefit for that office in the primary election campaign period, the board shall immediately certify to the state treasurer the name of that candidate together with the amount of a supplemental grant that shall become payable to that candidate. The supplemental grant shall be equivalent to the aggregate independent disbursements exceeding the applicable public financing benefit made or obligated to be made by a person, but not to exceed, exclusive of any amount to which a candidate is entitled under s. 11.512(2), an amount equal to 3 times the public financing benefit payable to a candidate for the applicable office at the primary or other election for which the benefit is received. The state treasurer shall then immediately credit that candidate with an additional line of credit for the amount certified.

To facilitate the Rescue Fund Provision, the IJB contains an "Independent Expenditure

Provision," codified at Wis. Stat. § 11.513(1) that states:

> [when] any person makes, or becomes obligated to make, by oral or written agreement, an independent disbursement in excess of $1,000 with respect to a candidate for the office of justice at a spring primary or election, that person shall file with the board a notice of the disbursement or obligation to make the disbursement. Any such person shall file reports of such disbursements or obligations to make such disbursements on the 15th or last day of the month that immediately follows the date of the disbursement or the obligation to make the disbursement, whichever comes first, except that, within 6 weeks prior to the date of the spring primary election, if a primary is held, and within 6 weeks prior to the date of the spring election, the person shall file such reports within 24 hours after each independent disbursement is made or obligated to be made. Any such person shall file an additional report after each additional $1,000 of disbursements are made or obligated to be made.

To determine the constitutionality of both the Rescue Fund Provision and the

Independent Expenditure Provision, this Court must make a three-part determination for the

statutes at issue: first, whether the provisions burden First Amendment rights; second, in

3

light of any First Amendment burdens, the proper level of scrutiny to apply; and third, whether the provisions meet the applicable level of scrutiny. As set forth in Plaintiffs' Summary Judgment Brief, Amended Verified Complaint, as well as below, the Rescue Fund Provision and the Independent Expenditure Provision are a substantial burden on Plaintiff WRTL's First Amendment rights, and under the applicable strict scrutiny standard, fail to meet their required constitutional burden.

      **1.**       **The Rescue Fund Provision Is Unconstitutional.**

          **a.**      **The Rescue Fund Provision Substantially Burdens WRTL's First Amendment Rights.**

Plaintiff WRTL intends to raise and spend in excess of $1,000 on independent expenditures in support of a 2011 Wisconsin Supreme Court candidate. (Am. Verified Compl. ¶ 18.) WRTL believes such an independent expenditure is the clearest way to communicate with the voters regarding this race. (*Id.*) However, with the IJB in place, WRTL will not make its independent expenditures supporting a nonparticipating candidate or opposing a participating candidate in the 2011 election, because it is highly likely that the threshold of $360,00 will be reached and their expenditure will be matched under the Rescue Fund Provision for that participating candidate. (Id. at ¶¶ 19, 20.) Contrary to Defendants' assertions, this chilling effect of core First Amendment freedoms creates a substantial burden analogous to that in *Davis v. FEC*, 128 S. Ct. 2759 (2008). (Defs. Opening Br. at 9.) *See also Green Party of Conn. v. Garfield,* __ F.3d. __, 2010 WL 2737153 at *25 (2d Cir. July 13, 2010). Much like the asymmetrical contribution limits in *Davis v. FEC*, the rescue fund provision requires WRTL "to choose between the First Amendment right to engage in unfettered political speech and subjection to" effectively funding a participating opponent. 128 S. Ct. at 2772. If WRTL were to

4

choose to speak despite the effect of the rescue funds provision, it "must shoulder a special and potentially significant burden." *Id.* (*citing Day v. Holahan*, 34 F.3d 1356, 1359-60 (8th Cir. 1994).

The "resulting drag on First Amendment rights is not constitutional simply because it attaches as a consequence of a statutorily imposed choice." *Id.* The Rescue Fund Provision is not merely a public financing scheme where candidate and third parties retain unfettered rights to make expenditures. *See id.* (*citing Buckley v. Valeo*, 424 U.S. at 54-58). The rescue funds do not provide organizations like WRTL any way to exercise their right without it being abridged once the threshold amount of $360,000 has been hit. *See Davis*, 128 S. Ct. at 2772. Indeed, the burden on third parties is actually greater than on candidates. A candidate must choose between participating in the rescue fund scheme, or not participating in the scheme and being substantially burdened by triggering funds to his opponent based upon his own spending. But groups like WRTL must choose between independently supporting a nonparticipating candidate with the consequent trigger of funds to a participating opponent, and not participating in that race at all. The Rescue Fund Provision thus imposes a particularly substantial burden on WRTL's free speech.

