IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

WISCONSIN RIGHT TO LIFE POLITICAL
ACTION COMMITTEE, et al.,

      Plaintiffs,

v.                                                                         Case No. 09-C-764

MICHAEL BRENNAN, et al.,

      Defendants.

RESPONSE BRIEF IN OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

INTRODUCTION

The defendants in the above captioned matter, by their undersigned counsel, respectfully submit this Response Brief in Opposition to Plaintiffs' Motion for Summary Judgment.  Many of the arguments made by plaintiffs in their Brief in Support of Motion for Summary Judgment (Dkt. #57) have already been thoroughly addressed in Defendants' Brief in Support of Motion for Judgment on the Pleadings (Dkt. #58).  In order to avoid unnecessary repetition, with regard to those issues that defendants have already fully briefed, defendants will stand on the arguments already presented in Defendants' Brief in Support of Motion for Judgment on the Pleadings (Dkt. #58) and will limit themselves here to directing the Court's attention to the specific pertinent portions of that brief.  The present brief will also respond to other points raised by plaintiffs that defendants have not yet fully addressed.

ARGUMENT

I.   *DAVIS v. FEC* HAS NOT SETTLED THE ISSUE OF THE CONSTITUTIONALITY OF MATCHING FUNDS.

Plaintiffs argue that the United States Supreme Court's decision in *Davis v. FEC*, ___ U.S. ___, 128 S. Ct. 2759 (2008), has superseded prior decisions by several federal circuit courts of appeals and has established that a campaign financing matching fund scheme like the one in Wis. Stat. § 11.513(2) imposes an impermissible burden on First Amendment rights. (Dkt. #57, pp. 2-4).

Plaintiffs are incorrect.  As Defendants have already shown in their earlier brief, providing a public subsidy to promote additional political speech without imposing any restriction on the political speech of independent spenders (or non-participating candidates) does not impose any First Amendment burden upon the latter (Dkt. #58, pp. 9-22).  Plaintiffs are also fundamentally mistaken in suggesting that matching funds mute their voice or leave them with no incentive to engage in political speech.  Their voice is not muted because they are free to spend as much money as they wish to express their own views.  The matching funds do not mute anyone's voice, but rather subsidize another voice, thereby facilitating and enlarging public discussion and furthering, rather than abridging, pertinent First Amendment values.  *See Buckley v. Valeo*, 424 U.S. 1, 92-93 (1976).

Moreover, by suggesting that matching funds leave them with no incentive to give their time and money to campaigns, plaintiffs are wrongly equating independent expenditures with campaign contributions (Dkt. #57, p. 9).  The purpose of an independent expenditure is not merely to provide financial support to a candidate, but rather is to express the political views of the independent spender.  Assuming that plaintiffs believe that their own views are worthy of

expression and deserving of consideration by the public, then plaintiffs necessarily have an incentive to spend money to advance their views, without regard to whether other competing views are also being expressed by someone else.

Furthermore, the Supreme Court, in upholding the constitutionality of campaign contribution limits, has held that the act of giving money to a candidate does not implicate First Amendment rights to the same extent as does the act of spending money on one's own speech. *Buckley,* 424 U.S. at 20-21. Therefore, to the extent that plaintiffs contend that the only incentive they have for making independent expenditures is to give a financial benefit to the candidate whom they support, they actually equate their spending with a form of speech that, under *Buckley*, receives less constitutional protection than is received by true independent expenditures made for the purpose of communicating the spender's own views.

II. EVEN IF MATCHING FUNDS WERE FOUND TO BURDEN FIRST AMENDMENT RIGHTS, THEY STILL SHOULD BE SUBJECT TO SUBSTANTIAL-RELATION SCRUTINY, RATHER THAN STRICT SCRUTINY.

