IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

WISCONSIN RIGHT TO LIFE
POLITICAL ACTION COMMITTEE,
GEORGE MITCHELL, and WISCONSIN
CENTER FOR ECONOMIC PROSPERITY,

                    Plaintiffs,                          OPINION AND ORDER

        v.                                                  09-cv-764-wmc

MICHAEL BRENNAN in his official capacity
as a member of the Government Accountability
Board, WILLIAM EICH in his official capacity
as a member of the Government Accountability
Board, GERALD NICHOL in his official capacity
as a member of the Government Accountability
Board, THOMAS CANE in his official capacity
as a member of the Government Accountability
Board, THOMAS BARLAND in his official capacity
as a member of the Government Accountability
Board, GORDON MYSE in his official capacity
as a member of the Government Accountability
Board, DAWN MARIE SASS in her official capacity
as Wisconsin State Treasurer, JOHN T. CHISHOLM
in his official capacity as Milwaukee County District
Attorney and BRAD SCHIMEL in his official capacity
as Waukesha County District Attorney,

                    Defendants.

---

    Plaintiffs challenge the constitutionality of several provisions in Wisconsin's

Impartial Justice Act -- enacted in December 2009 -- which governs campaigns for

election to a seat on the Wisconsin Supreme Court, the first of which is scheduled for the

April 5, 2011.  Generally, plaintiffs contend that the Act impermissibly burdens their

First Amendment rights of free speech and association on its face.[1]  Specifically, plaintiffs challenge (1) the reporting requirements for third-party, independent disbursements for "express advocacy," Wis. Stat. § 11.513(1); (2) the possible triggering of supplemental grants to candidates who elect to participate in public financing based on plaintiffs' disbursements, Wis. Stat. § 11.513(2); and (3) the $1000 limit on contributions made by individuals and committees to privately-funded candidates, Wis. Stat. §§ 11.26(1)(am), (2)(an).  Plaintiffs maintain that each of these provisions constitute unconstitutional impingement on their speech during campaigns for a seat on the Wisconsin Supreme Court.

The possibility of an asymmetrical grant of supplemental funds to a candidate triggered by independent expenditures expressly for an opponent or against the candidate makes this a close question in light of the Supreme Court's decision in *Davis v. Federal Election Commission*, 128 S. Ct. 2759, 2768 (2008).  Nevertheless, the likelihood of a triggering of supplemental funds by plaintiffs is remote and any arguable, limited impingement on plaintiffs' First Amendment rights outweighed by Wisconsin's compelling interest in the election of justices to its highest court free from an appearance of bias.

Here, the only speech even arguably impinged are independent expenditures expressly advocating the election or defeat of a clearly-identified candidate, which both historical and current records tell us is highly unlikely to reach the $360,000 trigger for

---

[1] The First Amendment's protections apply to the states through the Fourteenth Amendment's due process clause.  *Ben's Bar, Inc. v. Vill. of Summerset*, 316 F.3d 702, 707 (7th Cir. 2003) (citing *Gitlow v. New York*, 268 U.S. 652, 666 (1925)).

the grant of matching funds under the Act -- not only accounting for plaintiffs' limited expenditures, but even if all other third-party expenditures of this kind are included. Ultimately, the relationship between *plaintiffs'* speech and the award of supplemental funding is too speculative, indirect and watered down to warrant the entry of an injunction, particularly with less than a week remaining before the election of a Wisconsin Supreme Court Justice in which both of the remaining candidates have elected public financing.   In light of the State's undeniable, compelling interest in avoiding a growing perception that the financing of elections of Wisconsin Supreme Court Justices is irreparably tainting them with an appearance of bias, this court will grant summary judgment to defendants and deny any injunctive relief.


FACTS[2]

### A.  Parties

Plaintiff Wisconsin Right to Life Political Action Committee ("WRTL") is a non-profit political action committee organized in Wisconsin with its headquarters in Milwaukee.  Plaintiff Wisconsin Center for Economic Prosperity PAC ("Prosperity") is a non-profit political action committee organized in Wisconsin with its headquarters in New Berlin.   Plaintiff George Mitchell is an individual living in Whitefish Bay, Wisconsin.

As for defendants, Judges Michael Brennan, William Eich, Gerald Nichol, Thomas Cane, Thomas Barland and Gordon Myse are all being sued in their official capacities as

---

[2] The following facts are taken from undisputed findings of fact in the parties' motion papers and the public record.

members of the Government Accountability Board ("GAB"), which under Wis. Stat. § 5.05, is responsible for the administration of Chapter 11 of the Wisconsin Statutes. Dawn Marie Sass, John T. Chisholm and Brad Schimel are being sued in their official capacities as Wisconsin State Treasurer, Milwaukee County and Waukesha County district attorneys, respectively.

**B.  <u>Growing Perception of Bias</u>**

In 1999, the Wisconsin Supreme Court Commission on Judicial Elections and Ethics (the "Commission") issued a report.  Among its finding was that there had been a dramatic escalation in the cost of statewide judicial races over the previous several elections.  For example, in 1965, the highest expenditure by a candidate was approximately $50,000 on his campaign; in 1989, the *average* amount of money raised by a candidate for a seat on the Wisconsin Supreme Court was $194,643; and in 1999, the average had more than tripled to $656,202, with a high of $1.2 million.  During that same ten year period (from '89 to '99):  75 percent of the cases heard by the Wisconsin Supreme Court involved a party, law firm, business or other organization that had made a financial contribution to the campaign of a sitting Wisconsin Supreme Court Justice; 45 percent of all the lawyers appearing before the court, had made a financial contribution to an elected justice; every elected justice had received money from an attorney or party who later appeared before the court; and a litigant appearing before the court had on average made a contribution 48 percent higher than other contributors to a Wisconsin Supreme Court campaign.

The Commission found "that the associated fundraising inevitably raises questions of bias and partiality and judicial independence which tend to undermine public confidence in the integrity of judicial officers and judicial process." (Defs.' PFOF (dkt. #64) ¶13.) A majority of the Commission concluded that there was an immediate and urgent need for the public financing of statewide judicial races. (*Id.*)

In 2002, the American Bar Association's Standing Committee on Judicial Independence recognized a similar, dramatic increase across the country. While cases of outright bribery were rare, the Committee noted greater attention was being paid by the press and public to suspicious correlations between the campaign contributions received by a judge and favorable treatment in court for the contributors. In particular, the Committee found a pervasive public perception that campaign contributions influenced judicial decisionmaking. As the ABA's Commission on Public Financing of Judicial Campaigns put it at the time:

> The net effect is to create the impression that judges are no different from other elected officials: that in judicial elections, as elsewhere, money talks; that judicial findings of fact and interpretations of law are subject to the vagaries of contributor and constituent influence and that judges are no more impartial than their counterparts in the political branches; and that politics rather than law therefore dominates the decision-making process.

(Defs.' PFOF (dkt. #64) ¶5.)

Perceptions have only worsened since those words were written in 2002. In particular, the combined fundraising of the two leading candidates running for a seat on the Wisconsin Supreme Court in 2007 exceeded $2.6 million, nearly doubling the previous state record. During that same campaign, the three highest spending independent interest groups alone spent around three million dollars on additional

television advertising, raising the total cost of the campaign to approximately six million dollars.  Following that election, all seven members of the Wisconsin Supreme Court issued an open letter asking that future elections be publicly funded.  The letter included the following statement:

> The risk inherent in any non-publicly funded judicial elections for this court is that the public may inaccurately perceive a justice as beholden to individuals or groups that contribute to his or her campaign.  Judges must not only be fair, neutral, impartial and non-partisan but also should be so perceived by the public.