Defendants claim no burden on speech exists because the Rescue Fund Provision furthers First Amendment freedom of speech by "facilitating more political speech, without imposing any legal restrictions on the ability of non-participating candidate or their supporters to raise and spend money to further their own views." (Defs. Opening Br. at 15.) That chilling groups like WRTL from speaking somehow "facilitates speech" is dubious. But more crucially, the lack of direct restriction on speech is not necessary. As the *Davis* court held, a campaign finance regulation that imposes a penalty on the robust exercise of a First Amendment right is just as

5

substantially burdensome as a direct restriction. *Davis*, 128 S. Ct. at 2771.  While the Rescue

Fund Provision may not impose a direct cap on independent expenditures, its penalty on both the

candidate and his or her supporters' right to engage in free speech is a substantial burden.  And

indeed, as was stated in *Buckley*, "the concept that government may restrict the speech of some

elements of our society in order to enhance the relative voice of others is wholly foreign to the

First Amendment."  424 U.S. at 48-49.  *See also Day v. Holohan*, 34 F.3d at 1360 ("The

knowledge that a candidate who one does not want to be elected will have her spending limits

increased . . . as a direct result of that independent expenditure, chills free exercise of that

protected speech").

Defendants would have this court follow a line of cases in which *Daggett v. Commission*

*on Governmental Ethics and Election Practices* is the most prominent. 205 F.3d 445 (1st Cir.

2000). *See also N.C. Right to Life Committee Fund for Independent Political Expenditures v.*

*Leake*, 524 F.3d 427 (4th Cir. 2008); *Gable v. Patton*, 142 F.3d 940 (6th Cir. 1998); *Rosenstiel v.*

*Rodriquez*, 101 F.3d 1544 (8th Cir. 1996).  However, each of these cases was decided prior to

the Supreme Court's decision in *Davis v. FEC*, which clarified many of the issues surrounding

rescue funds, and which governs this Court's decision.

The *Davis* case involved the so-called "Millionaire's Amendment" to the Bipartisan

Campaign Reform Act ("BRCA").  Under the Millionaire's Amendment of the BCRA, "when a

candidate spends more than $350,000 in personal funds and creates what the statute apparently

regards as a financial imbalance, that candidate's opponent may qualify to receive both larger

individual contributions than would otherwise be allowed and unlimited coordinated party

expenditures." *Davis,* 128 S. Ct. at 2770.  The Court found that the Millionaire's Amendment

6

"scheme impermissibly burdens [the] First Amendment right to spend [one's] own money for campaign speech." *Id*. at 2771. The Court reasoned that:

> [w]hile BCRA does not impose a cap on a candidate's expenditure of personal funds, it imposes an unprecedented penalty on any candidate who robustly exercises that First Amendment right. [The Millionaire's Amendment] requires a candidate to choose between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations.

*Id*.

In *Daggett*, the First Circuit upheld the rescue funds provision of the Maine Clean Election Act against a First Amendment challenge. 205 F.3d at 464-65. However, the Supreme Court's subsequent decision in *Davis v. FEC* shows that the reasoning in *Daggett*, as well as the other cases cited by Defendants, was flawed. In *Daggett*, the First Circuit stated that the Maine Clean Election Act "in no way limits the quantity of speech one can engage in or the amount of money one can spend engaging in political speech, nor does it threaten censure or penalty for such expenditures. These facts allow us comfortably to conclude that the provision of matching funds based on independent expenditures does not create a burden on speakers' First Amendment rights." *Daggett*, 205 F.3d at 464. The Supreme Court expressly rejected this view in *Davis v. FEC*. In *Davis v. FEC*, "the vigorous exercise of the right to use personal funds to finance campaign speech produce[d] fundraising advantages for opponents in the competitive context of electoral politics." 128 S.Ct. at 2772. The Supreme Court found that "[t]he resulting drag on First Amendment rights is not constitutional simply because it attaches as a consequence of a statutorily imposed choice." *Id*. The Supreme Court in *Davis v. FEC* approved of the reasoning in *Day*, stating that those who make the choice to trigger rescue funds provisions through their spending choices "must shoulder a special and potentially significant burden if they make that choice." *Id*. Thus, the Supreme Court has clarified that *Davis v. FEC*, rather than the

7

reasoning employed in *Daggett* and the cases cited by Defendants, controls the constitutionality of the Rescue Fund Provision of the IJB.