Plaintiffs assert, with little supporting argument, that the challenged matching fund provision "impose[s] a substantial burden upon the core freedoms protected by the First Amendment" and, therefore, can survive constitutional review only if it passes strict scrutiny—*i.e.,* if the provision is narrowly tailored to advance a compelling governmental interest (Dkt. #57, p. 11).[1] As Defendants have already shown, plaintiffs have failed to demonstrate that

---

[1] In arguing for the application of strict scrutiny, plaintiffs cite to the Supreme Court's statement, in *Davis*, that under *Buckley* contribution limits "cannot stand unless they are 'closely drawn' to serve a 'sufficiently important interest,'. . . . " Plaintiffs' Brief in Support of Motion for Summary Judgment (Dkt. #57, p. 11) (*quoting Davis*, 128 S. Ct. at 2770). The "closely drawn" scrutiny that applies to contribution limits, however, is actually a lesser degree of scrutiny than the strict scrutiny that applies to the most severe burdens on fully protected speech such as direct expenditure limits. Any suggestion that closely drawn scrutiny is the same as strict scrutiny is incorrect.

matching funds impose any burden on their First Amendment rights. Therefore, the matching fund provision survives constitutional review without need for any further judicial inquiry. However, even if the Court were to determine that the matching fund provision does impose some burden on First Amendment interests, plaintiffs are still incorrect in contending that any such burden is severe enough to require strict scrutiny.

Strict scrutiny does not apply to every campaign finance law that may have some deterrent effect on protected speech, but only to laws that place a "severe burden" on speech, such as direct caps on spending. *Lincoln Club of Orange Cnty. v. City of Irvine, CA*, 292 F.3d 934, 938 (9th Cir. 2002). This approach is consistent with *Buckley*'s discussion of federal statutes that required disclosure once an entity made expenditures above a certain threshold. In considering the constitutionality of such disclosure provisions, *Buckley* assumed that "compelled disclosure has the potential for substantially infringing the exercise of First Amendment rights" and "will deter some individuals who otherwise might contribute." *Buckley*, 424 U.S. at 66, 68. *Buckley* did not, however, apply strict scrutiny to those disclosure provisions. Instead, it inquired whether those provisions exhibited a "substantial relation between" a "sufficiently important" governmental interest "and the information required to be disclosed." *Id*. at 64. In applying this intermediate level of scrutiny, the Court recognized that the burdens of disclosure are not equivalent in magnitude to the burden of an expenditure limit because "disclosure requirements impose no ceiling on campaign-related activities." *Id*. at 64. Requiring disclosure of independent expenditures, the Court reasoned, is "a reasonable and minimally restrictive method of furthering First Amendment values by opening the basic processes of our federal election system to public view." *Id*. at 82.

The Supreme Court recently reaffirmed the appropriateness of applying substantial-relation scrutiny to campaign-finance laws that may indirectly burden political expenditures. In *Citizens United v. FEC*, ___ U.S. ___, 130 S. Ct. 876 (2010), the Court upheld federal disclaimer and disclosure provisions and, as in *Buckley*, found that:

> Disclaimer and disclosure requirements may burden the ability to speak, but they impose no ceiling on campaign-related activities, and do not prevent anyone from speaking. The Court has subjected these requirements to exacting scrutiny, which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest.

*Id.* at 914 (internal citations and quotations omitted).

*Citizens United* and *Buckley* thus preclude the leap of logic from the assumption that matching funds may indirectly burden independent spending to the conclusion that strict scrutiny applies. Instead, the issue is whether any burden associated with matching funds—if such a burden is found to exist at all—is closer in kind to the indirect burden of disclosure laws or to the severe burden of a direct limit on expenditures. If matching funds are like a direct expenditure limit, strict scrutiny is warranted. But if matching funds only have effects comparable in severity to disclosure requirements, then a more intermediate level of scrutiny applies and matching funds need only have a substantial relation to the government's interest in encouraging participation in its public funding program.

The burden that plaintiffs allege here is equivalent to the burden that the Supreme Court has assumed is imposed by disclosure laws: a "deterrent effect on the exercise of First Amendment rights." *Buckley*, 424 U.S. at 65. Under plaintiffs' theory, a speaker may strategically decide not to spend money, in a desire to avoid triggering matching funds for opposing responsive speech. Similarly, *Buckley* recognized that a speaker may strategically decide not to spend money in order to avoid having to disclose his activities. *Id*. at 64, 68. But

*Buckley* and *Citizens United* make clear that such a deterrent effect—where it even exists—requires application of only substantial-relation scrutiny, not strict scrutiny. *Id.* at 64; *Citizens United*, 130 S. Ct. at 914. Therefore, even if the Court concludes that the matching fund provision imposes some First Amendment burden, it still should subject that provision only to substantial-relation scrutiny, rather than strict scrutiny.