(Defs.' PFOF (dkt. #64) ¶9.)

In January of the following year, the results of a poll found that 78 percent of Wisconsin's voters believed that campaign contributions to judges either have some or a great deal of influence on judges' decisions.  The results also showed that 77 percent of Wisconsin's voters felt that the Legislature and the Governor needed to take action on judicial campaign reform before the next Supreme Court election and that 65 percent of Wisconsin's voters supported the public financing of judicial campaigns.[3]

---

[3] One can argue about how closely they are linked, but the explosion of campaign expenditures has coincided with a marked decline in the Wisconsin Supreme Court's perceived ability to function collegially.  During the 2008 election, television advertising hit a new low.  Then candidate, now Justice Gableman ran an ad that falsely suggested then Justice Butler had in his capacity as defense counsel obtained the release of an individual who went on to molest again, and whose underlying premise was that anyone who would vigorously defend someone accused of a serious crime is unqualified to serve on the Wisconsin Supreme Court, a theme that independent groups ran with in their own ads falsely suggesting that during Butler's earlier career as a public defender, a similar event occurred involving a repeat murderer.  The ad motivated the Wisconsin Judicial Commission to sanction Justice Gableman, ultimately resulting in the unprecedented situation where an equally-split Wisconsin Supreme Court purported to issue two, opposing "per curiam" opinions, one striking down the sanction, *In re Judicial Disciplinary Proceedings Against Gableman*, 2010 WI 61, and the other upholding it, 2010 WI 62.  Justice Gableman did not go unscathed during the campaign either, confronted

## C.  Impartial Justice Act

On December 1, 2009, Governor Jim Doyle signed the Impartial Justice Act into law.[4]  The Act creates a "Democracy Trust Fund" ("the Fund") for publicly financing campaigns for a seat on the Wisconsin Supreme Court.  The Fund is financed by two sources: (1) voluntary taxpayer contributions and (2) if this does not generate sufficient funds, appropriations from the state's general fund.  Wis. Stat. § 20.855(4)(bb).  Candidates are free to choose whether to participate in the Fund or to conduct privately financed campaigns.

To be eligible to participate in the Fund, the candidate must satisfy certain prerequisites under the Act.  During an initial period, the participating candidate must collect qualifying contributions of $5 to $100 from at least 1,000 separate contributors.  Wis. Stat. §§ 11.501(16), 11.502(2).  Cumulatively, the candidate must collect at least $5,000, but no more than $15,000.  Wis. Stat. § 11.502(2).  Additionally, during an initial exploratory period and the qualifying period, participating candidates also may

---

as he was with independent "issue ads" describing him as soft on sex offenders.  *See Reality Check: Ad Attacking Gableman On Sex Offenders Makes Misleading Claims*, Channel 3000, Mar. 28, 2008, *available at* http://www.channel3000.com/ politics/15728488/detail.html (last visited Mar. 7, 2011).   While independent expenditures abated in the 2010 Wisconsin Supreme Court election, the public fissure in the court continues unabated, resulting in additional unseemly, public disputes, all of which have severely harmed the reputation of a court once considered among the best in the country. *See* N. Heffernan, (quoting Roger Traynor, then Chief Justice of the California Supreme Court, as saying in 1964 that Justice Hefferman had joined "the best court in the country . . . All are excellent judges, and two, George Currie and Tom Fairchild, are the best appellate judges in the country.").  Tom Fairchild Remembered, 2007 Wisconsin Law Review 34.

[4] The Act was originally set to take effect on December 1, 2010, but was amended five months later to become effective on May 1, 2010.

accept up to $5,000 in "seed money contributions," which is defined as contributions under $100 or money from a candidate's personal funds. Wis. Stat. § 11.508(1).

Upon certification, a participating candidate (1) becomes eligible to receive public grants from the Fund *and* (2) may not accept any further private contributions. Wis. Stat. § 11.506(1). A non-participating candidate may continue to accept private contributions throughout his or her campaign, but not more than $1000 from a single campaign contributor, whether an individual or a committee. Wis. Stat. §§ 11.26(1)(am) and (2)(an).

1. **Public Funding**

The amount a participating candidate receives depends on the stage and competitiveness of the campaign. If there are no challengers, the participating candidate receives no public funds. Wis. Stat. § 11.511(4). A participating candidate facing opposition receives $100,000 for the primary election and $300,000 for the general election. Wis. Stat. §§ 11.511(2), (3).

Under the Act, a participating candidate is also eligible to receive a "supplemental grant" if the disbursements by a non-participating candidate or by independent, third-parties exceed a statutory threshold. These supplemental, matching grants are triggered: (1) when a non-participating candidate "receives contributions or makes or obligates to make disbursements in an amount that is more than 5 percent greater than the public financing benefit" originally provided a participating candidate, Wis. Stat. § 11.512(1); and (2) "[w]hen the aggregate independent disbursements made or obligated to be made by a [third-party] against an eligible candidate for office or for the opponents of that

8

candidate exceed 120 percent of the public financing benefit for that office." Wis. Stat. § 11.513(2).[5]   Once the money spent or obligated to be spent exceeds one of these two "trigger" amounts, the participating candidate receives periodic, supplemental grants equal to the amount in excess of that trigger.   The supplemental grants are, however, capped once they total three times the initial grant -- that is, capped at an additional $300,000 in the primary election and $900,000 in the general election.   Wis. Stat. §§ 11.512(2), 11.513(2).   If expenditures do not exceed either trigger amount, the participating candidate receives no supplemental matching funds.

## 2.  Reporting Requirements

The Act also imposes certain reporting obligations on non-participating candidates to facilitate the timely grant of matching funds.  In addition to other reports required by law, a non-participating candidate is required to report to GAB all contributions or disbursements exceeding 105 percent of the initial public financing benefit. Wis. Stat. § 11.512(1).   Once the 105 percent threshold has been surpassed, a non-participating candidate must report each additional $1000 contributions received or disbursements made thereafter.   *Id.*   These reports are required by the 15th day of the month or the last day of the month that immediately follows receipt of the contribution or the making of

_____

[5] Under a straightforward reading of the statutory provisions, it would appear that spending by non-participating candidates and third-parties is not aggregated when determining the trigger point for supplemental funds.  In other words, there are separate triggers for expenditures by non-participating candidates and third-parties.  For purposes of the upcoming spring election, the distinction is of no moment because both of the candidates are participating, making the non-participating candidate provisions irrelevant.  For purposes of future elections, the impact on plaintiffs is at best muddled, since an aggregation of both categories would make a trigger more likely, but also accelerate the period in which matching funds would be available before the hitting the maximum cap.

the disbursement, whichever comes first (except that during July, August and September reports are due the last day of the month).  Wis. Stat. § 11.506(2).  If contributions or disbursements are made within six weeks of the primary election date, however, the reports must be filed within 24 hours after the contribution is received or the disbursement is made.  *Id.*

For independent entities, every disbursement in excess of $1000 must be reported by the next regular period; if the disbursement is made within six weeks of the primary or general election, each additional $1000 disbursement must be reported within 24 hours. Wis. Stat. § 11.513(1).[6]

### 3.  Penalties

Under Wis. Stat. § 11.60(1), "any person, including any committee or group, who violates [Chapter 11] may be required to forfeit not more than $500 for each violation." Furthermore,

> any person, including any committee or group, who is delinquent in filing a report required by this chapter may be required to forfeit not more than $50 or one percent of the annual salary of the office for which the candidate is being supported or opposed, whichever is greater, for each day of delinquency.