Most recently, in *Green Party of Connecticut*, a similar rescue fund provision was struck down because of the Supreme Court's reasoning in *Davis v. FEC*. As opposed to the IJB, the Connecticut statute was passed in response to several corruption scandals and therefore had more validity and support. Nevertheless, the Connecticut rescue fund provision was still struck down. The Second Circuit specifically noted that a rescue fund provision causes the nonparticipating candidate to "shoulder a special and potentially significant burden" because he or she can only spend above the threshold if he or she accepts that the opponent will receive additional public money.[2] *Green Party*, 2010 WL 2737153 at *26; *see also Davis*, 128 S. Ct. at 2772.

Prior to the Supreme Court's decision in *Davis v. FEC*, there was some division among courts as to whether rescue funds provisions, like the Rescue Fund Provision of the IJB, were a substantial burden on First Amendment rights. However, the *Davis v. FEC* decision

---

[2] Shortly after the *Green Party of Connecticut* decision, the Arizona District Court considered a similar case and found that *Davis* applied to a rescue funds scheme and that such rescue funds scheme was therefore unconstitutional. In *McComish v. Brewer*, No. CV-08-1550, 2010 WL 2292213 (D. Ariz. Jan. 20, 2010), the court analyzed the rescue fund case before it under *Davis v. FEC*: "Plaintiffs face a choice very similar to that faced in *Davis*: either 'abide by a limit on personal expenditures' or face potentially serious negative consequences. . . . Here, the negative consequence is having one's opponent receive additional funds." *Id.* at *8. The Arizona court then quoted *Green Party of Connecticut*, and concluded that "[i]f lifting a candidate's opponent's fundraising limitations constitutes a 'substantial burden,' awarding funds to a candidate's opponent must constitute a 'substantial burden' as well. " *Id.* at *8. The Arizona court then found that the rescue fund scheme in Arizona failed strict scrutiny, entered summary judgment for the plaintiffs in that case, and enjoined enforcement of Arizona's rescue funds provisions. *Id.* at *13.

On May 21, 2010, the U.S. Court of Appeals for the Ninth Circuit reversed the District Court's decision. *McComish v. Bennett*, No. 10-14165, 2010 WL 2595288 (9th Cir. May 21, 2010). However, shortly thereafter, on June 8, 2010, the Supreme Court vacated the stay issued by the Ninth Circuit, pending timely filing and disposition of a petition for a writ of certiorari. *McComish v. Bennett*, No. 09A-1163, 2010 WL 2265319 (June 8, 2010). Attorneys for plaintiffs in the *McComish* case have indicated they will soon be filing a petition for a writ of certiorari. Press Release, Institute for Justice, *U.S. Supreme Court Prevents Arizona From Penalizing Free Speech During 2010 Election*, June 8, 2010.

demonstrates why statutes such as the Rescue Fund Provision are a substantial burden on First Amendment rights, and that such statutes are unconstitutional.

### b.     The Rescue Fund Provision Fails Strict Scrutiny.

Because the Rescue Fund Provision is a substantial burden on speech, strict scrutiny applies.[3] *Davis*, 128 S. Ct. at 2772. As set forth above, since *Buckley*, there has been only one legitimate compelling state interest for restricting campaign finance: the interest in preventing corruption or the appearance of corruption. *See FEC v. National Conservative Political Action Committee*, 470 U.S. 480, 496-97 (1985) ("The corruption-related interest cited by the *Buckley* Court remains "the only legitimate and compelling government interest [] thus far identified for restricting campaign finances"); *see also Davis*, 128 S. Ct. at 2771 (reaffirming *Buckley*'s argument that an expenditure cap cannot be justified on grounds of equalizing the relative financial resources of candidates competing for government office). Thus, the only compelling government interest that the State can use to justify infringing First Amendment rights through the IJB is that the IJB specifically addresses corruption or the appearance of corruption.  Yet Defendants, with the burden of proving this interest, fail to meet that burden. *See FEC v. Wisc. Right to Life*, 551 U.S. 449, 464 (2007).