> III. EVEN UNDER STRICT SCRUTINY, THE MATCHING FUND PROVISION IS CONSTITUTIONAL, BECAUSE IT IS NARROWLY TAILORED TO SERVE TWO COMPELLING STATE INTERESTS.

Plaintiffs contend that the independent expenditure matching fund provision in Wis. Stat. § 11.513(2) fails strict scrutiny because it is not narrowly tailored to serve a compelling governmental interest. That contention is incorrect. Although the Court should apply intermediate scrutiny, rather than strict scrutiny, the matching fund provision survives under either level of review.

> A. The Interest in Combating Corruption and the Appearance of Corruption.

Plaintiffs argue, first, that the only compelling governmental interest that could justify infringing First Amendment rights would be the interest in preventing corruption or the appearance of corruption (Dkt. #57, p. 12). According to plaintiffs, the Defendants cannot advance an argument as to why the matching fund provision advances that anti-corruption interest because the Defendants, in their response to interrogatories served by plaintiffs, indicated that the State has not received complaints about or investigated judicial candidates for improper judicial campaign spending (Dkt. #57, p. 12). Plaintiffs are incorrect.

It is well established that combating corruption and the appearance of corruption are compelling governmental interests. *See Buckley*, 424 U.S. at 25-27; *First Nat. Bank of Boston v. Bellotti,* 435 U.S. 765, 788 n.26 (1978); *Nixon v. Shrink Missouri Government PAC,* 528 U.S. 377, 390 (2000); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) ("'A State indisputably has a compelling interest in preserving the integrity of its election process.'") (*quoting Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989)); *Crawford v. Marion County Election Bd.*, 128 S. Ct. 1610, 1620 (2008) (recognizing the state interest of promoting public confidence in the integrity of the electoral process). Moreover, reducing the potential for corruption in judicial elections and assuring the integrity of the courts is a matter of special importance. *See Republican Party of Minnesota v. White*, 536 U.S. 765, 793 (2002) (Kennedy, J., concurring) (noting that the state interest in maintaining judicial integrity is of "vital importance" and that "[j]udicial integrity is . . . a state interest of the highest order").

It is equally well established that this anti-corruption interest is furthered by providing a public campaign funding option that reduces the reliance of participating candidates on private contributions. *See Buckley*, 424 U.S. at 86 (affirming the constitutionality of public funding systems); *Daggett v. Commission on Govern. Ethics and Elec.*, 205 F.3d 445, 455-58 (1st Cir. 2000) (finding a "sufficiently important governmental interest" in abolishing the appearance of corruption in the political process); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39-40 (1st Cir. 1993) (finding that even if higher level of scrutiny applied, cap gap which increased likelihood of participation in public funding scheme was narrowly tailored to serve a compelling state interest including interest in combating fraud); *Rosenstiel v. Rodriquez,* 101 F.3d 1544, 1555 (8th Cir. 1996) (finding compelling the state's interest in reducing the possibility of corruption that may arise from contributions).

This anti-corruption interest—especially in the context of judicial integrity—is so obvious and so well-recognized by the courts that it should be found to exist in a case such as this without any need for the Defendants to create a factual record involving investigations of specific instances of actual corruption in judicial elections in Wisconsin. It defies logic to suggest that a state cannot legislate to protect the integrity of its judiciary until after that integrity has already been undermined by one or more scandals. On the contrary, states have a recognized interest in combating the *appearance* of corruption, as well as its reality. In addition, the Supreme Court has indicated that First Amendment cases should be subject to expeditious resolution and should not invariably be turned into complex and burdensome expert-driven factual disputes. *See Federal Election Com'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 469 (2007). Accordingly, this Court should accept as sufficient the universal judicial recognition of the compelling governmental interest in combating the reality and appearance of corruption without requiring Defendants to establish the kind of investigative record demanded by plaintiffs.