Wis. Stat. § 11.60(2).  Both the GAB or the district attorney of the county in which a violation of the Act occurs may bring actions against those who violate the Act.  Wis. Stat. § 11.60(4).

---

[6]  These additional reporting requirements are inapplicable to participating candidates because they forego all private funding after the qualifying period, but participating candidates are still bound by the general registration and reporting requirements governing the creation and use of a campaign committee, as well as reporting receipt of contributions by such a committee.  *See* Wis. Stat. §§ 11.05, 11.06.

## D.  Independent Expenditures

While spending by independent third-parties has exploded in recent campaigns, independent disbursements for "express advocacy," -- those actually reported to GAB and having the potential to trigger supplemental funds -- make up a small piece of the pie.  In the 2003 election for the Wisconsin Supreme Court, the total amount of independent disbursements for the support or opposition of a candidate reported to GAB was $21,919.88.  In the 2005 and 2006 elections, there were no reported independent disbursements.  In the 2007 election, GAB received reports of independent disbursements for express advocacy totaling $99,963.40.  In the 2008 election, between candidates Michael J. Gableman and Louis Butler, GAB received reports of independent disbursements totaling $467,335.56, which was more than quadruple any previously reported.[7]  In the 2009 election, however, the reported independent disbursements fell back to zero.

In the past, plaintiff WRTL has spent approximately $1000 on a Wisconsin Supreme Court election.[8]  Though WRTL would like to spend as much or more in the

---

[7] Although this number is much higher than the previously recorded independent disbursements, the amount is dwarfed by the estimated $4 million spent on so-called "issue advocacy" by independent third-parties (advertising that links a candidate to a cause or issue without formally advocating a vote for or against them).  *See* Wisconsin Democracy Campaign, *available at* http://www.wisdc.org/hijackjustice08issueads.php. (last visited Mar. 7, 2011).

[8] Plaintiffs provide no details about the aggregate amount of money they have spent in past supreme court elections, nor evidence showing a likelihood of spending a certain amount in the current election.  In fact, it appears that since 2000, plaintiff WRTL has spent in total $100,029 in independent disbursements, not just in supreme

2011 election, WRTL maintains that the reporting and matching funds provisions will keep it from making such disbursements out of fear that the matching funds provision will be triggered and a participating candidate whom it opposes will receive money equal to their disbursements.   Also, plaintiffs Mitchell and Prosperity have previously contributed more than $1000 to support candidates running for a seat on the Wisconsin Supreme Court.  Under the Act, contributions can no longer exceed $1000.

### E.  **Current Posture**

Plaintiffs have moved for summary judgment on their claims (dkt. #55) and defendants for judgment on the pleadings (dkt. #56).[9]  Several days before the briefing on those motions were completed, however, the Wisconsin Supreme Court enjoined enforcement of a related campaign finance reporting requirement under Wis. Admin. Code GAB § 1.28(3)(b).  *Wis. Prosperity Network v. Myse*, No. 2010AP001937, slip op. at 2 (Wis. Sup. Ct. Aug. 13, 2010).  This injunction limits disclosure and reporting of independent disbursements to "express advocacy," narrowly defined as explicit statements for or against the election of a specific candidate, as opposed to, for example, criticizing or lauding a candidate's position on an issue and urging readers or listeners to

court races but *all* elections of any kind.  *See* Wisconsin Democracy Campaign, *available at* http://www.wisdc.org/ind10-500640.php (last visited Mar. 7, 2011).

[9]  Because both parties submitted proposed undisputed facts not found in the pleadings, the court will treat defendants' motion for judgment on the pleadings as a motion for summary judgment as well pursuant to Fed. R. Civ. P. 12(d).  Because plaintiffs filed their own summary judgment motion and had an opportunity to respond to defendants' proposed facts, they were given ample opportunity to present all material pertinent to defend against defendants' motion as required by Rule 12(d).

contact that candidate -- so-called "issue advocacy." *See* GAB Statement Regarding Wisconsin Supreme Court Decision in Campaign Finance Case (Dec. 1, 2010) http://gab.wi.gov/node/1474 (last visited Mar. 7, 2011).[10]

With the spring election fast approaching, plaintiffs filed a motion for a preliminary injunction last month to enjoin enforcement despite these changes. As of the March 2, 2010 hearing on plaintiffs' motion for preliminary injunction, reported independent disbursements for express advocacy in the current election for a seat on the Wisconsin Supreme Court totaled only $440. Plaintiff WRTL was responsible for $420 of that amount, which was made on February 9, 2011, the day after plaintiffs filed their preliminary injunction motion. As of March 28, 2010 (one week from the election), reported independent expenditures still total only about $13,000, or some $347,000 below the trigger amount of $360,000.

OPINION

Plaintiffs contend that their obligations to report independent expenditures, and their potential to trigger supplemental matching funds to be used against their candidate or in support of an opponent, creates a substantial burden on their expression of political

---

[10] Although the Wisconsin Supreme Court's short injunction order lacks any elaboration as to the plurality's reasoning, a concurring opinion relies on the State's representation to this court in another lawsuit that GAB would not enforce a requirement for reporting any independent expenditures except on express advocacy. An injunction was entered to ensure § 1.28(3)(b) would not be expanded to require disclosure and reporting under Chapter 11 of the Wisconsin Statutes beyond express advocacy.

speech.   Plaintiffs also contend that the $1000 limit on contributions to a non-participating candidate is so low that it unconstitutionally drives candidates running for a seat on the Wisconsin Supreme Court to choose public financing over private. Ultimately, plaintiffs argue that if the supplemental grant provision is invalid, not only are the other challenged provisions invalid, but so, too, is the Act itself, since they are all part and parcel of the same unconstitutional campaign finance scheme.

With one exception discussed below, the United States Supreme Court's decision in *Davis v. Federal Election Commission*, 128 S. Ct. 2759 (2008), serves as something of a dividing line in deciding the merits of plaintiffs' claims here, though that case did not address a matching fund provision.  Before *Davis*, the prevailing view of courts was that matching funds would pass constitutional muster.  Since *Davis*, the view is substantially different, particularly with respect to asymmetrical funding of candidates.

Though other circuits have weighed in on the constitutionality of triggering provisions similar to that at issue here, the Seventh Circuit has not.  Nor has the United States Supreme Court, though it may soon do so in *McComish v. Bennett*, 611 F.3d 510 (9th Cir. 2010), *cert. granted*, 131 S. Ct. 644 (2010).  Even acknowledging a possible impingement on these plaintiffs' free speech rights by virtue of the Act's matching fund provision, however, this court is satisfied it is outweighed by Wisconsin's compelling interest in avoiding the appearance of bias in the election of justices to the Wisconsin Supreme Court.