Defendants argue that the purpose of the Rescue Fund Provision is to protect a participating candidate from a "tactical competitive advantage" from her opponent and thereby secure her participation in the program and reduce corruption.  (Defs. Opening Br. at 25.) However, inducing participation in the program is not a legitimate interest.  As the Second Circuit stated in *Green Party of Connecticut*, "encouraging participation in the [fund] does not

---

[3] Defendants do not specifically address the applicable level of scrutiny for the Rescue Fund Provision of the IJB.  Because the burden is on Defendants to demonstrate that scrutiny is satisfied, if this Court finds a substantial burden exists, it should find the Rescue Fund Provision fails strict scrutiny.

justify the burden on First Amendment rights caused by the [rescue fund] provision." 2010 WL 2737153 at *27.  Moreover, in establishing the rescue fund, with all its attendant reporting, Wisconsin gives a participating candidate a tactical competitive advantage. Every communication made or intended to be made through expenditures by a nonparticipating candidate or third party is reported to the State, resulting in a reporting burden to the nonparticipating candidate that does not fall on the participating candidate. Thus, even if the State's argument as to the substantiality of the interest was legitimate, the Rescue Fund Provision is not narrowly tailored.[4]

The Rescue Fund Provision at issue here is comparable to the rescue fund provision struck down in *Green Party of Connecticut*, and the effects are comparable to the provision in *Davis v. FEC*.  Like those previously struck down laws, Wisconsin's Rescue Fund Provision penalizes and consequently chills political speech.  Accordingly, the Court should follow the Second and Eighth Circuits, and the Supreme Court, and hold that the Rescue Fund Provision of the IJB is an unconstitutional burden on First Amendment rights.

**2.      The Independent Expenditure Provision of the IJB Is Unconstitutional.**

Plaintiff WRTL intends to raise and spend in excess of $1,000 on independent expenditures in support of a 2011 Wisconsin Supreme Court candidate because it believes it is the clearest way to communicate with the voters. (Am. Verified Compl. ¶ 18.) Wis. Stat. § 11.513(1) requires a person who makes an independent expenditure of $1000 or more "with respect to" a candidate to file notice of the expenditure to the State. That report must be filed on

---

[4] If the State truly sought to ameliorate a "tactical advantage" in a narrowly tailored way, the complicated and unconstitutional system they have set up would not be the method chosen. Instead, the State could have implemented a system where candidates are given an adequate amount of money for his or her campaign from the first day of the campaign, thus not requiring the unconstitutional rescue fund system they have set up.

the fifteenth or last day of the month following the expenditure. Wis. Stat. § 11.513(1). If the expenditure is made within six weeks of the election, it must be reported within 24 hours of being made. *Id.* These reports are required for each separate expenditure of $1000 or more, and apply not just to actual expenditures, but any "obligated" expenditure, which is an expenditure that has not yet been made and may never actually be made. *Id.*

In *Buckley*, the Supreme Court specifically stated that "significant encroachments on First Amendment rights of the sort that compelled disclosure imposes cannot be justified by a mere showing of some legitimate governmental interest," and instead required "exacting scrutiny." *Buckley*, 424 U.S. at 64.  Rescue fund provisions do impose a substantial burden upon the core freedoms protected by the First Amendment. *Davis*, 128 S. Ct. at 2774-75.  Therefore, as outlined in *Buckley*, the applicable level of scrutiny requires that an independent expenditure provision must be narrowly tailored and "justified by a compelling state interest." *Id.* at 2772; *see also Buckley*, 424 U.S. at 64.

Since the reporting requirements must survive strict scrutiny, the State's compelling interest must be in preventing corruption or the appearance of corruption. *See FEC v. Nat'l Conservative Political Action Comm.*, 470 U.S. 480, 496-97 (1985) ("The corruption-related interest cited by the *Buckley* Court remains "the only legitimate and compelling government interest [] thus far identified for restricting campaign finances"); *see also Davis*, 128 S. Ct. at 2771 (reaffirming *Buckley's* holding that an expenditure cap cannot be justified on grounds of equalizing the relative financial resources of candidates competing for government office). However, the State advance no such argument; instead, the State repeatedly acknowledges that the purpose of the disclosure requirement is to implement the rescue fund and minimize "tactical advantage."  (Defs. Opening Br. at 6, 25.) Any informational interest to expose corruption is

11

minimal because of reporting requirements already in place. *See* Wis. Stat. ¶¶ 11.05 and 11.06.