Moreover, even in the absence of the kind of complaints and investigations sought by the plaintiffs, it is still easy to confirm the reality of the anti-corruption interest from readily available sources. In 2002, the American Bar Association's Commission on Public Financing of Judicial Campaigns found that the cost of judicial campaigns is increasing dramatically across the country. *See* American Bar Association Standing Committee on Judicial Independence, "Report of the Commission on Public Financing of Judicial Campaigns," American Bar Association (2002) (Bellavia Affidavit Ex. A, p. 11). With regard to Wisconsin, former Chief Justice Nathan Heffernan noted that, in 1965, his Supreme Court race cost him only $50,000, as contrasted to the $1.2 million spent in 1999 (Bellavia Affidavit Ex. A, p. 13). The ABA Commission also found that, even though cases of outright bribery may be rare, it is more common to find situations in

which members of the press or the public call attention to what they regard as suspicious correlations between a judge's campaign contributions and favorable judicial treatment of the contributors (Bellavia Affidavit Ex. A, p. 18). Accordingly, the ABA Commission found a pervasive public perception that campaign contributions influence judicial decision making (Bellavia Affidavit Ex. A, p. 20). The Commission summarized the appearance created by this situation as follows:

> The net effect is to create the impression that judges are no different from other elected officials: that in judicial elections, as elsewhere, money talks; that judicial findings of fact and interpretations of law are subject to the vagaries of contributor and constituent influence and that judges are no more impartial than their counterparts in the political branches; and that politics rather than law therefore dominates the decision-making process.

(Bellavia Affidavit Ex. A, p. 27).

Another report has found that, between 1999 and 2007, candidates for state supreme courts throughout the country raised over $165 million (or approximately $18.3 million per year), whereas between 1993 and 1998 they had raised only $62 million (or approximately $10.3 million per year). *See* Justice At Stake Campaign, "The New Politics of Judicial Elections in the Great Lakes States, 2000-2008," Justice at Stake Campaign (2008) (Bellavia Affidavit Ex. B, p. 3). With regard to Wisconsin, that report found that the two candidates in the April 2007 Wisconsin Supreme Court election set a new state fundraising record by raising a combined total of over $2.6 million, nearly double the state's previous record. (Bellavia Affidavit Ex. B, p. 28; Affidavit of Tracey Porter, ¶ 11). In addition, spending on television advertising by the three biggest-spending independent interest groups in the 2007 election reportedly totaled about $3 million, bringing the true cost of the race to somewhere in the $5 to $6 million range (Bellavia Affidavit Ex. B, p. 28). In the aftermath of that election, in December 2007, all seven members of

the Wisconsin Supreme Court issued an open letter calling for public funding of Supreme Court elections, stating: "The risk inherent in any non-publicly funded judicial election for this court is that the public may inaccurately perceive a justice as beholden to individuals or groups that contribute to his or her campaign. Judges must not only be fair, neutral, impartial and non-partisan but also should be so perceived by the public" (Bellavia Affidavit Ex. B, p. 29). A month later, in January 2008, polling data showed that 78 percent of Wisconsin voters believed that campaign contributions to judges have either some influence or a great deal of influence on their decisions, 77 percent felt that the Legislature and the Governor needed to take action on judicial campaign reform before the next election, and 65 percent specifically expressed support for public financing of judicial campaigns (Bellavia Affidavit Ex. B, pp. 4, 30).