## A.  Constitutionality of Matching Funds

1.  Pre-*Davis* rulings

The public financing of elections is hardly new.  Nor are the courts struggles to balance competing rights under the First Amendment.  The United States Supreme Court first considered the constitutionality of the federal government's public financing of presidential election campaigns in *Buckley v. Valeo*, 424 U.S. 1 (1976).  Among other issues, the appellants in *Buckley* argued that "any scheme of public financing of election campaigns is inconsistent with the First Amendment."  *Id.* at 90.  The Supreme Court disagreed, reasoning that the public financing of elections "is a congressional effort, not to abridge, restrict, or censor speech, but rather to use public money to facilitate and enlarge public discussion and participation in the electoral process, goals vital to a self-governing people.  Thus, [the public financing scheme] furthers, not abridges, pertinent First Amendment values."  *Id.* at 92-93.

After the *Buckley* Court rejected the argument that public financing of elections is *per se* unconstitutional, legal challenges to the public financing of elections became more focused.  Beginning in the 1990's and spilling into the new millennium, candidates and political supporters began challenging public financing provisions that provided incentives for candidates to choose public over private funding, such as matching funds or trigger provisions that provided participating candidates with additional grants of money should an opponent or the opponent's supporters spend above a designated amount during the election campaign.  Until 2010, however, only the Court of Appeals for the Eighth Circuit had ruled that such a triggering provision violated the First Amendment.

In *Day v. Minnesota Citizens Concerned for Life, Inc.*, 34 F.3d 1356 (8th Cir. 1994), the Eighth Circuit considered the constitutionality of the trigger provision in a Minnesota campaign reform statute. *Id.* at 1359-60. The Eighth Circuit found the provision infringed protected speech "because of the chilling effect [it] ha[d] on the political speech of the person or group making the independent expenditure." *Id.* at 1360. The Eighth Circuit held:

> The knowledge that a candidate who one does not want to be elected will have her spending limits increased and will receive a public subsidy equal to half the amount of the independent expenditure, as a direct result of plaintiff's independent expenditure, chills the free exercise of that protected speech.

*Id.* at 1360.

Until the Supreme Court's decision in *Davis*, 128 S. Ct. 2759, the Eighth Circuit's decision in *Day* stood alone. *See Rosenstiel v. Rodriguez*, 101 F.3d 1544, 1551-53 (8th Cir. 1996) (upholding a different trigger provision removing expenditure limitations on candidates participating in Minnesota's public funding program when non-participating candidates received contributions or made expenditures equaling 50 percent of the expenditure limit); *Gable v. Patton*, 142 F.3d 940, 949 (6th Cir. 1998) (to conclude that Kentucky's public financing trigger provision is unconstitutional, "would be making a distinction based on degree" and "[f]aced with a difference only in degree, we will not second guess the Kentucky legislature by applying a 'scalpel' and declaring that Kentucky's scheme goes one step over the line of unconstitutional coercion, especially

where, as here, the line is not a clear one" (citing *Buckley*, 424 U.S. at 30))[11]; *Daggett v.*

*Commission on Governmental Ethics & Election Practices*, 205 F.3d 445, 464 (1st Cir. 2000)

(holding that the state's trigger provision merely provided candidates who chose public

financing with the ability to disseminate speech responsive to speech disseminated by

non-participating candidates or their supporters and because the First Amendment does

not protect "[a] right to speak free from response," the court concluded the provision did

not burden anyone's First Amendment rights); *North Carolina Right to Life Committee Fund*

*for Independent Political Expenditures v. Leake*, 524 F.3d 427, 437-39 (4th Cir. 2008) (siding

with the First Circuit's *Daggett* decision in concluding that North Carolina's "provision of

matching funds does not burden the First Amendment rights of nonparticipating

candidates or independent entities that seek to make expenditures on behalf of

nonparticipating candidates" because "[t]he only (arguably) adverse consequence" was

distribution of matching funds, which "furthers, not abridges, pertinent First Amendment

---

[11] In 1995, the District Court for the Western District of Kentucky upheld the same trigger provision in *Wilkinson v. Jones*, 876 F. Supp. 916 (W.D. Ky. 1995). Based on specific facts, the court in *Wilkinson* distinguished Kentucky's provision from the trigger found unconstitutional in *Day*. *Id.* at 927-28. Among other distinctions, the district court noted that in *Day* the triggering action was independent expenditures, which were outside the control of non-participating candidates, whereas activation of the Kentucky trigger was "a calculated strategic decision" made solely by non-participating candidate. *Wilkinson*, 876 F. Supp. at 927. The district court was "not convinced that [the Kentucky trigger] impermissibly chill[ed] the speech of privately-financed candidates simply because it enable[d] the speakers' adversaries to respond." *Id.* at 928. Instead, the court found in an oft-repeated phrase "that the trigger provision promotes *more* speech, not less." *Id.* (emphasis added).

values by ensuring that the participating candidate will have an opportunity to engage in responsive speech." (internal quotation omitted)).[12]

### 2. _Davis v. FEC_

Given the trend in case law up until the Supreme Court's 2008 decision, it is hardly surprising that challengers to the constitutionality of matching funds provisions in state's public financing schemes, including plaintiffs here, tout the _Davis_ decision as a "game changer," despite the decision not concerning the public financing of campaigns, nor even mentioning matching funds provisions. Rather, the Supreme Court considered the constitutionality of section 319(a) of the Bipartisan Campaign Reform Act of 2002, 2 U.S.C. § 441a-1(a), the so-called "Millionaire's Amendment," which "under certain circumstances, impose[d] different campaign contribution limits on candidates competing for the same congressional seat." _Id._, 128 S. Ct. at 2765.

Under previous federal law, all candidates for the House of Representatives, and their authorized committees, were limited in the amount of contributions they could receive and spend from others, but not in the amount they wished to spend out of their own, sometimes deep pockets. _Id._ at 2765. The Supreme Court found the Millionaire's Amendment "fundamentally alter[ed] this scheme when, as a result of a candidate's

---

[12] Like the First Circuit before it, the Fourth Circuit explicitly rejected the logic of _Day_, considering it an "anomaly" in the light of the Eighth Circuit's later decision in _Rosenstiel_. _Leake_, 524 F.3d at 437-38. The court found that "_Day_'s key flaw" was equating the potential for self-censorship created by a matching funds scheme with direct government censorship." _Leake_, 524 F.3d at 438 (internal quotation omitted). Thus, the so-called "chilling effect" complained of was "not from any fear of direct government censorship but rather from the realization that one group's speech will enable another to speak in response." _Id._

expenditure of personal funds, the 'opposition personal funds amount' (OPFA) exceed[ed] $350,000." *Id.* at 2766. Simply put, when a candidate's "expenditure of personal funds" passed a $350,000 threshold, that candidate's opponent, but not the candidate, was no longer subject to normal contribution limits. *Id.* Instead, the opponent had the right to receive contributions from individuals at three times the normal limit *and* to receive unlimited coordinated party expenditures. *Id.*

Davis, a candidate for the House of Representatives when he filed the lawsuit, challenged the constitutionality of this "new, asymmetrical regulatory scheme," arguing that "the First Amendment is violated by the contribution limits that apply when § 319(a) comes into play." *Id.* at 2770. In particular, the appellant reasoned that "exercise of his First Amendment right to make unlimited expenditures of his personal funds" was being unconstitutionally burdened "because making expenditures that create the imbalance has the effect of enabling his opponent to raise more money and to use that money to finance speech that counteracts and thus diminishes the effectiveness of [his] own speech." *Id.*