Without the prerequisite compelling interest, the independent expenditure provision fails strict

scrutiny.

Defendants also urge that a lesser form of scrutiny be applied, relying heavily on

*Buckley*'s determination that line-drawing was "necessarily a judgmental decision" and that

reporting requirements should be struck down only if the provision is "wholly without

rationality." (Defs. Opening Br. at 24.)  However, this analysis by the *Buckley* Court referred to

the threshold limit that would trigger the reporting requirement, not the reporting requirement

itself. *Buckley*, 424 U.S. at 83. As a result, Defendants' claim that something less than strict

scrutiny applies with regard to the Independent Expenditure Provision's reporting requirements

is without merit.

Defendants also attempt to distinguish between a 24-hour reporting requirement that applies at

all times (such as that at issue in *Citizens for Responsible Gov't v. Davidson*, 236 F.3d 1174,

1197 (10th Cir. 2000))*,* from a 24-hour reporting requirement that only applies in a limited time

period before an election (such as that of the Independent Expenditure Provision of the IJB).

(Defs. Opening Br. at 27). This difference in timing—which results in an increase in the number

of reports—makes no difference at all, because increasing the number and timing of reports

during the final six weeks of a campaign in no way combats corruption beyond what Wisconsin's

reporting requirements already do. If Wisconsin wanted to more clearly address its alleged anti-

corruption interest, it would be better served by more thorough reporting requirements—such as

12

more detailed reports about independent expenditures—than by requiring more reports at a quickened pace.[5]

Like the Rescue Fund Provision of the IJB, the Independent Expenditure Provision's reporting requirement imposes a substantial burden on WRTL's First Amendment rights. Applying strict scrutiny, the State cannot justify the reporting requirement of the Independent Expenditure Provision, which is thus unconstitutional.

## C. The Independent Expenditure Provision Is Vague and Overbroad.

### 1. The Independent Expenditures Provision is Vague.

A law is void for vagueness "if it fails to give fair warning of what is prohibited, if it fails to provide explicit standards for the persons responsible for enforcement and thus creates a risk of discriminatory enforcement, and if its lack of clarity chills lawful behavior." *Anderson v. Milwaukee Co.*, 433 F.3d 975, 978 (7th Cir. 2006). As set forth by Defendants, mathematical precision or certainty is not required of the law (Defs. Opening Br. at 30). However, laws regulating First Amendment freedoms—such as the IJB—are closely examined to ensure they are precisely drafted. *Buckley,* 424 U.S. at 40-41.

---

[5] Additionally, Defendants attempt to equate the reporting requirements at issue here with those upheld in *McConnell v. FEC*, by referring to their similar time limitations. 540 U.S. 93 (2003). However, *McConnell* is an example of reporting requirements that do not require more, but require better, reporting.  The *McConnell* provision focused on one specific type of expenditure, "electioneering communication" defined as "1) a broadcast, 2) clearly identifying a candidate for federal office, 3) aired within a specific time period, and 4) targeted to an identified audience of at least 50,000 viewers or listeners."  *McConnell*, 540 U.S. at 194. Consequently, the provision in *McConnell* leaves open many expenditures that do not require the 24-hour reporting and focuses on a distinct area of expenditures that were seen as particularly problematic.  The *McConnell* provision is much more precise and burdens speech to a much smaller degree than a 24-hour reporting requirement for any expenditure made within six weeks of an election, such as that of the IJB.

13

The Independent Expenditure Provision requires nonprofit entities like WRTL to not only report actual expenditures, but to report the mere possibility of such expenditures—what the statute deems "obligations"—without articulating what the State considers as such an "obligation." (Am. Verified Compl. ¶ 34.) What rises to the level of an obligation for purposes of determining when to report and what is sanctionable effectuates either excessive, unnecessary reporting that risks disclosing political strategy, or a chill from making the expenditure at all. Because of such vagueness, the reporting requirement unconstitutionally burdens the rights of free speech and free association guaranteed by the First Amendment.