Even as early as 1999, a Wisconsin Supreme Court Commission on Judicial Elections and Ethics found that the cost of statewide judicial races had escalated dramatically over the previous several elections and that the associated fundraising "inevitably raises questions of bias and partiality and judicial independence which tend to undermine public confidence in the integrity of judicial officers and judicial process." *See* Final Report of the Wisconsin Supreme Court's Commission on Judicial Elections and Ethics (1999) (Bellavia Affidavit, Ex. C, p. 5). Accordingly, a majority of that Commission found an "immediate and urgent" need for public financing of statewide judicial races in Wisconsin (Bellavia Affidavit, Ex. C, p. 5). Finally, a 2001 report from the National Institute on Money in State Politics found that, between 1989 and 1999, the average amount raised by a Wisconsin Supreme Court candidate increased more than three-fold from $194,643 to $656,202. *See* Samantha Sanchez, "Campaign Contributions and the Wisconsin Supreme Court," Money in Judicial Politics Project, National Institute on Money in State Politics (2001) (Bellavia Affidavit Exhibit D, pp. 2-3). During that ten-year period:

75 percent of cases heard by the Wisconsin Supreme Court involved a party, law firm, business or other organization that had made a campaign contribution to a Supreme Court candidate; 45 percent of all lawyers appearing before the Supreme Court made contributions to elected Justices; every elected Justice received money from an attorney or party who later came before the Court; and the average contribution of a litigant was 48 percent higher than that of other contributors (Bellavia Affidavit Exhibit D, p. 2). Even if this kind of data does not establish actual bribery, it plainly creates the serious risk—expressly recognized by the members of the Wisconsin Supreme Court in 2007—that the public may inaccurately perceive members of the court as beholden to campaign contributors. For all of these reasons, the State of Wisconsin's interest in combating corruption and the appearance of corruption in Wisconsin Supreme Court elections is manifestly both real and compelling.

Plaintiffs further argue that, even if the State is found to have a compelling anti-corruption interest, the challenged matching fund provision still is not narrowly tailored to advance that interest. According to plaintiffs, the matching fund provision is underinclusive because it only provides funding to candidates who participate in the public funding system and thus, plaintiffs contend, does not address any corruption concerns related to non-participating, privately funded candidates (Dkt. #57, p. 13).

That argument, however, proves far too much to be valid. All voluntary public funding systems—including the system approved in *Buckley*—obviously provide funding only to candidates who opt into the system. If plaintiffs' argument were correct, then all voluntary public funding systems would be underinclusive in relation to the anti-corruption interest. That outcome, however, is plainly precluded by *Buckley* and its progeny. The argument, therefore, fails.

In addition, plaintiffs' argument is based on a basic misunderstanding of the way in which matching funds advance the State's anti-corruption interest.  The State has an interest in providing matching funds in order to encourage participation in its public funding scheme.  Because *Buckley* held that public financing of elections furthers First Amendment values, federal courts have found that states may structure them in a manner which will encourage candidate participation in them.  *See, e.g., Rosenstiel,* 101 F.3d at 1553 ("the State has a compelling interest in stimulating candidate participation in its public financing scheme").  The Eighth and First Circuits have found this interest to be so compelling as to withstand even the strictest scrutiny.  *See id.; Vote Choice*, 4 F.3d at 39-40 (finding that the state has a "compelling" interest in "having candidates accept public financing").

In this regard, plaintiffs misapprehend how Wisconsin's Impartial Justice Act ("the Act") operates to combat corruption.  They wrongly assume that the Act is intended to combat corruption among non-participating candidates by reducing their incentive to engage in a large amount of potentially corrupting private fundraising.  Because the Act only provides matching funds to participating candidates, plaintiffs infer that the Act is not narrowly tailored to that anti-corruption purpose.

The Act, however, is actually aimed at reducing corruption among participating candidates and the relevant inquiry thus is whether matching funds bear a substantial relation to that aim.  In exchange for public funding, participating candidates relinquish almost all of their right to raise campaign contributions from private donors.  As a result, they have reduced opportunities and reduced incentives for any corrupt exchanges of judicial favors for financial contributions.  The Supreme Court has noted that "[i]t cannot be gainsaid that public financing as a means of

eliminating the improper influence of large private contributions furthers a significant governmental interest." *Buckley,* 424 U.S. at 96.

When the Act is viewed from this perspective, it is clear that the anti-corruption purpose is directly advanced by high participation in the public funding program. The greater the number of judicial candidates who opt into public funding, the smaller the number of elected judges and judicial candidates who will appear as potentially beholden to their campaign contributors.