The Court recognized that had § 319(a) raised the contribution limits for *all* candidates, the appellant's argument would fail. *Id.* Instead, asymmetrical contribution limits were triggered by the candidate's exceeding a personal expenditure threshold. *Id.* at 2771. Explaining that it had "never upheld the constitutionality of a law that imposes different contribution limits for candidates who are competing against each other," the Court held the Millionaire's Amendment "impermissibly burden[ed] a candidate's First Amendment right to spend his own money for campaign speech." *Id.*

19

The Supreme Court emphasized that placing a cap on a candidate's expenditure of personal funds to finance campaign speech had been "soundly rejected" in *Buckley* and, although § 319(a) did not impose a cap, it did impose "an unprecedented penalty on any candidate who robustly exercises [his] First Amendment right [to spend personal funds for campaign speech]." *Id.*   In this way, the Court explained, § 319(a) provided candidates with a stark choice "between the First Amendment right to engage in unfettered political speech and subjection to discriminatory fundraising limitations," the latter option resulting in a "special and potentially significant burden." *Id.* at 2771-2772. In noting this burden on political speech, the Supreme Court referred the reader to the Eighth Circuit's decision in *Day* and specifically to its conclusion that increasing "a candidate's expenditure limits and eligibility for public funds based on independent expenditures against her candidacy burdened the speech of those making the independent expenditures." *Davis*, 128 S. Ct. at 2772 (citing *Day*, 34 F.3d at 1359-60).

The *Davis* Court went on to explain that the choice about whether to expend a certain amount of personal funds that a self-financing candidate faces under § 319(a) was not comparable to the voluntary choice about whether to accept or forgo public financing that a presidential candidate faced in *Buckley*.   128 S. Ct. at 2772.  In *Buckley*, the choice was between voluntary acceptance of public funds, and the concurrent, voluntary limiting of one's personal expenditures, or exercising one's "unfettered right to make unlimited personal expenditures."   *Id.*   Under § 319(a), in contrast, the *Davis* Court found a candidate could either "abide by a limit on personal expenditures or endure the burden that is placed on that right by the activation of a scheme of discriminatory contribution

limits." *Id.* Accordingly, the Court found that § 319(a) imposed "a substantial burden on the exercise of the First Amendment right to use personal funds for campaign speech." *Id.*

Finally, because it imposed a substantial burden on a First Amendment right, § 319(a) could not survive unless it was justified by a compelling state interest. *Id.* The Supreme Court found in *Davis* no such interest existed: the government's interest in "level[ing] electoral opportunities for candidates of different personal wealth" was simply not compelling; in fact, leveling electoral opportunities had "ominous implications because it would permit Congress to arrogate the voters' authority to evaluate the strengths of candidates competing for office." *Id.* at 2773. In the end, the Court held that "the unprecedented step of imposing different contribution and coordinated party expenditure limits on candidates vying for the same seat is antithetical to the First Amendment." *Id.* at 2774.

### 3. Post-*Davis* rulings

After *Davis,* the Ninth Circuit was the first to address a matching funds provision within a state's public financing scheme. *See McComish v. Bennett*, 611 F.3d 510 (9th Cir. 2010). In the wake of several large, ugly political scandals, Arizona voters passed an initiative entitled the Citizens Clean Elections Act. *Id.* at 514. Under the CCEA, candidates choosing to participate in the public financing system must agree to forfeit their right to fund their campaigns with private contributions. *Id.* at 516. Once qualified for public financing, participating candidates receive a lump-sum grant of public funds;

however, the participating candidate may receive additional matching funds if (1) a nonparticipating candidate spends more than the initial grant; or (2) the nonparticipating candidate's expenditures *plus* independent expenditures (in opposition to the participating candidate or in support of the nonparticipating candidate) exceeds the amount of the initial grant.  *Id.* at 516-17.  Matching funds are capped under the Act at three times the amount of the initial grant to the participating candidate.  *Id.* at 517.

The *McComish* plaintiffs -- candidates for the Arizona House of Representatives and Senate, as well as several political action committees -- challenged the constitutionality of the matching funds provision because they claimed it deterred them from engaging in political speech in the form of money expenditures.  *McComish*, 611 F.3d at 517.  Relying on the Supreme Court's *Davis* decision, the plaintiffs argued CCEA's matching fund provision placed a severe burden on their speech.  *Id.* 521.

The Ninth Circuit disagreed, finding that "*Davis* says nothing about public 'funding schemes and therefore says nothing about their constitutionality.'"  *McComish*, at 521 (quoting Comment, 122 Harv. L. Rev. 375, 383 (Nov. 2008)).  In distinguishing *Davis* from the case before it, the Ninth Circuit explained that "[t]he law in *Davis* was problematic because it singled out the speakers to whom it applied based on their identity.  The [CCEA]'s matching funds provision makes no such identity-based distinctions."  *Id.* at 523.  The Ninth Circuit further explained that "[b]ased on the

record before us, we conclude that any burden the Act imposes on [appellants'] speech is indirect or minimal."[13]  *Id.*

Having found plaintiff's free speech rights only minimally burdened, the Ninth Circuit applied what it described as "intermediate scrutiny" to the CCEA's matching fund provision.   Ultimately, the court found the government's interest in preventing corruption, and the appearance of corruption as well as its interest in encouraging participation in its public financing scheme, were sufficiently important and substantially related to the matching funds provision to survive intermediate scrutiny and, thus, did not violate the First Amendment.  *Id.* at 525.

In a little over a month, however, two other circuit courts issued decisions finding matching funds provisions unconstitutional.  In *Green Party of Connecticut v. Garfield*, 616 F.3d 213 (2d Cir. 2010), the Second Circuit considered a challenge to "non-participating candidate" and "non-candidate" trigger provisions in the Citizens Election Program (CEP) portion of Connecticut's Campaign Finance Reform Act.  *Id.* at 218.  That court concluded both trigger provisions imposed a potentially significant burden or penalty on a non-participating candidate.  *Id.* at 244.  Writing for the court, Judge Cabranes actually found this burden exceeded the one struck down in *Davis*, because there was no doubt that the opponent of a self-financed candidate "will receive additional money."  *Id.*  The only difference -- that non-candidates as opposed to candidates were being burdened -- was insignificant to the Second Circuit.  *Id.*  The court further found that both provisions

---

[13] This latter finding was based on the *McComish* plaintiffs failure to demonstrate their speech had actually been burdened by Arizona's matching funds provision.

failed to pass strict security, because the state's interest in promoting participation in CEP was not compelling.  *Id.* at 246.

In *Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010), the Eleventh Circuit considered a provision under the Florida Election Campaign Financing Act that provided an additional public subsidy to candidates participating in Florida's public financing system, triggered by a non-participating opponent spending in excess of $2 for each registered Florida voter.  612 F.3d at 1281.  The Eleventh Circuit found it "obvious that the subsidy imposes a burden on nonparticipating candidates, like plaintiffs, who spend large sums of money in support of their candidacies."  *Id.* at 1290.  Like the Second Circuit, the court also found that "the burden that an excess spending subsidy imposes on nonparticipating candidates 'is harsher than the penalty in *Davis*, as it leaves no doubt' that the nonparticipants' opponents 'will receive additional money.'"  *Id.* at 1291 (quoting *Green Party*, 616 F.3d at 244).  According to the Eleventh Circuit, what triggered strict scrutiny in *Davis* was "the grant of a competitive advantage."  *Id.*  Finally, the excess spending subsidy failed strict scrutiny as it was unclear how Florida's public financing system furthered the anticorruption interest and, even if it did, the excess spending subsidy was not the least restrictive means to reach that purpose.  *Id.* 1293-94.