Defendants argue that *McConnell v. FEC* forecloses WRTL's vagueness claim. (Defs. Opening Br. at 28.) *See also McConnell v. FEC*, 540 U.S. 93 (2003). However, *McConnell* is readily distinguishable. In *McConnell*, the Supreme Court upheld a provision that required an electioneering communication expenditure to be disclosed when a contract to produce or broadcast the communication is entered into, even if the communication itself had not yet been disseminated. *McConnell*, 540 U.S. at 199-200. The provision at issue was much more specific than the IJB, in that it applied to a *contract* to disburse such funds. An "obligation" was clearly when an contract had been entered into. Such is not the case with Wisconsin's provision: it provides only that all $1000 disbursements and obligations of such disbursements be reported. Wis. Stat. § 11.513(1).

For similar reasons, Defendants' reliance on *Day v. Hayes*, 863 F. Supp. 940 (D. Minn. 1994) is misguided. The provision in *Day v. Hayes* required reporting when a person "makes or becomes obligated to make by oral or written agreement . . ." *Id.* at 948-50. Defendants focus on the usage of the word "obligated," yet ignore the clarifying, subsequent language. This additional phrase qualifies what an "obligation" is and therefore makes the provision one similar

14

to the *McConnell*-type described above (i.e., an "obligation" as a legal contract). This is entirely unlike the vague "obligation" of Wisconsin's Independent Expenditure Provision, which does not specify what constitutes an "obligation."

Defendants' efforts to write in the contract formalities expressly found in *McConnell* and *Day v. Hayes* only serve to underscore the deficiencies of the reporting requirement language. The Wisconsin statutes define the term "incurred obligation," yet when enacting the IJB, the Legislature made the choice to use the undefined term "obligation." At a minimum, this suggests that the scope of the term "obligation" as used in the IJB is broader than the defined term "incurred obligation." It is precisely this lack of precision in what constitutes an "obligation" in the Independent Expenditure Provision that creates the problem of vagueness in the IJB. Under the IJB, "obligation" might include the mere possibility of a future expenditure, the result of which is either excessive, unnecessary reporting that risks disclosing political strategy, or a chill an individual or group from making the expenditure at all.

### 2.     The Independent Expenditure Provision Is Overbroad.

An overbroad law is to be facially invalidated if the impermissible applications of the law are substantial when compared to the law's legitimate application. *Commodity Trends Serv. v. Commodity Futures Trading Comm'n,* 149 F.3d 679, 688 n. 4 (7th Cir. 1998) (*quoting Broadrick v. Okla.*, 413 U.S. 601, 615 (1973)). As such, the overbreadth doctrine prevents laws from having deterrent effects on protected speech. *Id.*

The Independent Expenditure Provision of the IJB requires nonprofit entities like WRTL to not only report actual expenditures, but to report the possibility of such an expenditure, even if the possible expenditure never actually takes place. (Am. Verified Compl. ¶ 39.) From its language, an "obligation" may be an expenditure that is obligated, but never actually expended.

15

However, because it must be reported upon its obligation, the "obligated" expense may trigger rescue funds, even if it is never becomes an actual expenditure. If the "obligation" does not trigger funds, the reporting of the "obligation" serves no purpose and renders the Independent Expenditure Provision overbroad, because it requires twice as much reporting as is necessary to implement the Rescue Fund Provision.

Defendants claim the Independent Expenditure Provision survives the overbreadth analysis because the reporting requirement of the Independent Expenditure Provision affects both speech and conduct, and is subject to limiting construction. (Defs. Opening Br. at 33.) That the Independent Expenditure Provision's reporting requirement affects both speech and conduct only results in application of the standard that the overbreadth of the statute be both real and substantial. *Broadrick,* 413 U.S. at 615. The reporting requirement satisfies this standard. Indeed, that the reporting requirement reaches obligations *at all* renders it overbroad—it requires substantial reporting of money not yet expended without justification. Requiring reports of obligated expenditures—obligations which may or may not actually transpire—results in multiple reports regarding the same money and has no bearing whatsoever on the disbursement of rescue funds. For this reason, Defendants' efforts to offer a limiting construction of the statute are unavailing. Whatever "obligation" may mean, reporting a mere "obligation" cannot trigger rescue funds. The primary constitutional infirmity with the reporting requirement is not that the word "obligation" itself is overbroad, but that its inclusion as part of the Independent Expenditure Provision's reporting requirement renders the statute overbroad.