Under this analysis, the fact that non-participating candidates do not receive public funding is not relevant to the Act's impact on corruption. In order to reduce the reality and appearance of corruption, the State must be able to attract participants into the public funding program and, to accomplish that goal, the State must be able to ensure that the choice to opt into that program will not make it impossible for participants to mount competitive campaigns. Matching funds play an important role in a candidate's decision to participate in the public funding system. Absent matching funds, non-participating candidates and other political opponents of a participant could derive a crucial competitive advantage by increasing their spending above the participating candidate's spending limit, so as to engage in campaign speech that the participating candidate would be powerless to answer.

Therefore, without a proper incentivizing mechanism such as matching funds, "the State could reasonably believe that far fewer candidates would enroll in its campaign financing program." *Rosenstiel*, 101 F.3d at 1554. Such a result would undermine the Act's effectiveness and defeat the purpose of combating the reality and appearance of corruption. In *Rosenstiel*, the court found that a provision which allowed a participating candidate to exceed statutory spending limitations under certain circumstances was narrowly tailored to remove the disincentive a candidate may have to participate in the public funding scheme because of concern over "being

grossly outspent by a privately financed opponent with no expenditure limit." *Id.* at 1551. The matching fund provision at issue here is similarly vital to serve the anti-corruption purpose of the public funding program. *See id.* at 1553; *Vote Choice*, 4 F.3d at 39.

Plaintiffs also argue that the matching fund provision is not narrowly tailored to advance an anti-corruption interest because, according to plaintiffs, the aggregation of expenditures involved in calculating the threshold for triggering matching funds chills independent expenditures "long before the trigger threshold is reached" (Dkt. #57, p. 13). Plaintiffs base this argument in part on the discussion of the aggregation of expenditures in the District Court decision in *Green Party of Connecticut* (Dkt. #57, p. 14). That discussion, however, is inapposite here because the law challenged in that case provided for combining independent expenditures with the campaign expenditures by all non-participating candidates. *See Green Party of Connecticut*, 648 F.Supp.2d at 368. In contrast, Wis. Stat. § 11.512 and § 11.513 quite plainly provide for separate treatment of matching funds triggered by non-participating candidate spending and matching funds triggered by independent spending. More specifically, Wis. Stat. § 11.513(2) speaks only of "aggregate *independent disbursements*" and clearly does not allow such disbursements to be combined with candidate expenditures.

Even more inapposite is plaintiffs' reliance on a hypothetical example involving a three-way election with two non-participating candidates and one participating candidate (Dkt. #57, p. 14). That example involves only spending by *candidates* and thus has no application to the *independent expenditure* matching fund provision in Wis. Stat. § 11.513(2), which is the provision at issue in the present case. Furthermore, the example is wrong even on its own terms because, under Wis. Stat. § 11.512, the threshold for triggering matching funds based on spending by a non-participating candidate clearly does not involve any aggregation of spending by multiple

non-participating candidates, but rather is calculated on a candidate-by-candidate basis. Plaintiffs have thus failed to establish that the independent expenditure matching fund provision in Wis. Stat. § 11.513(2) has a chilling effect on First Amendment rights "long before the trigger threshold is reached" (Dkt. #57, p. 13).

### B. The Interest in Enlarging Political Speech

In addition to advancing the State's compelling interest in combating the reality and appearance of corruption, public funding systems—including the Act at issue here—also foster First Amendment interests by freeing candidates from the rigors of fund-raising and permitting them to devote time to communication and debate. *See Buckley*, 424 U.S. at 96 ("Congress properly regarded public financing as an appropriate means of relieving . . . candidates from the rigors of soliciting private contributions."); *Rosenstiel*, 101 F.3d at 1553 (recognizing Minnesota's compelling interest in reducing "the time candidates spend raising campaign contributions, thereby increasing the time available for discussion of the issues and campaigning"); *Vote Choice*, 4 F.3d at 39 (upholding Rhode Island public financing law because such programs "'facilitate communication by candidates with the electorate' [and] free candidates from the pressures of fundraising") (quoting *Buckley*, 424 U.S. at 91).