### 4.  Pending Appeal before United States Supreme Court

On November 29, 2010, the United States Supreme Court granted certiorari review from the Ninth Circuit's decision in *McComish*, 131 S. Ct. 644 (U.S. Nov. 29, 2010) (No.10-239).[14]  One of the questions certified for review is:

> Whether *Citizens United v. Federal Election Comm'n*, 130 S. Ct. 876 (2010), and *Davis v. Federal Elections Comm'n,* 128 S. Ct. 2759 (2008), require this Court to strike down Arizona's matching fund trigger under the First and Fourteenth Amendments because it penalizes and deters free speech by forcing privately-financed candidates and their supporters to finance the dissemination of hostile political speech whenever they raise or spend private money, or when independent expenditures are made, above a "spending limit."

*McComish v. Bennett*, No. 10-239, http://www.supremecourt.gov/qp/10-00239qp.pdf.  Oral argument on this appeal was heard this past Monday, March 29, making a decision likely by the end of this term.[15]

---

[14] The Supreme Court consolidated the *McComish* appeal with its companion case, *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 644 (U.S. Nov. 29, 2010) (No.10-238).

[15] Obviously, even the narrow holding by this court today may be undermined by the Supreme Court's decision in *McComish*, and the court considered a decision on the merits here pending further guidance from the Supreme Court.  There is, however, an important distinction between the trigger provisions in this case and those in *McComish* and other decisions to date.  Here, the matching fund provision is *solely* applicable to elections of justices to the State of Wisconsin's highest court and unlikely to be triggered even then.  If the interests of avoiding bias in judicial elections to a state's highest court are not sufficiently compelling to allow a public financing scheme which includes trigger provisions for matching funds, then no interest will be and trigger provisions must be unconstitutional in all circumstances.  Since *McComish* is unlikely to decide definitively the level and likelihood of impingement or the unique interest of a state in judicial elections, the court will rule without further guidance to facilitate argument before a higher court well in advance of the *next* election to the Wisconsin Supreme Court in 2013.  At the same time, the court is painfully aware that its decision may merely be contributing to public financing's "death by a thousand cuts," as Justice Breyer put it during oral argument earlier this week in *McComish*, recognizing that money, like water, seems to find its own level.

**B. Wisconsin's Impartial Justice Act's Matching Funds Provision**

1. Burden on speech

The starting point in evaluating plaintiffs' First Amendment claim is determining what, if any, burden the matching fund provision places on plaintiffs' speech.  Since we await more definitive guidance from the Supreme Court, and the Seventh Circuit has not yet ruled or even been faced with determining whether matching funds provisions burden free speech, this court is left to look to *Davis* and the decisions of other circuits for guidance.

Similar to the self-funding candidate in *Davis*, Wisconsin's Impartial Justice Act certainly presents plaintiffs and other third-parties with a choice:  spend money directly supporting your chosen candidate or against their opponent and risk triggering (or at least playing a role in triggering) the grant of public moneys to fund an opponent's response.  As defendants point out, there are, of course, potentially important differences here.  Although the choices appear similar to *Davis*, the actual penalty or burden is at least more muted under the Act at issue.  In *Davis*, the self-funded candidate had spent up to the limit and faced an immediate, certain triggering of the "Millionaire Provision," which would free his opponent from private fundraising limitations to which he remained subject.  Here, the possibility of plaintiffs, or any other third party for that matter, triggering the rescue funds provision appears remote.

The evidence submitted by defendants establishes that (1) only once in a previous Wisconsin Supreme Court election would the trigger amount have been reached and (2) the named plaintiffs' independent disbursements never reached a level that would even

26

approach a trigger amount.[16]  In fact, they represent a tiny fraction (less than 1%) of the $360,000 trigger.  Therefore, plaintiffs' concern that their independent disbursements would result in directly funding a candidate they oppose is, at the most, speculative.

Even assuming that supplemental funds had a chance of being triggered in a Supreme Court race, the category of speech being impinged -- that is, the kind of speech plaintiffs would be motivated to self-censor -- is far more limited than that in *Davis*. Specifically, plaintiffs' triggering activities only apply to their narrowly-defined, express advocacy.  As previously mentioned, the Wisconsin Supreme Court currently has before it a case in which it must decide if Wis. Admin. Code GAB § 1.28(3)(b), which expands disclosure and reporting requirements from independent disbursements for express advocacy to those for issue advocacy, violates third parties' First Amendment free speech rights.  *See Wis. Prosperity Network v. Myse*, No. 2010AP001937 (Wis. Sup. Ct. Aug. 13, 2010).  While that court considers the issue, however, GAB has voluntarily restricted the reach of its regulation to express advocacy, and the Wisconsin Supreme Court subsequently enjoined it from expanding the reporting requirements.  Accordingly, the only speech by third parties, like plaintiffs here, that could trigger rescue funds is independent disbursements for express advocacy.[17]

---

[16] Despite moving for summary judgment, plaintiffs have submitted nothing but vague assertions about the Act's supposed impact on their speech.

[17] Of course, the analysis may differ if all independent expenditures, or at least all expenditures on the "functional equivalent" of express advocacy, were subject to reporting and triggering of asymmetrical public funding of a participating candidate. This court will not, however, address a theoretical challenge to application of a wider reaching regulation, at least when such application is voluntarily restricted by the enforcing agency and wider enforcement is specifically enjoined by the state supreme

A look at the relevant statutory provisions and administrative rules governing regulated campaign activities establish just how limited is this category of speech. The challenged statutory provision requires third parties, like plaintiffs, to report to GAB "independent disbursements in excess of $1000." Wis. Stat. § 11.513(1). "Disbursements" are defined in relevant part as "[a] purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value . . . made for a political purpose." Wis. Stat. § 11.01(7)(a)(1). The statute goes on to explain that "[a]n act is for 'political purposes' when it is done for the purpose of influencing the election or nomination for election of any individual to state or local office." *Id.* § 11.01(16). The statute further elaborates on "political purposes" by specifically listing "a communication which expressly advocates the election or defeat . . . of a clearly identified candidate." *Id.* § 11.01(16)(a)(1).

GAB has since promulgated rules to provide additional guidance on what a communication for a "political purpose" is:

> The communication contains terms such as the following or their functional equivalents with reference to a clearly identified candidate and unambiguously relates to the campaign of that candidate: 1. "Vote for;" 2. "Elect;" 3. "Support;" 4. "Case your ballot for;" 5. "Smith for Assembly;" 6. "Vote against;" 7. "Defeat;" or 8. "Reject."

Wis. Admin. Code GAB § 1.28(3)(a). Simply put, unless plaintiffs produce and disseminate communications that contain blatant terms such as "vote for," "elect" or "support," or conversely "vote against," "reject" or "defeat," a candidate, their political

---

court. Moreover, to address such an application would require review of the state supreme court's order, something this court has no power to do. *See Atl. Coast Line R. Co. v. Bhd. Of Locomotive Eng'rs*, 398 U.S. 281, 296 (1970) ("[L]ower federal courts possess no power whatever to sit in direct review of state court decisions.").

speech will not trigger supplemental funds, even in the now unlikely event the trigger amount is exceeded by other, independent disbursements.