Moreover, the overbreadth of the statute is not avoided by limiting the construction to the statutorily defined "incurred obligation." Given that the legislature had the option to employ this statutorily defined term, but chose not to, undermines such a construction.

16

Defendants rely upon a provision in *North Carolina Right to Life Committee for Independent Political Expenditures v. Leake*, 524 F.3d at 440 n.3, to buttress their overbreadth arguments. (Defs. Opening Br. at 34.) However, the "obligation" described by Defendants and the Court is more closely related to the *McConnell*-type described above than the Wisconsin version. Defendants appear to rely on the small portion of the statute quoted in the opinion for their argument; however, a reading of the statute in its entirety shows that the "obligation" of *Leake* is of an entirely different type than that of Wisconsin's Independent Expenditure Provision. Under the North Carolina statute at issue, "participating and certified candidates shall report any money *received*, including all previously unreported qualifying contributions, all campaign expenditures, obligations, and related activities to the Board." N.C. Gen. Stat. Ann. §163-278.66(b) (emphasis added). The North Carolina statute limits the term "obligation" by requiring that "obligation" to have been received before it is reported. This is entirely unlike the scheme in Wisconsin, where an obligation must be reported, whether or not it is actually received by a candidate.

**D.     The Contribution Limits of the IJB Are Unconstitutional.**

**1.     The Contribution Limits Fail Intermediate Scrutiny.**

Wis. Stat. §§ 11.26(1)(am) and (2)(an) establish a $1,000 limit on all contributions to individuals running for a position on the Wisconsin Supreme Court.  (Am. Verified Compl. ¶ 48.)  The U.S. Supreme Court has previously stated that such contribution limits are subject to intermediate scrutiny; in other words, statutes that implement contribution limits must be "closely drawn" to a "sufficiently important interest," or else they abridge First Amendment freedoms. *McConnell v.* FEC, 540 U.S. at 231; *Buckley v. Valeo*, 424 U.S. at 25. The only important  interest the Supreme Court has recognized is the interest in preventing quid-pro-quo

17

corruption. *McConnell,* 540 U.S. at 138; *Nixon v. Shrink Mo. Gov't. PAC*, 528 U.S. 377, 393

(2000); *FEC v. National Right to Work Comm.*, 459 U.S. 197, 198-199, and n. 1 (1982); *Buckley*,

424 U.S. at 26–27.[6]

Defendants do not dispute this standard of review, but instead contend that the State's

anti-corruption interest is reflected in the limits imposed, despite the disparity of limits among

statewide races. (Defs. Opening Br. at 38.)  Defendants argue that those who do not receive full

public funding—as is the case in other statewide races—are legitimately subject to higher

contribution limits to "enable them to raise enough money to finance their campaign." (*Id*. at 38.)

This argument cuts against their contention that corruption is the concern of the $1,000 limit.

Partial public funding of candidates with contribution limits ten times higher for state races other

than Supreme Court demonstrates that the complete public funding at issue here—with its

significantly lower contribution limits—is not necessary to  curb corruption.

Even if the nature of the seat sought somehow justifies lower limits, (Defs. Opening Br.

at 39), the contribution limits among judicial races in Wisconsin are higher for all appellate

courts and certain trial courts than for statewide election of Supreme Court justices. Wis. Stat. §§

11.26(cc) and (cg) (contribution limit for court of appeals judges as $2,500 or $3,000 depending

on location); Wis. Stat. §§ 11.26(cn) and (cw) (contribution limit for candidates for circuit judge

in counties with populations over 300,000 set at $3,000; smaller counties set at $1,000). That

contribution limits are higher in other judicial races casts doubt on the credibility of a corruption

interest being at issue here at all.  That a contribution to a Wisconsin Supreme Court justice is

somehow more corrupting than those to a court of appeals or circuit judge candidate—who hear

---

[6] Defendants discuss other purposes for Wisconsin's campaign finance laws, (Defs. Opening Br. at
40-42), which are not relevant to the analysis.

18

significantly more cases, including every case that eventually makes its way to the Wisconsin Supreme Court—defies logic. Per Defendants' arguments, Supreme Court justices are more susceptible to corruption than other Wisconsin judges, and therefore should be subject to stricter contribution limits, even though they hear the same cases.