The government's compelling interest in promoting First Amendment values through the adoption of an effective public financing system is well established. In upholding the presidential public financing system in *Buckley*, the Court emphasized that public financing "furthers, not abridges, pertinent First Amendment values" by "facilitat[ing] and enlarg[ing] public discussion and participation in the electoral process, *goals vital to a self-governing people*." *Buckley*, 424 U.S. at 92-93 (emphasis added). While *Buckley* did not explicitly use the term "compelling" to

describe the government's interest in promoting First Amendment values through public financing, its reference to that interest as a "goal[] vital to a self-governing people" leaves little room for doubt that the interest is in fact compelling. Indeed, lower courts have since recognized that states have "a *compelling interest* in encouraging candidates to accept public financing and its accompanying limitations which are designed to promote greater political dialogue among the candidates." *Wilkinson v. Jones*, 876 F.Supp. 916, 928 (W.D. Ky. 1995) (emphasis added). The matching funds provision in Wis. Stat. § 11.513(2) is narrowly tailored to advance this interest in enlarging political speech both by directly subsidizing speech by participating candidates and by providing an adequate incentive structure to encourage candidates to participate in the public funding program.

### IV. THE INDEPENDENT EXPENDITURE REPORTING REQUIREMENTS IN WIS. STAT. § 11.513(1) SURVIVE CONSTITUTIONAL REVIEW BECAUSE THEY ARE SUBSTANTIALLY RELATED TO SEVERAL IMPORTANT GOVERNMENT INTERESTS.

Plaintiffs next argue that the independent expenditure reporting requirements in Wis. Stat. § 11.513(1) are unconstitutional because those requirements allegedly are not narrowly tailored to serve a compelling governmental interest. This argument fails for several reasons which Defendants have already discussed in their earlier Brief in Support of Motion for Judgment on the Pleadings (Dkt. #58, pp. 23-28). First, reporting requirements are not subject to strict scrutiny, as plaintiffs wrongly suggest, but rather are subject to exacting scrutiny—a less stringent level of review (Dkt. #58, pp. 23-24). Second, contrary to plaintiffs' assertions, the independent expenditure reporting requirements do serve the governmental interest in combating the reality and appearance of corruption (Dkt. #58, pp. 24-27). Third, the anti-corruption interest is not the

only legitimate governmental interest that has been judicially recognized for the purpose of justifying campaign finance reporting requirements. On the contrary, courts have also recognized that reporting requirements are justified by important governmental interests in informing voters about candidates' possible allegiances and interests and in facilitating the enforcement of other substantive campaign finance regulations (Dkt. #58, pp. 24-27).

Plaintiffs also challenge as patently unreasonable the requirement in Wis. Stat. § 11.513(1) that independent expenditures in excess of $1,000 that occur within six weeks of a primary or general election must be reported to the Wisconsin Government Accountability Board ("G.A.B.") within 24 hours. (Dkt. #57, p. 16) (*citing Citizens for Responsible Government v. Davidson*, 236 F.3d 1174, 1197 (10th Cir. 2000)). Defendants have already shown, in their earlier brief, that this argument fails because the reporting requirement in *Davidson* is distinguishable from the one at issue here (Dkt. #58, pp. 27-28).

### V. THE INDEPENDENT EXPENDITURE REPORTING REQUIREMENTS IN WIS. STAT. § 11.513(1) ARE NEITHER UNCONSTITUTIONALLY VAGUE NOR OVERBROAD.

Plaintiffs next argue that the independent expenditure requirements in Wis. Stat. § 11.513(1) are both unconstitutionally vague and unconstitutionally overbroad (Dkt. #57, pp. 16-18). Both of those arguments fail for the reasons that Defendants have already thoroughly discussed in their earlier brief (Dkt. #58, pp. 28-34).