Nor does the Act dictate the content of plaintiffs' message. *See, e.g., FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 477 n.9 (2007) (corporations may not be ordered to change what they said to avoid regulations because "[s]uch notions run afoul of 'the fundamental rule of protection under the First Amendment, that a speaker has the autonomy to choose the content of his own message.'")(quoting *Hurly v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 573 (1995)).   Indeed, plaintiffs are able to engage in express advocacy, subject to reporting requirements and some risk, however remote, that this speech may contribute to triggering, or if triggered, will precipitate, up to a point the public funding of an opponent's speech.

Admittedly, the speech theoretically being impinged is still core, political speech. Indeed, expressly and directly urging a vote for or against a candidate must be at or near the fiery center of free speech.   But it is also the most overt tie of the speaker *to the candidate* and, therefore, the most likely to create an appearance of bias should the speaker (or those of similar special interest) later appear before the court.   Moreover, it is a type of speech that can, under the Act as applied, be easily avoided without meaningfully diluting the power of its message and is, therefore, unlikely to hit a trigger *or* chill speech.   On the contrary, as previously discussed, recent elections have involved robust, even overwhelming, independent expenditures extolling both the virtues and (real or imagined) faults of candidates without the overt message to vote "for" or "against" ever being expressly stated and, therefore, ever becoming reportable.   Further, plaintiffs

have never asserted that the political speech they intend to engage in, or are refraining from engaging in, is the narrow, express advocacy regulated under the Act. Therefore, on the record before the court, the actual burden placed on plaintiffs' free speech rights appears minimal.[18]

Moreover, plaintiffs have failed to establish their speech actually has been or will be meaningfully burdened by the Act's matching funds provision. Certainly plaintiffs' vague assertions of self-censorship appear suspect in light of the remote possibility that their speech will trigger a grant of supplemental, public funds to an opponent. This is in distinct contrast to facts in *Davis* and *Scott,* where the plaintiffs had both the ability and likelihood of hitting a trigger. The closer case would be *Green Party*, where plaintiffs, as here, offered no evidence that they or others had the means to trigger any supplemental grants, but even there the Second Circuit still found the Green Party's endorsement was enough to create a possibility that its members and other supporters could trigger the

---

[18] For purposes of the upcoming spring election, the aspect of the Act that is most troublesome under *Davis* is the asymmetry between the two participating candidates, if supplemental funds were actually triggered by independent disbursements outside the control of either candidate. For example, if only one of the candidates confront independent groups who collectively spend over $360,000 on express advocacy, then only that one will receive supplemental public funds, while the other would have to make do with the initial $300,000 grant for the general election. Even so, this is a risk both candidates accepted when taking public funds. Plus, the additional funding in that scenario would likely be used to respond to asymmetrical, independent endorsements, which is not to minimize its possible deterrent effect on independent expenditures, though here the court finds it outweighed by the State's interest in avoiding an appearance of bias.

matching fund provision.   616 F.3d at 243.   Here, the risk of the named plaintiffs triggering is sufficiently remote to make any alleged chilling of speech extremely remote.[19]

At most, plaintiffs' claim of possible "self-censorship" is a tactical decision, not unlike one faced by all contributors to a campaign regardless of the Act's matching funds provisions.  Whenever one candidate or her supporters spend money to facilitate political speech, they must weigh the potential benefit of getting out their message against the opposing candidate's and his supporter's ability to respond, as well as the strength of that candidate's opposing argument.[20]

### 2.  Passing strict scrutiny

The Impartial Justice Act's matching fund provision creates a minimal, and at least in the near term almost wholly theoretical, burden on plaintiffs' free speech, but the effect, however remote, could nevertheless be to deter or at least shape core political speech to avoid asymmetrical, public funding going to one's opponent.  To the extent that burden is real, it requires application of strict scrutiny to the subject provision which must both further a compelling interest and be narrowly tailored to achieve that interest. *Wis. Right to Life, Inc.*, 551 U.S. at 464.

---

[19]  This is especially true for the spring judicial election, where a $360,000 trigger must be reached and less than $14,000 of independent disbursements have been reported with less than a week to go.

[20]  In fact, under the Act, independent entities have the advantage of knowing that the participating candidate will only have the ability to respond until he or she hits the $300,000 primary cap or $900,000 cap in the general election.  While a similar cap existed in *Green Party*, the Act's matching funds provision is not like Florida's, which left "no doubt" that the candidate being opposed would receive substantial, additional money. *Scott,* 612 F.3d at 1291.

Defendants contend the governmental interest served by the Act's matching funds provision is to provide an incentive for candidates running for a seat on the Wisconsin Supreme Court to choose public financing, which in turn reduces bias or the appearance of bias, or worse corruption or the appearance of corruption, in state judicial races. Plaintiffs argue that burdening the speech of independent entities in no way serves this purpose.

Whatever its other purposes or effects, the matching funds provision, certainly serves as an *incentive* for candidates for Wisconsin Supreme Court Justice to choose to participate in public financing.  Once a candidate limits their receipt of private contributions, the *appearance* of bias or corruption for that candidate is also unquestionably reduced because the participating candidate's ability to raise money from private donors is severely limited.  Because a participating candidate receives the vast majority of his or her campaign monies unfettered from the state, any chance of the candidates obtaining large, corrupting private contributions from members of a single interest group is all but eliminated.

Of course, the Act does nothing about independent expenditures by third-parties on "issue advocacy," but at least the judicial candidates or their proxies are not engaged in the unseemly process of raising and spending large sums of money directly, nor in regularly having those same contributors appearing before them as counsel or parties.  So, too, providing a participating candidate with supplemental funds when independent disbursements for express advocacy surpass $360,000 reduces the incentive to forego public finances altogether.

Preventing corruption, and its appearance, through public financing has long been found to be a significant governmental interest. *See Buckley*, 424 U.S. at 96 ("It cannot be gainsaid that public financing as a means of eliminating the improper influence of large private contributions furthers a significant governmental interest."). In fact, some courts have found that creating an incentive for candidates to choose public financing in an effort to prevent and reduce the appearance of corruption is so compelling it would survive strict scrutiny. *See McComish*, 611 F.3d at 526 (citing *Rosenstiel*, 101 F.3d at 1553); *Vote Choice, Inc. v. DiStefano*, 4 F.3d 26, 39-40 (1st Cir. 1993)).

Wisconsin's interest in safeguarding even an appearance of bias is stronger than any of the public financing statutes considered by courts to date. The Act covers *only* campaigns for a seat on the state's highest court. As the United States Supreme Court recognized in *Caperton v. A. T. Massey Coal Co.*, 129 S. Ct. 2252 (2009), the need to insure judicial elections are free from any appearance of bias or corruption is unquestionably stronger than the need in elections for legislative or executive offices. *Id.* at 2266. ("The Conference of the Chief Justices has underscored that the codes [of judicial conduct] are the principal safeguard against judicial campaign abuses that threaten to imperil public confidence in the fairness and integrity of the nation's elected judges." (Internal quotation omitted)). *See also Republican Party of Minn. v. White*, 536 U.S. 765, 793 (2002) ("Judicial integrity is . . . a state interest of the highest order.") (Kennedy, J., concurring).