Indeed, Defendants concede that the lower contribution limits are intended to induce Supreme Court candidates to participate in public funding. (Defs. Opening Br. at 38.) While providing incentives to accept public financing can be constitutional, the United States Supreme Court has stated that the state may not go beyond mere promotion of voluntary use of public funding and improperly inject itself into the political process by attempting to equalize the relative financial resources of the candidates. *See Buckley,* 424 U.S. at 48-49. With the variable limits imposed by the State in Wisconsin elections, the State is effectively attempting to equalize the financial resources of candidates in their respective races. This attempt to level the playing field has repeatedly been found unconstitutional by the Supreme Court. *See Citizens United*, 130 St. Ct. at 909 (holding that the only constitutionally cognizable interest in restricting political speech is the anti-corruption interest); *Davis,* 128 S. Ct. at 2773 (declining to recognize any interest in equalizing the financial resources of candidates). Thus, the contribution limits do not survive intermediate scrutiny because they are underinclusive and do not support a sufficiently important State interest.

### 2. The Contribution Limits of the IJB Are Unconstitutionally Low and Lack Special Justification.

In claiming that Wisconsin's contribution limits are not unconstitutionally low, Defendants cite to *Randall v. Sorell* and focus on three aspects of *Randall*'s analysis: 1) the Vermont limits applied per election cycle, 2) Vermont's limits were the lowest in the nation

19

overall, and similarly, 3) Vermont's limits were well below the lowest limit the Court had previously upheld. 548 U.S. 230, 248-251 (2006). (*See also* Defs. Opening Br. at 45.) Defendants' analysis, however, fails to address the actual five factors that the *Randall* court looked at in determining whether the contribution limits at issue in that case were constitutional.[7]

The full five factors the court looked at in *Randall* are: 1) whether the record shows that the contribution limits will significantly restrict the funding available for challengers to mount effective campaigns; 2) whether the contribution limits are the same for individuals as well as political parties; 3) whether volunteer activities are excepted from the statute; 4) whether the limits are adjusted for inflation; and 5) whether there is any special justification for the low contribution limits. *Randall*, 548 U.S. at 253-262. Plaintiffs specifically addressed these factors, and why Wisconsin's contribution limits for Supreme Court races fail in light of them, in their Brief in Support of Motion for Summary Judgment. (Summary Judgment Br. at 20-22.) As set forth in that brief, Wisconsin's disparate contribution limits for different races (including the higher contribution limit for judges of lower courts in Wisconsin, as set forth above), the disproportionate burden that challengers suffer under the IJB, the failure of the statute to adjust for inflation, and the lack of a special justification for these lower limits all show that the contribution limits here are unconstitutionally low under the factors set forth by the *Randall* court.

---

[7] Defendants' analysis conflates two tests used by the *Randall* court. The three "danger signs" noted by Defendants are not the test of whether a contribution limit is unconstitutionally too low, but "danger signs that [the] contribution limits may fall outside tolerable First Amendment limits." *Randall*, 548 U.S. at 253. If there is evidence that the contribution limits may fall outside these First Amendment limits, a court "consequently must examine the record independently and determine whether [the] contribution limits are 'closely drawn' to match the State's interest." *Id*. The five factors discussed by Plaintiffs go to the actual test of the constitutionality of the contribution limits, and not to the possibility of a problem that Defendants address.

### III. Conclusion

For the foregoing reasons, as well as those articulated in the Plaintiff's Brief in Support of Motion for Summary Judgment, the Rescue Fund Provision, the reporting requirements of the Independent Expenditure Provision, and the Contribution Limits of the IJB are all unconstitutional as a matter of law. Consequently, this Court should deny Defendants' request for judgment on the pleadings, and grant Plaintiffs' previously filed Motion for Summary Judgment.

Dated: July 30, 2010

Respectfully submitted,

____s/ Michael D. Dean_____

James Bopp Jr., Ind. #2838-84
Anita Y. Woudenberg, Ind. #25162-64
Sarah E. Troupis, Wis. #1061515
BOPP, COLESON & BOSTROM
1 South Sixth Street
Terre Haute, IN 47807-3510
Ph: 812/232-2434
Fax: 812/234-3685
*Lead Counsel for Plaintiffs*

Michael D. Dean
First Freedoms Foundation, Inc.
20975 Swenson Drive, Suite 125
Waukesha, WI 53186
Ph: 262/798-8046
Fax: 262/798-8045
*Local Counsel for Plaintiffs*

21