In addition, as part of their argument about alleged overbreadth, plaintiffs raise two issues that are based on erroneous readings of Wis. Stat. § 11.513(1). First, plaintiffs assert that Wis. Stat. § 11.513(1) requires multiple reports of a single expenditure both when it is obligated and when it is actually disbursed (Dkt. #57, pp. 17-18). That is inaccurate. The statute in question

says: "If any person makes, or becomes obligated to make, by oral or written agreement, an independent disbursement in excess of $1,000 with respect to a candidate for the office of justice at a spring primary or election, that person shall file with the board a notice of the disbursement or obligation to make the disbursement." Wis. Stat. § 11.513(1). The phrase "makes, or becomes obligated to make" is susceptible of two different interpretations: (1) it could mean that an expenditure must be reported when it is either disbursed or obligated, whichever comes earlier; (2) it could mean that an expenditure must be reported both when it is obligated and when it is actually disbursed. Plaintiffs adopt the second interpretation. It is Defendants' view, however, that requiring the same expenditure to be reported more than once is an unreasonable reading of the statute and that the first interpretation is, therefore preferable. Moreover, this Court cannot find a statute unconstitutional where, as here, the statutory language is subject to a more reasonable interpretation that would avoid the alleged constitutional difficulty.

Second, plaintiffs assert that, during the last six weeks of an election cycle, Wis. Stat. § 11.513(1) requires that every $1,000 of spending be separately reported, so that a single $5,000 expenditure would require the filing of five separate reports (Dkt. #57, p. 18). That interpretation, too, is inaccurate. The statute says: "Any such person shall file an additional report after each additional $1,000 of disbursements are made or obligated to be made." Wis. Stat. § 11.513(1). It is Defendants' view that that statutory language does not plainly require the filing of five separate reports for a single $5,000 expenditure and that any such interpretation of that language is highly unreasonable. Once again, the Court must reject plaintiffs' argument where the challenged statute is subject to a reasonable interpretation that avoids any constitutional problem.

VI.     THE CONTRIBUTION LIMITS IN WIS. STAT. § 11.26(1)(am) AND (2)(an) SURVIVE INTERMEDIATE SCRUTINY.

Plaintiffs next argue that the campaign contribution limits in Wis. Stat. §§ 11.26(1)(am) and (2)(an)—under which no individual or committee, other than a political party or legislative campaign committee, may contribute more than $1,000 to a candidate for the Wisconsin Supreme Court during a single primary and general election cycle—fail intermediate scrutiny (*i.e.*, are not closely drawn to advance a sufficiently important government interest) (Dkt. #57, pp. 18-19). That argument fails for the reasons that Defendants have already thoroughly discussed in their earlier brief (Dkt. #58, pp. 35-43).

VII.     THE CONTRIBUTION LIMITS IN WIS. STAT. § 11.26(1)(am) AND (2)(an) ARE NOT UNCONSTITUTIONALLY LOW UNDER THE SUPREME COURT'S DECISION IN *RANDALL V. SORRELL*.

Finally, plaintiffs argue that the $1,000 contribution limits in Wis. Stat. § 11.26(1)(am) and (2)(an) are unconstitutionally low under the Supreme Court's decision in *Randall v. Sorrell*, 548 U.S. 230 (2006) (Dkt. #57, pp. 20-22). That argument fails for the reasons that Defendants have already thoroughly discussed in their earlier brief (Dkt. #58, pp. 43-49).

CONCLUSION

For all of the reasons stated herein and in Defendants' Brief in Support of Motion for Judgment on the Pleadings, defendants respectfully ask the Court to deny plaintiffs' motion for summary judgment and to enter judgment in Defendants' favor on all six counts in the Amended Complaint and to grant Defendants such further relief as the Court deems appropriate.

Dated this 30th day of July 2010.

J.B. VAN HOLLEN
Attorney General

s/ Thomas C. Bellavia
THOMAS C. BELLAVIA
Assistant Attorney General
State Bar #1030182

CHRISTOPHER J. BLYTHE
Assistant Attorney General
State Bar #1026147

Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
Tel:   (608) 266-8690 (TCB)
       (608) 266-0180 (CJB)
Fax:   (608) 267-2223
Email: bellaviatc@doj.state.wi.us
       blythecj@doj.state.wi.us

bellaviatc\cases\first amendment cases\election cases\wrtl\br\2010 07-30 sj resp brief.doc