Members of "political" branches of government are expected to be representative of and responsive to the interests of their electoral constituencies, while judges -- even

when popularly elected -- are *not* representative officials, but rather are expected to be, and to appear to be, impartial and independent in applying the rule of law.  The Fourth Circuit recently provided a succinct explanation for the long-standing, fundamental importance of an impartial and independent judiciary:

> The concern for promoting and protecting the impartiality and independence of the judiciary is not a new one; it dates back at least to our nation's founding, when Alexander Hamilton wrote that 'the complete independence of the courts of justice is peculiarly essential' to our form of government.

*Leake*, 524 F.3d at 441 (quoting *The Federalist No. 78*, at 426 (E.H. Scott ed., 1898)).

The Wisconsin Legislature passed the Impartial Justice Act in an effort to protect the impartiality and independence of the Wisconsin Supreme Court by limiting even the appearance of impropriety in campaigns for a seat on that court, including a public financing option and matching funds provisions.  At minimum, on the record before the court, Wisconsin's efforts through the Act's public financing incentives are sufficiently compelling to allow for some potential, and still mainly theoretical, impingement on speech, even, perhaps especially, political speech.

Plaintiffs stand on stronger footing in challenging whether the triggering provision is narrowly tailored to achieve the state's interest.  Undoubtedly, in an election for a seat on the Wisconsin Supreme Court, the matching funds provision has a *substantial* relation to protecting the impartiality and independence of the judiciary by fighting against bias and corruption, as well as the appearance of each.  In finding that Arizona's matching funds provision was substantially related to the state's anticorruption interest, the Ninth Circuit explained that "[i]n order to promote participation in the [public financing]

program, and reduce the appearance of *quid pro quo* corruption, the State must be able to ensure that participating candidates will be able to mount competitive campaigns . . . [because] [a] public financing system with no participants does nothing to reduce the existence or appearance of *quid pro quo* corruption." *McComish,* 611 F.3d at 526-27.

Without the matching funds and triggering provisions, candidates for a seat on the Wisconsin Supreme Court may not choose public financing under the Act for fear of being easily outspent by a privately-funded opponent and his or her supporters. Thus, encouraging participation in the public financing of supreme court candidate's campaigns undoubtedly bears a substantial relation to the sufficiently compelling governmental interest in maintaining an impartial court untainted by an appearance of bias.

Of course, there may be less restrictive ways to accomplish the same goal. One would be to make the initial, public grant so large as to make participation too attractive to decline regardless of the private resources available to the candidate's opposition. If this were ever a realistic alternative for the State of Wisconsin, it is no longer.[21] Similarly, Wisconsin could adopt a practice of appointing members to its highest court. Not only would this require a constitutional amendment, however, it would ultimately deny voters a direct voice in choosing the court's members. Neither of these alternatives is sufficiently realistic to render the State's use of matching funds unconstitutional. *See, e.g., Weinberg v. City of Chicago*, 310 F.3d 1029, 1040 (7th Cir. 2002) ("To satisfy the

---

[21] Indeed, even the current public financing provided may give way to current budget pressures. Larry Sandler, *Budget Defunds Elections*, Milwaukee Journal Sentinel, Mar. 27, 2011, www.jsonline.com/news/statepolitics/118749889.html.

narrowly tailored test, an ordinance need not be the least restrictive method for achieving the government's goal.").

Of course, the asymmetrical grant of supplemental funds to one's opponent may arguably deter otherwise legitimate political speech.  Further, because the provision accounts for only express advocacy, it is not preventing the appearance of bias or corruption created through independent issue advocacy, which in recent years has become a huge portion of spending on Wisconsin Supreme Court elections. Nevertheless, the State of Wisconsin has taken a step to limit an appearance of bias and corruption on its highest court.  If third parties spend bundles of cash expressly advocating the election of a Wisconsin Supreme Court Justice, the public, unsurprisingly, is likely to perceive the appearance of bias or even corruption *if -- and* for the largest of contributors, what often turns out to be *when --* those third parties later appear before the Wisconsin Supreme Court.  *See, e.g.*, *Caperton, Id.* at 2263-64 ("We conclude that there is a serious risk of actual bias--based on objective and reasonable perceptions--when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent.").  In the end, a matching funds provision is a reasonable and feasible method to achieve the state's compelling interest.

## C.  Reporting And Direct Contribution Limits

Plaintiffs also challenge the Act's reporting requirements, as well as its limits on private contributions.  Their success in challenging the reporting requirements rises and falls with their success on the challenge to the matching fund provision.  If the reporting requirements' sole function was to enforce an unconstitutional provision, it would be unconstitutional as well.  *See Buckley*, 424 U.S. at 75-76.  Since the court has found the matching fund provision constitutional, the only remaining, arguably valid challenge is to the acceleration in reporting requirements to 24 hours during the last six weeks before an election.  Again, however, in light of the limited category of disbursements that must be reported and Wisconsin's interest in encouraging candidates to choose public financing of supreme court campaigns, this court is not prepared to find it an undue burden for expenditures of more than $1000.[22]

Plaintiffs' challenge to contribution limits meets a similar fate.  Contribution limits become unconstitutional when they "prevent[] candidates and political committees from amassing the resources necessary for effective advocacy."  *Id.* at 21.  Plaintiffs fail to offer any evidence that the $1000 limits would have such an effect.  Moreover, the amount in itself -- $1000 -- does not appear so low as to even raise suspicion about candidates being unable to mount effective campaigns.  *Cf. Randall v. Sorrell*, 548 U.S. 230, 249 (2006) ($200 limit on contributions to candidates for state wide office --

---

[22] Plaintiffs also complain that the language of the Act and GAB regulation is not sufficiently clear as to what must be reported.  Given the likelihood that GAB will accept any good faith reporting of actual or committed disbursements for express advocacy exceeding $1000, this complaint does not give rise to a cognizable constitutional violation absent contrary proof in practice -- especially in light of the minor, monetary fines imposed for a violation.

governor -- was too low in light of fact that limit was twice as low as other states' lowest contribution limits on state wide offices -- $500).

Plaintiffs, nonetheless, point to higher contribution limits for those contributing to the campaigns of appellate and some circuit judges as evidence that the contribution limits here are too low or at least designed to deter candidates from declining to participate in public financing.   This court will not second guess the Wisconsin Legislature's decision to be more concerned with the appearance of bias and corruption in regard to the state's highest court, resulting in lower contribution limits, nor will it impute an unconstitutional motive when other explanations are reasonable.  Courts have "'no scalpel to probe' each possible contribution level" and, therefore, ordinarily "defer[] to the legislature's determination of such matters."   *Randall*, 548 U.S. at 248 (quoting *Buckley*, 424 U.S. at 30).  In the end, without any evidence from plaintiffs that the $1000 limits prevents effective, private campaigning, this court will defer to the legislature's determination.

ORDER

IT IS ORDERED that:

(1)  The Kloppenburg for Justice Committee's unopposed motion for leave to file an *amicus* brief (dkt. #100) is GRANTED;

(2)  Plaintiffs' motion to strike exhibit #2 to the *amicus* brief (dkt. #102) is DENIED;

(3)  Plaintiffs' motion for summary judgment (dkt. #55) is DENIED;

(4)  Defendants' motion for judgment on the pleadings (dkt. #56) is deemed a cross-motion for summary judgment and GRANTED; and

(5)     Plaintiffs' motion for a temporary restraining order and preliminary
         injunction (dkt. #84) is DENIED.

Entered this 31st day of March, 2011.

                        BY THE COURT:

                        /s/
                        _____
                        WILLIAM M. CONLEY
                        District Judge